# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | |
|---|---|
| **SCOTT D. DALESANDRO, et al.,**<br>**On behalf of themselves and**<br>**all others similarly situated,** : | **Case No.: C-1-01-109** |
| : | |
| : | **Judge Sandra S. Beckwith** |
| : | |
| **Plaintiffs,** : | |
| : | **NOTICE OF FILING** |
| **v.** : | |
| : | |
| **THE INTERNATIONAL PAPER** : | |
| **COMPANY,** : | |
| : | |
| **Defendant.** : | |

Please take notice that Plaintiffs have filed the following exhibits, numbers one through eight, in support of Plaintiffs' Reply Memorandum in Support of Their Motion For Attorneys Fees, Expenses, Interest and Incentive Awards which was filed on October 21, 2003. These exhibits were unable to be attached to that filing via the ECF system in spite of numerous attempts, due to our being closed out of the Court's website each time we tried to place an attachment with the Reply. We were also unable to receive assistance from the Help Desk which was closed at that time.

Respectfully submitted,

s/Theresa L. Groh
Theresa L. Groh (0029806)
John C. Murdock (0063749)
Murdock Goldenberg Schneider & Groh, L.P.A.
700 Walnut Street, Suite 400
Cincinnati, Ohio 45202-2011
Telephone: (513) 345-8291
Facsimile: (513) 345-8294
Trial Attorneys for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 22, 2003, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Michael Roberts, Esq., Graydon, Head & Ritchey LLP, 1900 Fifth Third Center, 511 Walnut Street, Cincinnati, Ohio 45202. I hereby certify that I mailed the Reply and exhibits via overnight mail service on October 21, 2003 to the following non CM/ECF participants: W. Carter Younger, Esq. and James P. McElligott, Esq., McGuire Woods, LLP, One James Center, 901 East Cary Street, Richmond, VA 23219-4030.

s/Theresa L. Groh
Theresa L. Groh

**Appendix**

1.  Transcript of June 20, 2003 telephone conference with the Court

2.  *Parke v. First Reliance Standard Life Insur. Co.,* 2002 U.S. Dist. LEXIS 18762 (D. Minn. 2002)

3.  October 21, 2003 Declaration of Richard S. Wayne

4.  *Grand Traverse Band of Ottawa and Chippewa Indians v. Director, Michigan Department of Natural Resources,* 1998 U.S. App. LEXIS 15145 (6th Cir. 1998)

5.  *Sees v. Fagen,* 2002 U.S. Dist. LEXIS 4845  (N.D.Tex. 2002)

6.  Affidavit of James Hillmann

7.  Champion International Corporation Reorganization Severance Policy #828

8.  *Day v. NLO, Inc.,* 1995 U.S. Dist. LEXIS 22316 (S.D. Ohio 1995)

# EXHIBIT 1

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

- - -

| | | |
|---|---|---|
| SCOTT D. DALESANDRO, et al., | . | CIVIL ACTION NO. C-1-01-109 |
| | . | |
| Plaintiffs, | . | Cincinnati, Ohio |
| | . | |
| - v - | . | Friday, June 20, 2003 |
| | . | 3:00 p.m. Conference |
| INTERNATIONAL PAPER COMPANY, | . | |
| | . | **Telephone Conference** |
| Defendant. | . | |

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE SANDRA S. BECKWITH, JUDGE
TRANSCRIPT ORDERED BY:  Theresa L. Groh, Esq.

APPEARANCES:

For the Plaintiffs:    MURDOCK, GOLDENBERG, SCHNEIDER & GROH,
                       L.P.A.
                       BY:  Theresa L. Groh, Esq.
                       and   John C. Murdock, Esq.
                       700 Walnut Street, Suite 400
                       Cincinnati, Ohio   45202

For the Defendant:     McGUIRE WOODS, LLP
                       BY:  James P. McElligott, Esq.
                       and  W. Carter Younger, Esq.
                       One James Center
                       901 East Cary Street
                       Richmond, VA   23219

                       GRAYDON, HEAD & RITCHEY, LLP
                       BY:  Michael Roberts, Esq.
                       1900 Fifth Third Center
                       511 Walnut Street
                       Cincinnati, Ohio   45202

Law Clerk:             Patrick F. Smith, Esq.

Court Reporter:        Mary Ann Ranz

2

```
1                    FRIDAY, JUNE 20, 2003

2                 IN CHAMBERS CONFERENCE          (3:15 p.m.)

3          THE COURT:  Hello?

4          MS. GROH:  Hi, Judge.

5          MR. McELLIGOTT:  Judge Beckwith.

6          THE COURT:  I'm sorry for keeping you waiting.

7   We're having telephone conferences hot and heavy here.

8          MR. McELLIGOTT:  This is Jay McElligott from

9   Richmond, Virginia, with McGuire Woods.  And my partner,

10  Carter Younger, is here, and Mike Roberts is there in his

11  office.

12         MR. ROBERTS:  Good afternoon, Your Honor.

13         MS. GROH:  And, Judge, for the plaintiff, this is

14  Terri Groh, and John Murdock is here with me.

15     Judge, we've all decided that it was necessary to come to

16  you today.  You do not have anything before you, but you put

17  an order on dated March 21st, and since that time the parties

18  have been working together to try to decide what we could

19  agree upon and what we had to disagree upon to get to the

20  final judgment entry.

21     And where we are now is, we would like to ask the Court,

22  since we've been unable to make a lot of headway in the last

23  few months, we'd like to ask the Court to set a couple of

24  dates for deadline.  And then we anticipate that we'll have

25  to brief a variety of issues for you, for you to be able to
```

3

1   put on a final judgment entry, which will have a lot of what

2   you had in our Order on class liability and issues.  And we

3   also have a notice that we'll submit to you that will go out.

4      Then you'll have to -- we'll ask you to please make

5   concise findings and an award of damages, to talk about the

6   certification, how that's appropriate under the provisions of

7   Rule 23, and there are a couple of ways to do that.

8      We're going to be moving for attorneys' fees and interest

9   and then incentive award, so that is the outstanding issue

10  that still has to be addressed that would be contained in the

11  final judgment entry.

12      We're now working on -- we want International Paper to

13  give us calculations.  You know, as we read your Order, that

14  is the next step, is we have to come to a number for damages.

15  And we would like -- the plaintiffs would like the Court to

16  set a date by which International Paper has to provide the

17  calculations for each class member to us, and then we would

18  like the Court to set a date by which notice has to be

19  submitted to you for approval.  Hopefully, we can agree upon

20  the notice.  We've been working on that.  If not, we need a

21  date by which we just have to cut bait and give it to you.

22  It then should be a pretty easy decision for you to say which

23  notice -- or the notice goes out.  As soon as you say, we'll

24  send the notice out to the employees.  They will then have

25  time to review calculations that International Paper has

4

1    provided.  And in the meantime, we'll do the briefs on the

2    final judgment entry.

3            MR. McELLIGOTT:  Your Honor, if I may, this is Jay

4    McElligott.  I was a little surprised to hear Terri say we

5    haven't made much progress.  Also surprised to hear Terri say

6    that we hadn't given them the calculations on severance,

7    because Terri's had those, I think, for more than a month,

8    including the details of everyone's service date, year of

9    service, how it was calculated, and the rest.

10           MS. GROH:  Can I stop you, because there really

11   isn't a dispute on that?  I'm sorry if I mischaracterized

12   that.  We're waiting for the calculations for each person to

13   go out and the notice.  That is what I meant.

14           MR. McELLIGOTT:  And again, Your Honor, I -- I would

15   say I think John and Terri and I have been working very

16   constructively in providing information.  The only piece of

17   information with respect to amounts has been -- really

18   relates to an issue that has never been litigated at all in

19   the case but it is a very important issue, and that is that

20   there are 17 individuals who were age 49 with ten or more

21   years of service at the -- at the time of the sale of

22   February 1st, 2001.  Those individuals were potentially

23   eligible to get an enhanced retirement benefit -- not under

24   the severance plan, but under the retirement plan, and so

25   International Paper had to figure out, What do we do on this?

5

1    Is this another issue that is a different plan we treat

2    differently?  We have to have a different claims procedure.

3    What is the right way to deal with us it? -- because again,

4    it is a fiduciary question determining how that works.

5        International Paper has decided that if, in fact, the

6    Court's decision is upheld, that those 17 individuals will

7    all get the enhanced retirement benefit.  It's called a Flex

8    6 benefit.  That we communicated that to John and Terri more

9    than a month ago.  And -- but, frankly, I've been trying to

10   figure out how this thing works and get John and Terri the

11   information they needed on this.  And frankly, Your Honor,

12   that's the area where there has been some delay on our part

13   and it's been a complication with my schedule and the

14   schedule of people that understand the benefits issues,

15   because it's not a simple issue to figure out how this works.

16   But we anticipate that we will have that information to John

17   and Terri in terms of just the actual numbers on this by next

18   week.  So, in terms of getting the information to John and

19   Terri, that's, I think, not a problem.

20       What we agreed with the plaintiffs several weeks ago --

21   and, Your Honor, our position has been that we will -- we'll

22   provide whatever information anyone needs to verify these

23   amounts and calculations that we have provided.  So, we

24   thought that this is really sort of a straightforward matter

25   of calculating the benefits, sort of what your last salary

6

1   was, what your years of service was, and to a certain extent

2   what your age is, so we would prepare individual exhibits for

3   each of the class members.

4       Those exhibits would contain those calculations.  If

5   someone said, "Hey, I think my salary was higher than this,"

6   that's a matter that they can calculate.  We just thought it

7   would be easy -- and when I say "We," I think that's John and

8   Terri as well as us -- to get that information in the hands

9   of the class members so that they can double check those

10   amounts, if they have questions.  Again, we will provide

11   whatever information and we provided whatever information

12   John and Terri has asked for.

13       But there is one additional piece that relates to

14   interest calculations we haven't yet gotten them.  We

15   discussed the concept of interest in a fair amount of detail,

16   had not reached agreement on that as Terri acknowledged.  But

17   we want to get information to John and Terri on the question

18   of to what extent were people paid in lump sums, or were they

19   paid over time, because that may have some impact on how the

20   interest issue works, and we're going to provide that

21   information and, again, any other information that folks have

22   asked for.

23       Now, John and Terri were good enough to send us a

24   proposed draft class notice several weeks ago, I think it was

25   more than a month ago, and this is another area where I have

1   been slow in getting back to them with our comments on the

2   draft notice, and I will take responsibility for that in not

3   getting back sooner than I did.  I only got back to John and

4   Terri this afternoon, and I'm not sure either one of them, in

5   fairness, have even had a chance to look at it, and again

6   that is my responsibility for that delay, Your Honor.  But it

7   was complicated by the fact we've got summer vacations and

8   people moving in different directions and getting comments

9   from all concerned.

10      I don't think there is a significant difference in

11  substance, and there is no dispute that the individual -- the

12  notice will tell every individual what their severance amount

13  is, how it was calculated.  And if they are among the

14  individuals who are entitled to this Flex 6 benefit, they

15  will have information on that in dollar amounts.  If they are

16  not among people entitled to Flex 6, they will be advised,

17  "Flex 6 is not applicable to you."  I don't know whether

18  we'll have issues on that front, but everyone will be getting

19  that information.  And, hopefully -- and again I'm -- and I'm

20  in no way criticizing Terri and John, because on that -- on

21  that respect, we have been slow in getting the information.

22  But we have asked Terri and John for information on their

23  attorneys' fees in terms of the amount and how to calculate

24  any of that.  But we've also agreed that we've got to get the

25  notice out first.

8

1    So, assuming we get the notice agreed upon shortly, I

2  think it can be submitted to the Court and we can move

3  forward on that.  But we also need the plaintiffs to give us

4  an amount.  We've been advised they had a contingent fee

5  arrangement on the attorneys' fees.  We haven't seen anything

6  on that.  I assume there is some documentation on that.  Your

7  Honor, we do not believe in doing, you know, discovery in

8  this area.  We think professionals ought to know enough about

9  the attorneys' fees issue to be able to supply appropriate

10  information on this.

11    There are a number of issues that we have discussed in

12  general in terms of what is the basis for the fee, have not

13  gotten agreement for that, but we need to know whether we

14  will have to do discovery.  So, we will need that information

15  on attorneys' fees.  But, again, I'm not suggesting in any

16  way that Terri and John have not been forthcoming on that

17  because, as I say, we've been the ones who have been somewhat

18  behind the power curve in getting the information to them on

19  the notice issue, and we understand the notice has to come

20  first.

21    On the interest issue, as I said, we do owe some

22  information to Terri and John on that.  Hopefully, we will

23  have that to them if not next week, then the week after.

24  Again, we've been trying to get the notice issues out of the

25  way first.  And then it's -- really, they're only about four

1    or five different options.  But I anticipate from our

2    discussions that we will not have agreement on the interest

3    issues -- I'm talking about the prejudgment interest

4    issues -- or on the attorneys' fees issue, so ultimately the

5    Court will have to decide those.  But I think, hopefully,

6    we'll try to tee them up in a way that's pretty

7    straightforward for the Court to decide.

8         I think we tried to make it clear to Terri and John that

9    we are not contesting their entitlement to attorneys' fees in

10   the -- in the case.  We recognize as the case stands now they

11   would ordinarily be entitled to attorneys' fees.

12        Again, we are -- we do anticipate in all respects, as the

13   Court would expect, the -- appealing the Court's decision,

14   but we see that again as a very simple appeal.  Our position

15   has been all along, Your Honor, it is really just a question

16   of interpreting what this plan says.  And it's not something

17   that involves a lot of discovery.  It's simply, "What does

18   this mean?"  The Court reached this conclusion, decided

19   against International Paper's position, we understand that,

20   but that's really all that's ever been involved in this case.

21        So, we do not think that some of the other issues in this

22   case were appropriate subject for attorneys' fees.  John and

23   Terri, I'm sure, have a different point of view.  But that's

24   sort of the nature of the -- of where the parties' disputes

25   are going to be.

And, you know, with respect to the issue of attorneys' fees and with respect to the issue of interest, this Court has considerable discretion in making those decisions and we recognize that.

So, that's -- that is basically where we are.  Hopefully, we will have a notice for the Court.  But I wanted the Court to know that in terms of the dollar amount, there's never been any problem on International Paper in getting those dollar amounts to plaintiffs or ultimately to the class members.

MS. GROH:  Judge, if I may, this is Terri Groh again.  Just to clarify, I certainly did not mean to intimate that counsel were not working well together.  We have from the beginning and we will continue to.  That has not broken down.

What we did get a month ago -- and Jay is right, I got a chart, but it's called Potential Severance Benefits Under Plan A 28.  And I -- maybe it was my misunderstanding:  I thought that was just to give us an idea of what kind of numbers we were talking about, and we were going to pursue the possibility of settlement and using it for that purpose.

And what I'm asking for, so that the Court is clear and, Jay, so you know, I'm just asking for those individual Exhibit A's that will go with the notice that -- that shows International Paper's calculations for each person.

11

1          MR. McELLIGOTT:  Right.  And, Terri, I'm sorry if I

2    wasn't clear, but I think the word "potential" was in there.

3    It wasn't my word, but I think we got that from International

4    Paper because, again, it is International Paper's view these

5    people were not entitled to severance, but if they were, what

6    would those amounts be?  And again, it is an amount that's

7    calculated by the years of service and age and last salary.

8    And I think, Terri, if I didn't make it clear before, that is

9    the best information that we have.  I think you also have the

10   last known addresses in there as well.  Isn't that included

11   in that information?

12          MS. GROH:  Yes.  Yes, it is.  But, Jay, did I

13   misunderstand?  I thought International Paper was going to do

14   the exhibits that were going with the notice.

15          MR. McELLIGOTT:  Well, we will put those in

16   individual exhibits.  But -- and again, I'll note we need to

17   get some agreement on the form of that exhibit, Your Honor.

18   This is where, again, the delay in getting the form to Terri

19   is on my head, and it really was a matter of trying to figure

20   out how to deal with the Flex 6 issue.  This was merely a

21   matter of severance.  The severance is reasonably

22   straightforward.

23      With respect to the retirement plan benefits,

24   International Paper had to figure out, Well, okay what do we

25   do with this?  Can we just make the decision?  Is there an

12

1    additional procedure we have to go through?

2        And after looking at the issue, International Paper said,

3    "No, we will pay these amounts if the Court's order is upheld

4    on appeal, and we will put those amounts out there."

5        And again in terms of plugging all those into individual

6    Exhibit A's, we could do all of the Exhibit A's based on the

7    -- with the severance amounts.  There would just be 17, which

8    didn't have the -- which we'd have to add the retirement plan

9    issues for.  So that's the only holdup on that.

10        MS. GROH:  Jay, can we jointly ask the Court to set

11    a date for us to get the notice and the Exhibit A's finished

12    and submitted to the Court?

13        MR. McELLIGOTT:  I absolutely agree.

14        MS. GROH:  Okay.  And we'd like -- we think -- can

15    it be done in two weeks?

16        MR. McELLIGOTT:  I think that's reasonable.

17        THE COURT:  Well, that falls on July the 4th.  How

18    about if we said July the 7th?

19        MR. ROBERTS:  That's a Monday.

20        MR. McELLIGOTT:  How about July the 8th?

21        MR. ROBERTS:  Probably that Monday will be a

22    disaster.

23        THE COURT:  All right, July the 8th.  And you'll

24    submit the notice -- proposed notice to the class, including

25    Exhibit A's, which will be the individual calculations of the

13

1   retirement plan or severance package as appropriate for the

2   individual plaintiffs.  Is that an accurate statement?

3         MR. McELLIGOTT:  I think that is, Your Honor.

4         MS. GROH:  Yes.

5         THE COURT:  Okay.  Then the next step would be, I

6   assume, that your notice form has dates for responses from

7   the individual plaintiffs?

8         MR. McELLIGOTT:  The parties have agreed on the

9   plaintiffs would have 30 days.  We were discussing earlier

10  today whether more time is needed on that.  But our tentative

11  sense is 30 days.  I don't know if Your Honor has experience

12  -- or some other thoughts.

13        THE COURT:  That's probably all right.  We may end

14  up -- occasionally there are requests to extend the 30-day

15  time limit, and we can deal with those on an individual

16  basis.

17        In the interim, can we proceed on -- let me ask you this:

18  On the exhibits, are you anticipating that you will just

19  simply say that there may be or there will be interest of an

20  amount as yet to be calculated in this --

21        MR. McELLIGOTT:  The -- again, I don't know if --

22  Terri and John may not have had a chance to see that.  The --

23  we, in our revised notice which we sent to the plaintiffs,

24  included a statement that the plaintiffs intend to request

25  the Court for interest.

14

1     THE COURT:  Okay.

2     MR. McELLIGOTT:  Which I'm confident --

3     MR. MURDOCK:  Your Honor, John Murdock for the

4  plaintiffs.  What I would think the parties would agree to in

5  our proposed notice for court approval is something to the

6  effect that the counsel for plaintiffs will be seeking

7  prejudgment interest, which will then be determined at the

8  Court's discretion.  Something to that effect.  But we will

9  give them notice that it will be sought and then the Court

10  will decide what that amount is.

11     THE COURT:  All right.  Then what would be an

12  appropriate deadline, do you think, for submitting briefs on

13  the issue of prejudgment interest?  And I'm assuming it would

14  be most helpful for us if the plaintiffs would file a

15  memorandum setting forth their position, and then the

16  defendant would respond, and then the plaintiffs would have

17  the last word, or reply.

18     MS. GROH:  Judge, that's fine by us.  This is Terri

19  Groh for the plaintiff.  And I would -- it may be ambitious,

20  but I would think that motion for interest would also include

21  the motion for the other items.

22     THE COURT:  Attorneys' fees.

23     MS. GROH:  Attorneys' fees and costs --

24     THE COURT:  Okay.

25     MS. GROH:  -- incentive awards to the class

1  representatives, and just to propose the language that you

2  would need for the final entry for finding and awarding the

3  damages, the severance pay, and the certification of the

4  class, we would do all that at once.

5      MR. McELLIGOTT:  And we're in agreement with that,

6  Your Honor.

7      What we wanted to do, Your Honor, under Rule 54, make --

8  make it clear that the judgment would not be entered until

9  all of these matters were laid out, so the Court of Appeals

10  would have a complete record to deal with --

11      THE COURT:  Right.

12      MR. McELLIGOTT:  -- on those issues.  With respect

13  to the briefs, Your Honor, I assume on the interest question,

14  I don't know that there is much factual information to be

15  submitted.  We could maybe stipulate with Terri what Terri

16  and John -- maybe we'd submit affidavits or something from

17  someone who can testify as to interest rates or calculations

18  or whatever.

19      But with respect to attorneys' fees, again we don't know

20  the amounts.  We don't know -- we understand there's an

21  agreement but haven't seen it, and we do need to get some

22  detail, all of which we discussed with the -- with John and

23  Terri.

24      So, what we would like to do is to have -- have the --

25  eventually get an amount in advance of the briefing, an

16

1   amount from Terri and John how they calculated it.  We would

2   like a breakdown of how the time was spent.  In the Sixth

3   Circuit, time spent on the administrative aspects of ERISA

4   benefit claims are not a subject of attorneys' fees.  John

5   and Terri may try to find an exception to that, but that is

6   an issue.

7       We understand that the plaintiffs will be seeking sort of

8   a percentage award or common fund-type award.  We believe the

9   appropriate standard in the Sixth Circuit is the lodestar,

10  what were the hours.  So, we do need a fair amount of

11  information on that, Your Honor.

12      And we really need -- if there are disputes that we need

13  to explore with discovery, which I don't like to do and I

14  really suspect we won't have to do it, but we want to know if

15  there are discovery disputes before we have to be dealing

16  with motions.  So, if we could get the information from the

17  plaintiffs as sort of a precondition to filing the motion,

18  that would -- that would let us know what we need to be able

19  to respond to that.

20      But again, I want to make clear we do not intend to be

21  unreasonable about either attorneys' fees or interest.

22  That's not the approach International Paper is taking in this

23  case.  We basically have always identified what our

24  interpretations are.  If it's wrong, International Paper

25  wants to do the right thing, including reasonable attorneys'

17

1  fees and reasonable prejudgment interest.  But, we want to do

2  it in a way that is appropriate under the facts.

3       MS. GROH:  And, Judge, this is Terri Groh.  We

4  will -- we will continue to work with trying to come to an

5  agreement and we will only brief what's in dispute.  I'll

6  take responsibility for not getting that information to

7  defendants right away, because we were working on that first

8  piece, which is a notice right now.  But, certainly, I have

9  every intention of trying to continue to work toward an

10  agreement and briefing only what is in dispute.

11       THE COURT:  Well, let me say this.  Obviously, I'm

12  gonna have to have the information to determine what is an

13  appropriate standard for establishing the attorneys' fees in

14  the first instance and then for determining the amount of the

15  attorneys' fees.  So, I would anticipate that in your motion

16  that you would set forth what you consider to be the basis

17  upon which I should determine the attorneys' fees and then

18  the underlying information.  Typically in our jurisdiction it

19  would be an affidavit of counsel outlining the hourly rate

20  and the time spent and the expenses incurred.  If you pled

21  that and attached an affidavit, then I would think that if

22  International Paper needs additional information, they could

23  request it.

24       And I'm understanding from you, Ms. Groh, that you would

25  provide any information sought, unless it's most

1    extraordinary, and then the defendant would respond, and we

2    could build in some extra time for the response in order to

3    anticipate the possibility that some additional information

4    is necessary, or we can establish a schedule, assuming

5    additional information is not going to be necessary.  And if

6    it is, then you all can contact the Court and ask for an

7    extension of time in order to allow some discovery on the

8    issues before the defendant responds, rather similar to a

9    motion for summary judgment where the party against whom the

10   motion is filed says, "I haven't completed my discovery

11   sufficient to respond."  Is this a reasonable approach?

12          MS. GROH:  Judge, on behalf of the plaintiffs, I

13   think we agree with everything you just said.

14          MR. McELLIGOTT:  That's fine, Your Honor.

15          THE COURT:  Well, okay.  In the first instance, Ms.

16   Groh, when do you think you could assemble your motion and

17   any necessary attachments covering all these various topics?

18          MS. GROH:  To be realistic, Judge, with the summer

19   schedule, I would ask for August 8th.

20          THE COURT:  Does that sound reasonable to you --

21          MR. McELLIGOTT:  That's fine.

22          THE COURT:  -- Mr. McElligott?  Okay.  And this is a

23   fairly complex motion with a lot of different topics.  Is

24   maybe September the 8th a reasonable time, or do you think

25   you would need --

1        MR. McELLIGOTT:  I think September the 8th is fine,

2   Your Honor.  Mr. Younger is telling me he's going to be out

3   of the country, so --

4        (Laughter.)

5        MR. McELLIGOTT:  Let me look real quickly at my

6   schedule and -- for that period of time.  September the 8th

7   is a Monday.  I wonder if we could make it September the 9th?

8        THE COURT:  Any objection?

9        MS. GROH:  No.

10       THE COURT:  September the 9th.  And is September the

11  23rd a reasonable date for a reply, or do you think you'd

12  need more time than that?

13       MS. GROH:  Give us 20 days, please.

14       THE COURT:  All right.

15       MS. GROH:  Can we go to the end of September?  How

16  about the 30th, since that's a Tuesday and Jay seems to like

17  Tuesdays?

18       THE COURT:  Is that satisfactory, Mr. Elligott?

19       MR. McELLIGOTT:  That's fine with me, Your Honor.

20       THE COURT:  All righty.  And the parties will serve

21  each other by facsimile or e-mail, or some other relatively

22  instantaneous means.

23       MR. McELLIGOTT:  Yes.

24       MS. GROH:  Yes.

25       THE COURT:  Okay.  Any other deadlines that we need

20

1    to establish?

2         MS. GROH:  No.  I do have an idea, though, about the

3    Exhibit A's that we set the deadline for before.  I think it

4    might be safe if International Paper could provide the

5    calculations on each Exhibit A to counsel, to plaintiffs'

6    counsel, and only the form to the Court, so that we don't

7    have to have a hundred and sixty Exhibit A's under seal.

8         THE COURT:  That's fine.

9         MR. McELLIGOTT:  I'm not -- I'm not sure -- I want

10   to make sure I understand.

11     Terri, are you saying that you -- you do not need the top

12   -- the actual form of Exhibit A until we file it with the

13   Court, but instead you just want the information that would

14   be in the Exhibit A's and you've already got the severance

15   information?

16        MS. GROH:  No.  Jay, can I stop you?

17        MR. McELLIGOTT:  Sure.

18        MS. GROH:  I would like International Paper to

19   provide the Exhibit A's with all the calculations but not to

20   file those, and to file those under seal, if you could.

21        MR. McELLIGOTT:  Oh, no.  Oh, I see what you mean.

22   You mean when we submit them to the Court.

23        MR. MURDOCK:  Right, just the form of Exhibit A, but

24   not each and every individual Exhibit A that we'd actually

25   send.

1        MS. GROH:  We need the actual Exhibit A, but the

2   Court does not.

3        THE COURT:  What I want from you is the proposed

4   notice with an attachment that only shows the format that you

5   are using for the Exhibit A's, with no particular person or

6   numbers in there.  Am I reading you correctly, Ms. Groh?

7        MS. GROH:  Yes, Judge.

8        MR. McELLIGOTT:  That's fine, Your Honor.  I think

9   that's a good idea.

10       THE COURT:  Okay.

11       MS. GROH:  But the plaintiffs' counsel still needs

12   the actual Exhibit A's with the calculations.

13       MR. McELLIGOTT:  Right.  So, again -- just again so

14   I understand, you would want to have the actual Exhibit A's

15   for each individual person?

16       MS. GROH:  Yes.

17       MR. McELLIGOTT:  Now, do we -- well, all right.

18   That's fine.  But the Court will simply get the form of

19   notice and the form of Exhibit A?

20       THE COURT:  Correct.  Anything else, folks?

21       MS. GROH:  Not from plaintiffs, Judge.

22       MR. McELLIGOTT:  I think that's it, Your Honor.

23       THE COURT:  Okay.  Very good.

24       MS. GROH:  Thank you for your time, Judge.

25       THE COURT:  All right.  We'll look forward to seeing

22

1    the proposed notice on July the 8th and plaintiffs' motion

2    and attachments August the 8th, defendant's response

3    September the 9th, and plaintiffs' reply September the 30th.

4    And as soon thereafter as we can, we'll either give you a

5    decision or let you know that we need to talk to you and

6    we'll set a hearing date.

7            MS. GROH:  Thank you, Judge.

8            MR. McELLIGOTT:  Thank you, Your Honor.

9            MR. MURDOCK:  Thank you, Your Honor.

10            THE COURT:  Thank you.  Bye-bye.

11            MS. GROH:  Bye.

12            MR. McELLIGOTT:  Bye-bye.        (3:50 p.m.)

13                        -   -   -

14                   PROCEEDINGS CONCLUDED

15                        -   -   -

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T E

I, Mary Ann Ranz, the undersigned, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


Mary Ann Ranz

Official Court Reporter

# EXHIBIT 2

LEXSEE 2002 U.S. DIST. LEXIS 18762

**JULIE PARKE, Plaintiff, v. FIRST RELIANCE STANDARD LIFE INSURANCE COMPANY, Defendant.**

**Civil No. 99-1039 (JRT/FLN)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA**

*2002 U.S. Dist. LEXIS 18762; 29 Employee Benefits Cas. (BNA) 1022*

**September 25, 2002, Decided**

**DISPOSITION:** Court found that defendant's initial denial of benefits was erroneous and that plaintiff was entitled to interest on delayed benefits as well as attorney's fees and costs.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**COUNSEL:** **[*1]** Mark M. Nolan, STAPLETON, NOLAN, MacGREGOR, & THOMPSON, St. Paul, MN, for plaintiff.

Joshua Bachrach, RAWLE & HENDERSON LLP, Philadelphia, PA, for defendant.

**JUDGES:** JOHN R. TUNHEIM, United States District Judge.

**OPINIONBY:** JOHN R. TUNHEIM

**OPINION:**

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR JUDGMENT**

Plaintiff Julie Parke brought this action under the Employee Retirement Income Security Act ("ERISA"), *29 U.S.C. § § 1001 et seq.*, seeking reinstatement of her long-term disability benefits, interest on her delayed benefits, attorneys fees and prejudgment interest. This matter was tried before the Court on November 5, 2001 to resolve the following issues: 1) whether defendant breached its fiduciary duties under ERISA in denying plaintiff's application for benefits initially and/or in suspending her benefits; 2) whether defendant is making proper offsets of plaintiff's social security benefits; and 3) whether plaintiff is entitled to attorneys fees and costs.

Based on the entire record and proceedings and the arguments of counsel, the Court makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

1. All of the Findings of Fact set **[*2]** forth herein are undisputed or have been proved by a preponderance of the evidence.

2. To the extent the Court's Conclusions of Law include what may be considered Findings of Fact, they are incorporated herein by reference.

3. Plaintiff is a 51-year old woman who is severely disabled as a result of complications from diabetes, from which she has suffered since childhood.

4. On June 1, 1998, she ceased working at her job as an account executive at Petry Media Corporation/Blair Television.

5. On August 18, 1998, Petry Media Corporation submitted an application for long-term disability benefits on Parke's behalf to defendant First Reliance Standard under a long-term disability policy, Policy No. LSC 020403. n1

n1 There has been some confusion over which policy was in effect at the time of plaintiff's application for benefits. The policy relied on by the parties on summary judgment is different from the one defendant relied on at trial. Defendant claims that the policy submitted at trial, which bears an effective date of August 1, 1997, is the correct policy. The Court therefore relies on that policy for purposes of this order.

Case 1:01-cv-00109-SSB    Document 54    Filed 10/22/2003    Page 30 of 80

Page 2

2002 U.S. Dist. LEXIS 18762, *; 29 Employee Benefits Cas. (BNA) 1022

[*3]

6. The policy is an "own occupation" policy, which provides benefits when the insured "cannot perform the material duties of his/her regulation occupation." Policy at 2.1. The insuring clause of the policy states:

> We will pay a Monthly Benefit if an Insured:
>
>> (1) is Totally Disabled as the Result of a Sickness or Injury covered by this Policy;
>>
>> (2) is under the regular care of a Physician;
>>
>> (3) has completed the Elimination Period; and
>>
>> (4) submits satisfactory proof of Total Disability to us.

Policy at 7.0.

7. Under the policy, monthly benefits are terminated on the earliest of: "(1) the date the Policy terminates; (2) the date the Insured ceases to meet the Eligibility Requirements; (3) the end of the period for which Premium has been paid for the Insured; or (4) the date the Insured enters military service (not including Reserve or National Guard)." Policy at 5.0.

**I. Initial Denial**

8. As stated above, Petry Corporation filed an application for benefits on plaintiff's behalf on August 18, 1998.

9. On August 26, 1998, First Reliance wrote to plaintiff acknowledging receipt of her claim for long-term disability benefits.

10. On [*4] August 31, 1998 and September 2, 1998, First Reliance wrote to plaintiff's treating physicians requesting copies of plaintiff's medical records and asking them to complete various forms.

11. The job analysis form completed by plaintiff's employer lists plaintiff's job title as "account executive." In describing the physical aspects of this job, the employer stated that standing, walking and sitting are required frequently and that balancing, stooping, kneeling, crouching, crawling, reaching/working overhead and climbing are required occasionally. n2

n2 Occasionally is defined as 1% to 33% of the time; frequently is defined as 34% to 66% of the time.

12. In the employee's statement, plaintiff stated that the physical and mental demands of her job require her to be at work from 8:30 a.m. every day until the job was completed which frequently was 7:00-9:00 p.m. working at a rapid pace with multiple demands on her time.

13. In a physician's statement completed by one of plaintiff's treating physicians, Dr. Mark [*5] Stesin, he stated that plaintiff is able to sit and drive 5-8 hours a day and walk 1-3 hours a day. She can bend, squat, climb, reach above the shoulder, kneel, crawl and use feet on a continuous basis n3 and can lift and carry objects consistent with medium work. When asked whether plaintiff has achieved maximum medical improvement, Dr. Stesin answered "no."

n3 Continuous is defined as 67% to 100%.

14. In a letter report dated July 20, 1998, Dr. Stesin described plaintiff's diabetes as "brittle," which means that:

> she has rapid and large fluctuations of her glucose values over very short time periods. The brittleness and lability of her glucose values on a daily basis causes her to frequently feel exhausted and weak, and interferes with her inability [sic] to concentrate at work.

Dr. Stesin also noted that plaintiff was now using a subcutaneous insulin pump instead of taking insulin injections. He stated that "while it is hoped that the pump will help her daily glucose values, the underlying [*6] brittleness of her diabetes will continue to make it difficult to regulate her daily glucose values on a long-term basis." On page two of the same report, Dr. Stesin described plaintiff's job as "highly demanding," which frequently requires long hours (55-60 hours per week). "The pace is hectic and demanding, and mealtimes are inconsistent due to the nature of her work . . . . Additionally, the brittleness of her diabetes further increases her job pressure."

15. In a physical capacity questionnaire dated August 31, 1998, Dr. Stesin states that plaintiff can sit 6-8 hours a day, stand 3-6 hours, but can only walk 1-3 hours a day. Dr. Stesin noted that these limitations are permanent.

16. In another physician's report dated September 25, 1998, Dr. Stesin indicates that plaintiff's hypoglycemic episodes are moderate to severe and occur one to three

2002 U.S. Dist. LEXIS 18762, *; 29 Employee Benefits Cas. (BNA) 1022

times a day. When asked whether plaintiff's condition is expected to 1) improve; 2) regress or 3) remain the same, Dr. Stesin states that plaintiff's condition is expected to "remain the same."

17. The initial claim file also included a job description of plaintiff's position at Blair Television. n4 This description states that an account [*7] executive is required to "represent team stations on a continual basis; be a marketer; go on higher level calls to sell special opportunities; execute constant sales calls; provide prompt and accurate responses to management requests." The job also requires a "willingness to put in as much time as needed to successfully complete the job" and an "ability to function in a high stress environment."

> n4 At trial, there was some dispute over whether a job description was included in the file during the initial claim. Upon review of the record, the Court concludes that a job description was part of the original file. In a cover letter dated September 15, 1998, Nancy Sullivan of Petry Media sent a copy of plaintiff's job description to Rosetta Davis. FRSL 000678-000679.

18. Plaintiff's claim file was reviewed by Kathy Young, a registered nurse. In a summary report dated September 23, 1998, she states:

> It would appear that over time cl [claimant] has developed a large number of chronic complications due to diabetes--diabetes [*8] is poorly controlled and it seems tx [treatment] and insulin reactions are interfering with ability to function at appropriate levels at home and in the workplace. R & L's [restrictions and limitations] would be expected to be sedentary in nature but not on a consistent (daily) basis. Get office notes and all diagnostic studies from Dr. Stesin from 1/1997 to present.

19. On November 6, 1998, First Reliance denied plaintiff's claim for disability benefits on the basis that her occupation was sedentary and her medical condition allowed her to do sedentary work. n5

> n5 The pertinent portion of the letter reads as follows:

> > The available medical reports on file show that you have type 1 diabetes, over the years and

developed chronic complications, your diabetes appears to have been sufficiently controlled with an infusion pump, and you have not had any recurrence of your cancer. Based on the pertinent medical information outlined above, your physical capacities are within the sedentary activity levels.

> > According to Department of Occupational Titles (DOT), your occupation is sedentary work.

> > Given these facts, we have determined that you do not meet your group policy's definition of Total Disability as your medical condition does not preclude you from performing sedentary work. Consequently your claim must be denied.

[*9]

20. Thereafter, plaintiff retained an attorney and appealed the denial administratively on February 3, 1999, after requesting and receiving an extension of time to do so.

21. On appeal, plaintiff argued, among other things, that First Reliance had misclassified her occupation as sedentary when it was actually light duty and had failed to take into account all of her disabling conditions and the relevant medical evidence documenting them. She also submitted additional documentation in support of her claim, including affidavits from co-workers describing Parke's job duties; an additional medical report from Dr. Stesin dated February 1, 1999; the description of an occupation from the DOT which plaintiff claimed better supported her position; and information on diabetes.

22. By letter dated June 4, 1999, First Reliance informed plaintiff that it was reversing its original denial of benefits and granting her application for long-term disability benefits effective June 1, 1998.

## II. Suspension of Benefits

23. In the same June 4, 1999 letter, First Reliance informed plaintiff that "medical information contained in [plaintiff's] claim file support total disability only to [January] [*10] 30, 1999." n6

> n6 Although the letter states March 30, 1999, the parties confirmed at oral argument for the

Case 1:01-cv-00109-SSB    Document 54    Filed 10/22/2003    Page 32 of 80

Page 4

2002 U.S. Dist. LEXIS 18762, *; 29 Employee Benefits Cas. (BNA) 1022

summary judgment motions that this was a clerical error. The correct date is January 30, 1999.

24. First Reliance made requests for medical records from Dr. Stesin on May 24, 1999 and again on May 27, 1999.

25. In a letter dated June 9, 1999, plaintiff's counsel disputed defendant's ability to unilaterally suspend plaintiff's benefits after January 30, 1999. According to plaintiff, the burden shifted to defendant to demonstrate that plaintiff is not disabled.

26. On June 21, 1999, counsel for defendant responded to plaintiff's June 9, 1999 letter. He emphasized that the insuring clause of the policy entitles plaintiff to benefits upon "satisfactory proof of total disability." According to defendant, the file supported plaintiff's disability only through January 30, 1999.

27. On July 7, 1999, plaintiff filed the instant lawsuit seeking, among other relief, reinstatement of her long-term disability benefits. [*11]

28. On September 9, 1999, First Reliance received a copy of an updated report from Dr. Stesin. The report is dated August 9, 1999 and carries a date stamp of August 11, 1999. It states:

> I understand from Julie Parke that your company has discontinued her benefits because there has not been satisfactory proof of disability. I find that surprising.
>
> The conditions that I described in detail and her medical records and reports provided to you demonstrate a permanent condition, which to a reasonable degree of certainty, will not improve.
>
> She is not only disabled, she is permanently totally disabled.

29. On September 24, 1999, counsel for defendant notified plaintiff that it was reinstating her benefits. Plaintiff's benefits were officially reinstated on October 14, 1999. n7

> n7 As a result, plaintiff's request for reinstatement of her long-term disability benefits in Count I of her complaint is moot. Nonetheless, she still seeks interest on the benefits that were suspended from February 1, 1999 to October 14, 1999.

[*12]

## III. Offset for Social Security

30. On October 17, 1999, plaintiff was awarded Social Security disability benefits, retroactive to November 1998.

31. The benefit provisions section of the Policy computes the monthly benefit payable to an insured as follows:

> BENEFIT AMOUNT: To figure the benefit amount payable:
>
> (1) multiply an Insured's Covered Monthly Earnings by the benefit percentage(s), as shown on the Schedule of Benefits page; n8
>
> (2) take the lesser of the amount:
>
> (a) of step (1) above; or
>
> (b) the Maximum Monthly Benefit as shown on the Schedule of Benefits page; and
>
> (3) subtract Other Income Benefits, shown as follows, from step (2) above.
>
> OTHER INCOME BENEFITS: Other Income Benefits are benefits resulting from the same Total Disability for which a Monthly Benefit is payable under this Policy. These Other Income Benefits are:
>
> * * *
>
> (7) disability or Retirement Benefits under the United States Social Security Act . . . for which:
>
> (a) an Insured is eligible to receive because of his/her Total Disability.

Policy at 7.0.

> n8 The Schedule of Benefits provides that: "The Monthly Benefit is an amount equal to 60% of Covered Monthly Earnings, payable in

Case 1:01-cv-00109-SSB    Document 54    Filed 10/22/2003    Page 33 of 80

Page 5

2002 U.S. Dist. LEXIS 18762, *; 29 Employee Benefits Cas. (BNA) 1022

accordance with the section entitled Benefit Amount." Policy at 1.0.

[*13]

32. Plaintiff's social security benefit is around $ 1,500 a month, but she receives around $ 1,123.30 after tax withholding.

## CONCLUSIONS OF LAW

### I. Jurisdiction

The Court has subject-matter jurisdiction over this matter under *28 U.S.C. § 1331*. Venue is proper pursuant to *§ 28 U.S.C. § 1391*(b)(2).

### II. Interest on Delayed Benefits

Plaintiff argues that defendant's actions in denying plaintiff's claim for benefits initially and in suspending her benefits were in violation of the plan and in breach of its fiduciary duties under ERISA. For relief, plaintiff seeks equitable restitution in the form of interest on the two periods of delayed benefits. The issue of whether interest as restitution under the circumstances presented here was an issue with which the Court dealt at great length in the summary judgment order. Memorandum Opinion and Order Denying Cross Motions for Summary Judgment and Denying Motion for Class Certification, Civ. No. 99-1039 (Dec. 28, 2000) (JRT/FLN) at 6-8 (hereinafter referred to as "December 28, 2000 Order"). Defendant argued that interest is recoverable only when a plaintiff is awarded [*14] benefits through a judgment against the plan. After a lengthy discussion and review of the applicable caselaw, the Court rejected that argument and concluded that an award of interest is available even when a plaintiff recovered benefits without resorting to litigation. Relying primarily on another decision from this District, *Jackson v. Fortis Benefits Ins. Co., 105 F. Supp. 2d 1055, 1056 (D. Minn. 2000),* the Court held that prejudgment interest is available under *§ 1132(a)(3)* so long as plaintiff demonstrates that the plan administrator either breached his statutory obligations under ERISA or the terms of the governing plan.

Defendant now argues that a recent Supreme Court decision, *Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 151 L. Ed. 2d 635, 122 S. Ct. 708 (2002),* calls into question the validity of the leading authority in the Eighth Circuit on this issue, *Jackson v. Fortis Benefits Ins. Co., 245 F.3d 748 (8th Cir. 2001).* The Court disagrees. *Knudson* involved an ERISA plan provision that required beneficiaries to reimburse the plan if they recovered any money from a third party. *122 S. Ct. at 711.* Knudson, the defendant, was [*15] injured in a car accident, and her medical expenses were covered by Great-West on behalf of her husband's health and welfare plan. *Id.* Knudson sued the car company in tort and recovered an additional sum of money in a settlement agreement. *Id.* Great-West then sued Knudson under ERISA § 502(a)(3) when she refused to pay the plan monies she recovered from her settlement.

Great-West claimed that its suit was for restitution and was therefore an equitable action permitted under ERISA. The Supreme Court disagreed, noting that restitution actions are not necessarily equitable, but the characterization depends upon the nature of the underlying remedy. *122 S. Ct. at 714.* The Court stated that restitution actions are "legal" when the plaintiff seeks to impose "merely personal liability upon the defendant to pay a sum of money," such as in a breach of contract case. *Id.* (quoting Restatement of Restitution § 160, cmt. a(1936)). Actions are "equitable" when they seek "to restore to the plaintiff particular funds or property in the defendant's possession." *Id.* The Court concluded that Great-West's suit to recover "money due and owing under a contract" from a third [*16] party was legal, not equitable, because Great-West was merely trying to hold Knudson personally liable for benefits Great-West had conferred upon her. Therefore, the Court held that the action could not be brought under ERISA § 502(a)(3), which permits only equitable relief.

In this case, the nature of plaintiff's suit for restitution is equitable, not legal. In *Knudson,* the Court explained that "a plaintiff could seek restitution in equity, ordinarily in the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *122 S. Ct. at 714.* The Court continued: "Thus, for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." *122 S. Ct. at 714-15.* That is precisely what plaintiff seeks to do here. Her claim is that First Reliance has in its possession monies rightfully belonging to her--benefits due under the plan. By not awarding her benefits during the [*17] periods which she claims were rightfully owed to her, defendant made a profit on that money in the form of interest earned. Plaintiff merely seeks to have defendant disgorge the interest it earned on the money due to her. n9 Thus, for the above-stated reasons, the Court concludes that *Knudson* does not alter the Court's previous determination.

n9 *Knudson* is distinguishable on an additional basis as well. There, the Court noted that the funds sought by Great-West were not even in Knudson's possession, but were committed to

trust accounts for her medical care and attorney's fees. *122 S. Ct. at 716.* Because the funds were not in Knudson's possession, it would be impossible to impose a constructive trust upon them for Great-West's benefit.

## A. Breach

As explained above, plaintiff cannot recover interest on delayed benefits absent a showing that defendant breached ERISA or the terms of the plan. *Jackson, 245 F.3d at 750.* Under the facts of this case and as framed in the order [*18] for motions for summary judgment, the question as to the first period of interest claimed is whether defendant's initial denial of plaintiff's claim for benefits was erroneous. Before making this determination, the Court's first task is to determine the applicable standard of review. This is an issue of great debate in many ERISA cases and this case is no exception. ERISA allows plan beneficiaries to seek judicial review of a benefits determination. *29 U.S.C. § 1132*(a)(1)(B). "Where a plan gives the administrator 'discretionary authority to determine eligibility of benefits,'" courts are to review an administrator's decision for an abuse of discretion. *Woo v. Deluxe Corp., 144 F.3d 1157, 1160 (8th Cir. 1998)* (quoting *Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 103 L. Ed. 2d 80, 109 S. Ct. 948 (1989)*). Otherwise, a *de novo* standard of review applies.

At summary judgment, defendant argued that a clause in the policy conferred the requisite grant of discretionary authority to trigger the more deferential abuse of discretion standard of review. The clause relied on by defendant provided that First Reliance will pay a monthly benefit to an insured [*19] if, among other requirements, the insured "submits satisfactory proof of Total Disability to us." Upon careful review of the relevant caselaw and the applicable language, the Court concluded that the language relied on by defendant was not sufficient to confer discretion on the administrator. December 28, 2000 Order at 9-12. Accordingly, the Court held that it would review the administrator's determinations de novo. Thereafter, the Eighth Circuit interpreted identical policy language and reached the same conclusion as this Court. *Walke v. Group Long Term Disability Ins., 256 F.3d 835, 839-40 (8th Cir. 2001).* With the decision in *Walke,* the Court believed this issue was fully resolved. However, on November 2, 2001, just days before trial was to begin, defendant informed the Court that it had discovered language in the Policy which confers a clear grant of discretionary authority. The provision states:

> First Reliance Standard Life Insurance Company shall serve as the claims review fiduciary with respect to the insurance policy and the Plan. The claims review fiduciary has the discretionary authority to interpret the Plan and the insurance policy and to determine [*20] eligibility for benefits. Decisions by the claims review fiduciary shall be complete, final and binding on all parties.

Policy at 4.0.

In light of this discovery, defendant argued once again that defendant's initial denial must be reviewed under an abuse of discretion standard. Plaintiff argues that defendant has waived this argument since it failed to exercise due diligence in locating the language earlier. In a motion hearing held before the start of trial, counsel for defendant explained that when plaintiff's file was sent to them, defendant sent the policy that was not in effect when plaintiff's claim was submitted. According to defendant's counsel, the policy it had at trial and which is located in its record file at FRSL000005 to FRSL000023 is the policy that was in effect at the time plaintiff's claim was submitted in August 1998. It bears an effective date of August 1997. The Court reluctantly held that in light of this clear grant of discretionary language, the Court would review the plan's determination under an abuse of discretion standard, but added that it would consider plaintiff's arguments that less deference should be afforded defendant under *Woo v. Deluxe Corp., 144 F.3d 1157, 1160 (8th Cir. 1998).* [*21] n10

n10 After trial, the Court reviewed the policy that was submitted as part of the summary judgment motions. The Court discovered that this policy contains the same discretion granting language. *See* Aff. of Mark Nolan, Exh B, Policy at 4.0 ("The claims fiduciary has the discretionary authority to interpret the Plan and the insurance certificate and to determine eligibility for benefits"). While this fact strengthens plaintiff's waiver argument, the Court will stand by its pretrial ruling on this issue.

Under *Woo* and its progeny, a court may apply a less deferential review if plaintiff demonstrates through the presentation of material, probative evidence that: "1) a palpable conflict of interest or serious procedural irregularity existed which 2) caused a serious breach of the plan administrator's fiduciary duty to her." *Woo, 144 F.3d at 1160; Barnhart v. UNUM Life Ins. Co. of America, 179 F.3d 583, 588 (8th Cir. 1999); Sahulka v. Lucent Technologies, Inc., 206 F.3d 763, 768 (8th Cir. 2000);* [*22] *Schatz v. Mutual of Omaha Ins. Co., 220 F.3d 944, 947 (8th Cir. 2000).* In order to satisfy the second prong of

Case 1:01-cv-00109-SSB    Document 54    Filed 10/22/2003    Page 35 of 80

2002 U.S. Dist. LEXIS 18762, *; 29 Employee Benefits Cas. (BNA) 1022                    Page 7

this test, plaintiff must demonstrate that "the conflict or procedural irregularity has 'some connection to the substantive decision reached.'" *Woo, 144 F.3d at 1161* (quoting *Buttram v. Central States S.E. & S.W. Areas Health & Welfare Fund, 76 F.3d 896, 901 (8th Cir. 1996)).*

In this case, plaintiff has presented evidence of a financial conflict. Defendant serves as both the insurer and plan administrator. Although the Eighth Circuit has stated that such a dual relationship does not create a conflict *per se, Woo, 144 F.3d at 1161, n.2*, defendant has not presented a persuasive argument that ameliorates the structural conflict. *Farley v. Arkansas Blue Cross and Blue Shield, 147 F.3d 774, 777 (8th Cir. 1998).* Plaintiff has also shown a connection between the conflict and the substantive decision reached. In denying plaintiff's initial claim for benefits, defendant selected a DOT which classified plaintiff's job as sedentary despite clear evidence in the record that plaintiff's position was not [*23] sedentary. In addition, the Court is troubled by the fact that defendant only had a nurse review plaintiff's claim. *Compare Woo, 144 F.3d at 1161* (plan administrator failed to use proper judgment by merely having in-house medical consultant review claim) *with Barnhart, 179 F.3d at 589* (plan administrator acted prudently by having medical evidence reviewed by outside medical examiners). These actions demonstrate that defendant did not thoroughly investigate the claim and failed to use proper judgment. *Woo, 144 F.3d at 1161* (citing Restatement (Second) of Trusts § 187 cmt. h. (1959)). Consistent with the sliding scale approach outlined in *Woo*, the Court thus takes these circumstances into account in its analysis and reviews defendant's decision with less deference than under the traditional abuse of discretion standard. *Id. at 1162* (explaining that the abuse of discretion standard is "inherently flexible, which enables reviewing courts to simply adjust for the circumstances").

## 1. Initial Denial

The Court has thoroughly reviewed the evidence contained in the file during the initial claim under the standard [*24] above and finds the evidence insufficient to support its denial of benefits. The job analysis prepared by plaintiff's employer indicated that the job required standing and walking frequently, which is defined as 34%-64% of the time. However, the Dictionary of Occupational Titles, which defendant relied on in classifying plaintiff's position and in denying her claim, defines sedentary work as follows:

S-Sedentary Work--Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible

amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. **Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.**

(Emphasis added.) Furthermore, plaintiff's job description indicated that plaintiff's occupation was fast-paced, requiring the execution of constant sales calls; the ability to function in a high stress environment; [*25] a willingness to put in as much time as needed to successfully complete the job, to be very detail oriented and have strong organizational skills. At oral argument, counsel for defendant argued that it was the additional materials submitted on appeal, including a copy of plaintiff's job description, which compelled defendant to reverse its decision and award plaintiff benefits. However, a review of the record reveals that a copy of the plaintiff's job description was part of the original record. The job description is clearly inconsistent with sedentary work described above. In sum, the defendant has simply failed to point to any evidence in the initial record which supports its determination that plaintiff's occupation was sedentary. The absence of this evidence demonstrates that the defendant failed to properly investigate plaintiff's claim. The Court thus concludes that defendant's initial denial of benefits was erroneous and that plaintiff is thus entitled to interest for this time period. n11

n11 The Court adds that it would reach the same conclusion even if it had applied the traditional abuse of discretion standard argued by defendant.

[*26]

## 2. Suspension of Benefits

The second aspect of plaintiff's claim for interest involves defendant's suspension of plaintiff's benefits. At trial, counsel for defendant claimed that it was justified in suspending plaintiff's benefits because some of the medical records in the file indicated that plaintiff's condition had improved with use of an insulin pump.

The Court concludes that defendant breached its statutory duties under ERISA and the plan in suspending plaintiff's benefits even under the most deferential standard of review. At the time defendant suspended her benefits in June 1999, the records already in defendant's possession supported plaintiff's total disability beyond

2002 U.S. Dist. LEXIS 18762, *; 29 Employee Benefits Cas. (BNA) 1022

January 30, 1999. Indeed, a February 1, 1999 letter from Dr. Stesin concluded that plaintiff "clearly cannot perform the substantial and material duties of her job on a continuous basis due to the fact that her diabetes is brittle, she has recurrent hypoglycemic episodes, and she has intractable, sever, painful, peripheral, diabetic neuropathy." Although defendant relies on statements in the record that it claims demonstrate that plaintiff's condition is improving through use of an insulin pump, Dr. [*27] Stesin qualified each of these statements, often within the same sentence. For instance, in the same February 1, 1999 letter, Dr. Stesin explains that "while her recent diabetes control has improved with the use of a subcutaneous insulin infusion pump, **her diabetes remains brittle and extremely difficult to control.**" (Emphasis added.) In the next paragraph, he further explains: "While I anticipate that the frequency of her insulin reactions will decrease with the use of an insulin pump, **her hypoglycemia unawareness will not improve, and I anticipate she will continue to encounter difficulty with insulin reactions.**" (Emphasis added.) Notably, this letter, which was part of the record which led defendant to conclude that plaintiff is disabled under the policy, is the same evidence that defendant claims warrants a suspension of benefits. *Gunderson v. W.R. Grace & Co. Long Term Disability Income Plan, 874 F.2d 496, 500 (8th Cir. 1989)* (termination of benefits not supported by substantial evidence where evidence in medical report which led the Plan to find plaintiff disabled was the same as a later report which the Plan now claimed supported a finding that plaintiff [*28] was no longer disabled).

Review notes prepared in May 1999, a month before defendant notified plaintiff of the suspension, also demonstrate the severity of plaintiff's condition. In a review note dated May 25, 1999, a nurse noted that due to the "progressiveness of plaintiff's disease . . . one would expect lowered tolerance to prolonged standing and compromised state of awareness from insulin reactions." In another review dated May 28, 1999, the claim reviewer concluded that "it's likely her R & L [restrictions and limitations] are within the sedentary range, however, I don't feel she would be capable of sustaining full-time work on a regular basis."

There is nothing in the evidence cited above to suggest that plaintiff no longer be totally disabled under the policy. This is evidenced by an August 9, 1999 letter from Dr. Stesin to First Reliance in response to defendant's suspension of benefits. In the letter, he noted his surprise at the fact defendant discontinued her benefits because there was a lack of satisfactory proof of disability. Dr. Stesin went on to explain:

The conditions that I described in detail and her medical records and reports provided to you demonstrate **[*29]** a permanent condition, which to a reasonable degree of certainty, will not improve. She is not only disabled, she is permanently totally disabled.

It appears from all accounts that defendant reinstated benefits largely, if not totally, on the basis of this letter. However, this letter essentially told defendant that the evidence already in the file indicated that plaintiff was totally disabled. On these facts, the Court cannot conclude that the decision to suspend plaintiff's benefits is supported by substantial evidence.

The facts of this case are unlike two cases relied on by defendant, *Coleman v. Metropolitan Life Ins. Co., 919 F. Supp. 573 (D.R.I)* and *Camarda v. Pan American World Airways Inc., 956 F. Supp. 299 (E.D.N.Y. 1997)*. In *Coleman*, the plaintiff's benefits were not suspended until **after** defendant received a report from the plaintiff's treating physician stating that plaintiff was capable of light work. *919 F. Supp. at 576-77.* In *Camarda*, the plaintiff himself obstructed the process for six years by refusing to sign necessary authorizations, thus justifying the defendant's suspension of benefits. *956 F. Supp. at 301-03.* In this **[*30]** case, plaintiff's benefits were suspended before she even knew her claim was approved or that additional records were necessary. n12 Thus, for all the foregoing reasons, the Court concludes that defendant failed to use proper judgment or thoroughly investigate plaintiff's claim before suspending benefits such that its actions were in violation of its fiduciary duties under the plan and ERISA. Restatement (Second) of Trusts § 187 cmt. h (1959). Plaintiff is therefore entitled to interest for this period as well.

---

n12 Although defendant suggests that the delay in obtaining updated medical records was the fault of plaintiff or her counsel, such delay could be attributed to them in June of 1999 at the earliest. Even then, the evidence is not strong in laying blame with plaintiff. In its June 4, 1999 letter, defendant stated that it would send supplementary forms to plaintiff for the purpose of updating her medical records. Yet, no such forms were ever sent. Plaintiff cannot be faulted at this time for not responding when the letter stated that forms would be sent to her.

**[*31]**

**III. Social Security Offset**

2002 U.S. Dist. LEXIS 18762, *; 29 Employee Benefits Cas. (BNA) 1022

Plaintiff also takes issue with the manner in which defendant offsets plaintiff's social security disability benefits from her monthly benefit payment under the policy. Specifically, plaintiff argues that defendant is wrongfully deducting the full $ 1500.00 in social security benefits from plaintiff's monthly benefit when in fact she only receives approximately $ 1,200 after tax withholding. Plaintiff claims the deduction of the gross amount rather than the net amount is in violation of the policy language, which provides that the insured will receive a monthly benefit of an amount equal to 60% of covered monthly earnings.

Upon review of the pertinent policy language, the Court concludes that the offset is not improper. The policy provides, in relevant part, as follows:

> BENEFIT AMOUNT: To figure the benefit amount payable:
>
> (1) multiply an Insured's Covered Monthly Earnings by the benefit percentage(s), as shown on the Schedule of Benefits page; n13
>
> (2) take the lesser of the amount:
>
> (a) of step (1) above; or
>
> (b) the Maximum Monthly Benefit as shown on the Schedule of Benefits page; and
>
> (3) subtract Other Income [*32] Benefits, shown as follows, from step (2) above.

> OTHER INCOME BENEFITS: Other Income Benefits are benefits resulting from the same Total Disability for which a Monthly Benefit is payable under this Policy. These Other Income Benefits are:
>
> * * *
>
> (7) disability or Retirement Benefits under the United States Social Security Act . . . for which:
>
> (a) an Insured is eligible to receive because of his/her Total Disability.

The clear language of the policy quoted above provides that the offset applies to social security benefits to which a claimant is "**eligible to receive**." It does not say the amount **actually** received. Plaintiff has elected to tell the Social Security Administration to deduct from her monthly social security benefit certain money for taxes because of her husband's tax liability. However, that does not change the wording of the policy, which clearly entitles defendant to deduct the amount plaintiff is "eligible" to receive. *Lake v. Metropolitan Life Ins., 73 F.3d 1372, 1379 (6th Cir. 1996)* (enforcing unambiguous terms of plan in determining offset for social security benefits). For these reasons, plaintiff's claim [*33] to correct the offset is denied.

> n13 The Schedule of Benefits provides that: "The Monthly Benefit is an amount equal to 60% of Covered Monthly Earnings, payable in accordance with the section entitled Benefit Amount." Policy at 1.0.

**IV. Attorney Fees**

Finally, plaintiff asserts that she is entitled to recover attorney fees and costs incurred in bringing this action as well as the fees and costs incurred for work performed during the administrative process. Under *29 U.S.C. § 1132*(g)(1), the Court has discretion to award a reasonable attorney fees and costs to either party. In exercising this discretion, courts must consider the following factors: (1) the degree of culpability or bad faith which can be assigned to the opposing party, (2) its ability to pay, (3) the potential for deterring others in similar circumstances, (4) whether the moving party sought to benefit all plan participants or beneficiaries or to resolve a significant legal question regarding ERISA, and (5) the relative [*34] merits of the parties' positions. *Mansker v. TMG Life Ins. Co., 54 F.3d 1322, 1329 (8th Cir. 1995)*. Although prevailing plan defendants ordinarily should not recover fees against an unsuccessful beneficiary in the absence of bad faith on the beneficiary's part, *Maune v. International Bd. of Elec. Workers, Local No. 1, Health and Welfare Fund, 83 F.3d 959, 964 (8th Cir. 1996)*, a plan beneficiary who succeeds in an ERISA action should recover attorney fees unless special circumstances would render the award unjust, *Welsh v. Burlington N., Inc., Employee Benefits Plan, 54 F.3d 1331, 1342 (8th Cir. 1995)*. The unsuccessful party has the burden of proving that such circumstances exist, and the absence of bad faith is not a special circumstance. *Id.*

First Reliance has not persuaded the Court that "special circumstances" make an award of attorney fees unjust in this case. Furthermore, consideration of the above factors weigh in favor of plaintiff. Defendant is

Case 1:01-cv-00109-SSB     Document 54     Filed 10/22/2003     Page 38 of 80

Page 10
2002 U.S. Dist. LEXIS 18762, *; 29 Employee Benefits Cas. (BNA) 1022

financially able to pay the fees and costs incurred by plaintiff in connection with this litigation. Awarding fees will also deter defendant and other similar entities from repeating [*35] the actions taken in this case. Moreover, plaintiff sought and succeeded in resolving a significant legal question under ERISA--whether a plaintiff can recover interest on delayed benefits as equitable restitution. The Court thus concludes that an award of attorney fees and costs is appropriate in this case.

The final issue the Court must resolve is whether plaintiff is entitled to fees and costs incurred for work performed during the administrative process. The Court reviewed this issue at length in its December 28, 2000 Order denying the parties' cross-motions for summary judgment. *Id.* at 18-21. In that order, the Court recognized that the two circuits to have addressed this issue had concluded that such fees are not recoverable in an ERISA action. *Id.* at 19 (citing *Anderson v. Procter & Gamble Co., 220 F.3d 449, 456 (6th Cir. 2000); Cann v. Carpenters' Pension Trust Fund for N. Cal., 989 F.2d 313, 317 (9th Cir. 1993).* The Court explained that, while the *Cann* court's analysis has some merit, its reasoning is not beyond criticism. *Id.* The Court reviewed two Supreme Court decisions, *Sullivan v. Hudson, 490 U.S. 877, 892, 104 L. Ed. 2d 941, 109 S. Ct. 2248 (1989)* [*36] and *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 560, 92 L. Ed. 2d 439, 106 S. Ct. 3088 (1986),* and found that the policy considerations influencing those decisions apply in equal measure in this ERISA action. The fact that the fees in this case were incurred prior to the start of judicial proceedings does not diminish their importance to the ultimate outcome. December 28, 2000 Order at 20.

Although the Court did not resolve the issue in its prior order, the Court resolves it now in plaintiff's favor for the reasons stated in that opinion. Accordingly, the Court concludes that plaintiff is also entitled to fees and costs incurred for work performed during the administrative process. Plaintiff shall have 30 days from the date of this order to submit a brief and affidavit(s) setting forth the attorney fees and costs expended in prosecuting this litigation and the administrative process. Defendant may file a response thereafter, if it so chooses, within 30 days of the service of plaintiff's brief. Finally, the record is not clear regarding the actual time spans of the two periods of delayed benefits in question or the percentage of interest that applies to each. Accordingly, [*37] the Court requests that the parties submit briefs, according to the time limits described above, regarding the amount of interest owed for the two periods in question.

**ORDER**

Based on the submissions of the parties, the arguments of counsel, and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant shall pay to the plaintiff interest on delayed benefits in an amount to be determined by the Court. In order to make this determination, plaintiff shall submit within ten (10) days of this Order a brief which sets forth the amount of interest it claims is owed for the two time periods in question. Defendant may respond ten (10) days after the plaintiff's submission.

2. Within thirty (30) days of this Order, Plaintiff shall submit a brief and affidavit(s) setting forth the attorney's fees and costs it expended prosecuting this lawsuit and during the administrative process. Defendant may respond within thirty (30) days after receipt of the plaintiff's submission.

**LET     JUDGMENT     BE     ENTERED ACCORDINGLY.**

DATED: September 25, 2002 at Minneapolis, Minnesota.

JOHN R. TUNHEIM

United States District Judge

# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| SCOTT DL DALESANDRO, *et al.*, On behalf of themselves and all others similarly situated,<br><br>                         Plaintiffs,<br><br>        vs.<br><br>THE INTERNATIONAL PAPER COMPANY,<br><br>                         Defendant. | Case No. C-1-01-109<br>(Judge Sandra S. Beckwith) |

## <u>DECLARATION OF RICHARD S. WAYNE</u>

I, Richard S. Wayne, under penalty of perjury pursuant to 28 U.S.C. 1746, declare as follows:

1.    I have submitted a separate Declaration in this case, dated August 6, 2003, which sets forth my background and experience litigating complex civil actions on behalf of plaintiffs, including ERISA cases and class actions.

2.    Based upon my personal knowledge of the billing and time-keeping practices of many law firms, it is my opinion that quarter-hour billing is a common practice and does not reflect inaccurate statements of time.

3.    I have extensive experience utilizing paralegals in these types of actions, and the $85 per hour rate submitted by the Plaintiffs for Stephanie Vaaler is below the rate I have charged in this time period for work in complex litigation. Based upon my experience and personal knowledge of rates charged for paralegals, it is my opinion that $85 per hour is a reasonable rate in this local market and within the range of hourly rates charged for comparable paralegal work in this type of class action.

4.    The cost of litigation document reproduction justifies the ten cents per page copy charge submitted by Plaintiffs in this case. I believe ten cents per page is less than what other Cincinnati law firms charge for copying. It is my opinion that the ten cents charge is reasonable and within the range of the rates charged for copying in this local market.

So declared this 21st day of October, 2003, Cincinnati, Ohio.

Richard S. Wayne

413222.1.

# EXHIBIT 4

LEXSEE

**Grand Traverse Band of Ottawa and Chippewa Indians, Plaintiff-Appellee,
Cross-Appellant, v. Director, Michigan Department of Natural Resources; Township
of Leland; Village of Northport, Defendants-Appellants, Cross-Appellees,**

Nos. 96-2396/96-2466

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

*1998 U.S. App. LEXIS 15145*

**July 1, 1998, Filed**

**NOTICE:** **[*1]** NOT RECOMMENDED FOR
FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE
24 LIMITS CITATION TO SPECIFIC SITUATIONS.
PLEASE SEE RULE 24 BEFORE CITING IN A
PROCEEDING IN A COURT IN THE SIXTH CIRCUIT.
IF CITED, A COPY MUST BE SERVED ON OTHER
PARTIES AND THE COURT. THIS NOTICE IS TO BE
PROMINENTLY DISPLAYED IF THIS DECISION IS
REPRODUCED.

**SUBSEQUENT HISTORY:**

Reported in Table Case Format at: *1998 U.S. App.
LEXIS 22709.*

Certiorari Denied December 7, 1998, Reported at: *1998
U.S. LEXIS 7881.*

**PRIOR HISTORY:** ON APPEAL FROM THE
UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MICHIGAN. 94-00707.
Enslen. 10-7-96.

**DISPOSITION:** AFFIRMED.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**COUNSEL:** For GRAND TRAVERSE BAND OF
OTTAWA & CHIPPEWA INDIANS, Plaintiff - Appellee,
Cross-Appellant (96-2396, 96-2466): William Rastetter,
Cedar, MI.

For GRAND TRAVERSE BAND OF OTTAWA &
CHIPPEWA INDIANS, Plaintiff - Appellee,
Cross-Appellant (96-2396, 96-2466): John F. Petoskey,

Grand Traverse Band Legal Department, Suttons Bay,
MI.

For DIRECTOR, MICHIGAN DEPARTMENT OF
NATURAL RESOURCES, Defendant - Appellee
(96-2396): Todd B. Adams, Office of the Attorney
General, Lansing, MI.

For TOWNSHIP OF LELAND, **[*2]** Defendant -
Appellant, Cross-Appellee (96-2396, 96-2466): William
M. Davison, Cunningham, Davison, Beeby, Rogers &
Alward, Traverse City, MI.

For TOWNSHIP OF LELAND, VILLAGE OF
NORTHPORT, Defendants - Appellants,
Cross-Appellees (96-2396, 96-2466): Stephen O. Schultz,
R. Lance Boldrey, Foster, Swift, Collins & Smith,
Lansing, MI.

For TOWNSHIP OF LELAND, VILLAGE OF
NORTHPORT, Defendants - Appellants,
Cross-Appellees (96-2396, 96-2466): James L.
Wernstrom, Thomas J. McGraw, Law, Weathers &
Richardson, Grand Rapids, MI.

For DIRECTOR, MICHIGAN DEPARTMENT OF
NATURAL RESOURCES, Defendant (96-2466): Todd B.
Adams, Office of the Attorney General, Lansing, MI.

**JUDGES:** BEFORE: JONES, NELSON and RYAN,
Circuit Judges. RYAN, Circuit Judge, concurring.

**OPINIONBY:** NATHANIEL R. JONES

**OPINION:**

**NATHANIEL R. JONES, Circuit Judge.** This is an appeal and cross-appeal of an award of attorney's fees under *42 U.S.C. § 1988.* The full facts of the underlying litigation in this appeal are set out in this court's opinion in *Grand Traverse Band of Ottawa and Chippewa Indians v. Director, Michigan Department of Natural Resources, et. al, 141 F.3d 635, 1998 WL 171331 (6th Cir. 1998).* [*3] For the purpose of the attorney's fees issue we briefly summarize the pertinent facts.

I.

The Grand Traverse Band of Ottawas and Chippewas ("GTB") sued the Village of Northport, the Township of Leland and the Director, Michigan Department of Natural Resources ("MDNR") challenging commercial use prohibitions contained in agreements between MDNR and the municipalities that prevented GTB tribal fishers from mooring their commercial fishing vessels at the municipalities' marinas. GTB charged that enforcement of the commercial use restrictions against them deprived its members of the right to fish guaranteed by treaties with the United States in 1836 and 1855, as well as a 1985 consent judgment entered into with the State of Michigan. These documents, GTB asserted, entitled its members to fish certain traditional fishing grounds located in the Great Lakes areas, and to enjoy a right of access to these areas that included mooring access to the municipalities' marinas. GTB also asserted two claims under *42 U.S.C. § 1983,* that the enforcement of the commercial use prohibitions violated its rights of due process and equal protection of the laws.

On December 19, 1995, the [*4] district court granted summary judgment to GTB on its treaty-based and consent judgment claims to establish mooring access to the municipalities' marinas. The district court granted summary judgment to the municipalities, however, on GTB's equal protection claim, and in a footnote of the opinion declined to rule on the due process claim finding that the claim needed further briefing. J.A. at 530 n.1. Subsequently, in a letter to the district court on December 29, 1995, GTB voluntarily dismissed the due process claim "in the spirit of comity" because the grant of partial summary judgment in its favor provided GTB with sufficient relief. J.A. at 548. This court affirmed the district court's decision granting transient mooring access to GTB on appeal.

GTB then sought attorney's fees from both Northport and Leland. n1 On August 19, 1996, GTB filed an amended bill of costs for attorney's fees and expenses under *42 U.S.C. § 1988* for the following: 1) approximately 552.59 hours of billed attorney's fees in the primary litigation, at $ 175.00 an hour totaling $ 96,703.25; 2) 335.43 hours of billed attorney's fees in ancillary federal and state court proceedings n2 [*5]

concerning: a) the arrest of a GTB member for mooring at the Northport Marina, and b) access to the Northport marina, at $ 175.00 an hour totaling $ 58,700.25; 3) expenses in the primary proceeding of $ 1,815.06; and 4) expenses in the ancillary state and federal court proceedings of $ 617.76. J.A. at 845-46.

n1 GTB did not seek fees against MDNR. After the filing of the lawsuit, MDNR supported GTB's request for mooring access and submitted a memorandum to the district court in GTB's favor.

n2 We refer to three separate proceedings as the "ancillary proceedings" for which GTB seeks attorney's fees. The proceedings arose after a GTB tribal fishermen, George Duhamel, was arrested and prosecuted for criminal trespass when he docked his commercial fishing vessel at the Northport Marina. In response, GTB sought declaratory and injunctive relief in federal court in *United States v. Michigan,* No. 2 73 CV 26, the first of the three separate proceedings, and a case over which the district court had continuing jurisdiction under the terms of the 1985 consent order. Apparently, the resolution of this case rendered that suit superfluous and that action was dismissed as moot. In the second proceeding, Northport commenced civil proceedings in state court against Duhamel seeking an injunction prohibiting Duhamel from mooring his vessel at its marina. GTB defended Duhamel in this state court civil action and also in the state court criminal proceeding concerning the trespass charge. GTB sought attorney's fees for all three of these proceedings, however, only against Northport.

[*6]

In three separate opinions, the district court granted GTB fees and held the municipalities jointly and severally liable for the entire amount of $ 98,518.31 (fees plus expenses) for the primary litigation. The district court determined that although it had declined to address GTB's § 1983 due process claim in its initial determination of summary judgment, the claim arose out of the same nucleus of facts as the treaty-based claims and as a prevailing party in the primary litigation GTB was entitled to a fee award. The district court, however, declined to award fees in the ancillary federal and state court proceedings, noting that the municipalities were not even parties to the federal proceedings and that the fees in the state proceedings did not specifically concern GTB, but one of its members. n3 The municipalities appeal the district court's award of attorney's fees in the primary

litigation and GTB cross-appeals the denial of fees in the ancillary proceedings.

> n3 In one opinion concerning attorney's fees, the district court initially found that GTB might be entitled to fees for the ancillary proceedings, but after further briefings by the parties declined to award fees.

[*7]

II.

We review a district court's grant of attorney's fees for an abuse of discretion, giving the district court's award of fees "substantial deference." *Hadix v. Johnson, 65 F.3d 532, 534 (6th Cir. 1995)* (citing *Hensley v. Eckerhart, 461 U.S. 424, 437, 76 L. Ed. 2d 40, 103 S. Ct. 1933 (1983)*). In so doing, we apply a clearly erroneous standard in determining whether the prevailing party has in fact worked the hours claimed; we determine whether the court erred "when reviewing legal questions concerning the relationship of the hours billed to the points on which the party prevailed"; and "we look to see whether the district court has misapplied the reasonable practices of the profession when determining whether a party used poor judgment in billing the opposing party for hours spent on the case." *Wooldridge v. Marlene Industries Corp., 898 F.2d 1169, 1175 (6th Cir. 1990)*.

While each party to a lawsuit ordinarily bears his or her attorney's fees and costs, *42 U.S.C. § 1988* authorizes an award of reasonable attorney's fees to prevailing parties in civil rights litigation. *Hensley, 461 U.S. at 429.* [*8] Under that section, which provides that "in any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985 and 1986 of this title...the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs," *42 U.S.C. § 1988*(b), a prevailing party will normally recover such fees "unless special circumstances would render such an award [of fees] unjust." *Hensley, 461 U.S. at 429* (citation and quotation marks omitted).

In determining a fee award under § 1988, we first must find that the party seeking fees under that section is the "prevailing party." This requires that a party "obtain at least some relief on the merits of [the] claim" where that relief "materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Farrar v. Hobby, 506 U.S. 103, 111-12, 121 L. Ed. 2d 494, 113 S. Ct. 566 (1992); see also Hensley, 461 U.S. at 433* ("Plaintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on [*9] any significant issue in

[the] litigation which achieves some of the benefit the parties sought in bringing suit.") (citation and quotation marks omitted).

The municipalities do not dispute that GTB meets the status of a "prevailing party" under the statute. GTB sought to declare the commercial use restrictions between MDNR and the municipalities unenforceable against them and was granted such relief. This court affirmed that judgment on appeal. Thus, prior to the district court's decision, GTB was not permitted to anchor its fishing vessels at the marinas owned by the municipalities, and it now is. The municipalities were clearly ordered to change their behavior in a way that directly benefits GTB, and given that fact GTB is a prevailing party in this litigation.

The primary contention made by the municipalities on appeal is that although GTB is a prevailing party, its treaty-based claim cannot be utilized as a basis for awarding attorney's fees under § 1988 because it is not an action to enforce § 1983. Treaty interpretation claims, the municipalities argue, do not support claims under § 1983.

In the *Washington* litigation, relied upon by the municipalities, the Ninth [*10] Circuit discussed the issue of attorney's fees in Native American treaty cases. *See United States v. Washington, 935 F.2d 1059 (9th Cir. 1991) (Washington IV); United States v. Washington, 873 F.2d 240 (9th Cir. 1989) ("Washington III"); United States v. Washington, 813 F.2d 1020 (9th Cir. 1987) ("Washington II"); United States v. Washington, 774 F.2d 1470 (9th Cir. 1985) ("Washington I").* In *Washington II*, the Ninth Circuit found that treaty interpretation claims do not give rise to claims cognizable under § 1983 unless those claims involve "known and well-delineated rights." *Washington II, 813 F.2d at 1023.* The court noted that throughout the prior litigation in the case concerning the Native Americans' right to fish under several treaties, there was no discussion of the state's violation of the Native Americans' rights under the treaties or the Fourteenth Amendment, because those rights were unknown until after a Supreme Court decision defining those rights. *Id.* The court found, however, that if the State of Washington presently had violated the rights delineated by the Supreme [*11] Court in the earlier litigation, there would be an actual conflict between state and federal law which might give rise to a § 1983 action. *Id.* Because the treaty interpretation claims did not involve known and well-delineated rights, the court found that they could not give rise to a § 1983 claim and accordingly could not serve as a basis for awarding attorney's fees. *Id.*

The court also rejected a second alternative basis for § 1988 attorney's fees, that there was a pendent Fourteenth Amendment claim pleaded in the original complaint, finding that any such claims "lurking about were so attenuated and unsubstantial as to be absolutely

devoid of merit." *Id.* (citations and quotation marks omitted). In *Washington III*, the Ninth Circuit again reversed an award of attorney's fees in Phase II of the litigation, finding that the judgment in the case resulted from treaty interpretation and was not based on a violation of rights under the treaty, and as such could not be a basis for an award attorney's fees. *Washington III, 873 F.2d at 242.* In *Washington IV*, however, the Ninth Circuit reversed the district court's decision denying a request for fees [*12] in the case. The court held that fees were proper in that aspect of the litigation because it was a subproceededing to enforce the Native Americans' rights to take certain fish. *Washington IV, 935 F.2d at 1061.* The court found that previous litigation had attempted to define the treaty rights, but that the subproceeding involved in its case was purely an action to enforce them. *Id.* The court noted that the district court had not been required, as in prior litigation, to interpret the treaties or define the rights conferred, but instead to enforce well-defined rights recognized by both parties. *Id.* Accordingly, the court found that attorney's fees could be awarded on that claim. *Id.*

We decline, however, to decide whether this circuit will adopt the Ninth Circuit's "known and well-delineated rights" test for determining whether treaty claims may properly serve as a basis for awarding attorney's fees under § 1988. n4 Rather, we rely on the basis used to award fees by the district court in this case, that the unaddressed § 1983 claim brought in the suit may serve as a basis for awarding fees. n5

n4 We do note, nonetheless, that GTB does have a strong argument that their case, unlike *Washington II* and *Washington III* was a claim to enforce their well-delineated rights. Unlike those cases, GTB did specifically allege that the defendants were violating the treaties, and their right to fish and for access to their fishing grounds had been well established since the litigation in *United States v. Michigan, 471 F. Supp. 192 (W.D. Mich. 1979), modified in part, 653 F.2d 277 (6th cir. 1981)* and the subsequent consent judgment in that case. [*13]

n5 The district court acknowledged that GTB's alternative basis for seeking attorney's fees was that the treaty claim itself could have been expressed as a § 1983 claim, but found that no purpose would be served by ruling on that basis. J.A. at 58.

It is well settled that if a party prevails on a non-fee-generating claim that is pendent to a fee-generating § 1983 claim, fees may be awarded for the entire action if the non-fee-generating claim is "substantial" and both claims arose out of a common nucleus of operative fact. *See Maher v. Gagne, 448 U.S. 122, 132-33 n.15, 65 L. Ed. 2d 653, 100 S. Ct. 2570 (1980)* ("The legislative history makes it clear that Congress intended fees to be awarded where a pendent constitutional claim is involved, even if the [other] claim on which the plaintiff prevailed is one for which fees cannot be awarded....If the claim for which fees may be awarded meets the 'substantiality test...attorney's fees may be allowed even though the court declines to enter judgment for the plaintiff on that claim, so long as the plaintiff prevails on the non-fee [*14] claim arising out of a 'common nucleus of operative fact.'") (citations omitted); *see also Seaway Drive-In, Inc. v. Township of Clay, 791 F.2d 447, 451-52 (6th Cir. 1986); Carreras, v. City of Anaheim, 768 F.2d 1039, 1050 (9th Cir. 1985); Williams v. Thomas, 692 F.2d 1032, 1036 (5th Cir. 1982); Lund v. Affleck, 587 F.2d 75, 77 (1st Cir. 1978); Seals v. Quarterly County Court of Madison County, Tennessee, 562 F.2d 390, 393-94 (6th Cir. 1977).*

The test for substantiality is quite liberal and does not even require that the claim be supported by the evidence. *Seaway, 791 F.2d at 452-53.* Indeed, "a claim is insubstantial [only] if it is 'obviously without merit' or if 'its unsoundness so clearly results from the previous decisions of [the Supreme Court] as to foreclose the subject and leave no room for the inference that the question sought to be raised can be the subject of controversy.'" *Id. at 452* (citation omitted). Thus, "the claim must be 'so insubstantial, implausible, foreclosed by prior decisions of [the Supreme Court] or otherwise completely devoid [*15] of merit as not to involve a federal controversy....'" *Id.* (citation omitted).

We find, as did the district court, that the unaddressed § 1983 due process claim was substantial. n6 GTB argued that the municipalities deprived GTB and its tribally licensed fishers of their treaty reserved property rights in the fisheries' resources, and deprived its members of entitlement to a protected liberty interest when they were jailed for mooring at the marinas and prevented from pursuing their occupations. The district court upon initial review declined to grant summary judgment and dismiss the claim on the merits although it could have done so, finding that the resolution of the claim was not clear, and it needed further briefing. The district court then determined with regard to the issue of attorney's fees, that the claim was substantial to the extent it claimed deprivation of procedural due process by the municipal defendants. Upon review we agree. Although there is clearly insufficient evidence to support a judgment on the

claim, it is not so wholly without merit as to be insubstantial and completely implausible. The district court in granting summary judgment on the treaty-based claim [*16] noted that GTB's fishers were being unreasonably deprived of their ability to commercially harvest fish from traditional fishing areas by the denial of mooring at the marinas, an interest which may serve as a basis for constitutional relief. *Cf. Wilkerson v. Johnson, 699 F.2d 325, 328 (6th Cir. 1983)* (finding that plaintiff was unconstitutionally deprived of liberty interest when prevented from pursuing business); *cf. also Greene v. McElroy, 360 U.S. 474, 492, 3 L. Ed. 2d 1377, 79 S. Ct. 1400 (1959)* (noting that the right to employment and to follow a chosen profession free from unreasonable governmental interference were liberty and property rights protected by the Constitution); *Schware v. Bd. of Bar Examiners, 353 U.S. 232, 238, 1 L. Ed. 2d 796, 77 S. Ct. 752 (1957)* (same).

    n6 We do not rely on GTB's § 1983 equal protection claim as a basis for an award of fees because the district court granted summary judgment to the municipalities on that claim, and accordingly it should not be used as a basis for fees. *See McDonald v. Doe, 748 F.2d 1055, 1057 (5th Cir. 1984)* (finding that an award of attorney's fees could not be based on a failed civil rights claim).

**[*17]**

We also conclude that the district court correctly determined that the claim was reasonably related and based on a common core of operative facts as the treaty-based claims. Essentially, all of the claims advanced by GTB were based on the fact that the municipalities refused to allow GTB to moor its commercial fishing vessels at the marinas, and simply were alternative arguments for challenging the commercial use restrictions. Thus, the district court did not err by finding that GTB may be awarded attorney's fees for this case.

III. Reasonable Fees

The municipalities contend that even if GTB was properly found to be entitled to fees, the amount of the fees was not reasonable. The municipalities challenge both the $ 175 per hour rate of GTB's attorney William Rastetter, and the number of hours charged by him. The municipalities further contend that the district court should have reduced the fee award to take into account the "limited" success of GTB and should have apportioned fees against the state defendant, MDNR.

A. Hourly Rate

When considering a petition for attorney's fees the starting point is the lodestar calculation, which is calculated by multiplying the number of hours [*18] reasonably spent on the litigation by a reasonable hourly rate. *Wayne v. Village of Sebring, 36 F.3d 517, 531 (6th Cir. 1994)* (citing *Hensley, 461 U.S. at 433*). The district court has broad discretion to determine a reasonable hourly rate. *Id.* at 533. A reasonable rate should be based on prevailing market rates in the community for the services rendered by similar attorneys of comparable skill, experience and reputation. *Hadix, 65 F.3d at 536* (citation omitted). The district court determined that GTB's request for attorney's fees at a rate of $ 175 per hour was reasonable and we agree. William Rastetter, the attorney who represented GTB, has been practicing law for more than 25 years, has represented GTB for several years in this litigation, and has special expertise in federal and Indian law. The district court, which is very familiar with this litigation, having continuing supervisory authority over the 1985 consent judgment regarding GTB's right to fish, recognized the specialized practice in federal and Indian law that this work required, and noted that the defendants themselves had initially conceded that the $ 175 per [*19] hour rate sought by GTB was reasonable. J.A. at 44-45. GTB also submitted several affidavits from attorneys in the Traverse City area providing that the rate for attorneys with special expertise was $ 175 per hour or more. J.A. at 645, 650, 654. Thus, we find that the district court did not abuse its discretion in determining that a rate of $ 175 was reasonable based on the experience and expertise of GTB's attorney and the prevailing market rate in the community.

B. Hours Expended

The next issue is whether the amount of hours charged by GTB's counsel were reasonable. In determining whether the hours requested are reasonable, this court uses a three-tiered approach. The first step is to review the district court's determination that the party has actually worked the hours set forth in the bill of costs for clear error. *Wooldrige, 898 F.2d at 1176*. We then determine whether the district court erred in determining legal questions concerning the relationship between the hours billed and the point on which the party prevailed. *Id.* Finally, we determine whether the district court misapplied reasonable practices of the profession when billing the opposing party [*20] for the hours spent. *Id.* The municipalities argue that GTB's attorney listed various tasks performed each day, but offered only a total number of hours worked per day without separating hours by subject matter or task, which they argue made it impossible to estimate the amount of time spent on any individual tasks and to determine whether that time was reasonable. They also argue that fee entries were excessive, redundant or otherwise unnecessary.

1998 U.S. App. LEXIS 15145, *

We reemphasize that it is the district court, with its "superior understanding of the litigation," that is best suited for determination of the reasonableness of the fees. *Hensley, 461 U.S. at 437.* Additionally, GTB's counsel, is of course "not required to record in great detail how each minute of his time was expended....[It is enough that counsel]...identify the general subject matter of his time expenditures." *Id. at 437 n. 12.* GTB's attorney requested fees for time involving this litigation encompassing more than two years, documenting each activity expended in the litigation. J.A. at 587-617, 704-07. The district court provided a concise and clear explanation as to why it felt that the hours [*21] requested were reasonable, noting that the extensive legal briefings filed in the case illustrated the complex issues involved and supported the amount of time billed by GTB's attorney. It concluded that the total hours of 552.59, for more than two years worth of work, was reasonable given the large demands of the litigation. J.A. at 46. While GTB's attorney did not specify in minute detail the amounts of time each separate activity required, it is apparent that the district court did not clearly err by finding that GTB's counsel in fact performed the services listed on his billing statements on a given day and for the number of hours provided. Moreover, the municipalities make only generalized objections to the number of hours on appeal, and only directly challenge work done with respect to the ancillary proceedings (work which the district court declined to award fees for).

### C. Reduction for "Limited" Success

The municipalities argue that the fee award should be reduced based on the "limited" success of GTB, because it was granted transient mooring access as opposed to a permanent right to moor at their marinas. This argument is wholly without merit and borders on the frivolous. [*22] GTB never requested a right of permanent mooring, but simply that the commercial use restrictions be declared unenforceable against it. J.A. at 24. This relief is precisely what the district court ordered. The fact that the district court granted a transient right to access the marinas, in common with the recreational public, does not in any way obviate the degree of success obtained by GTB. In fact, GTB "has obtained excellent results...[and its] attorney should recover a fully compensatory fee...encompassing all hours reasonably expended on the litigation...." *Hensley, 461 U.S. at 435.*

### D. Apportionment

Finally, the municipalities argue that the district court should have apportioned fees against defendant MDNR. They maintain that MDNR is the more culpable defendant because the agreements restricting the commercial use of their marinas were drafted by MDNR, and GTB initially

filed suit only against MDNR and later joined the municipalities as defendants.

GTB, however, did not request fees from MDNR because MDNR assisted GTB in its assertion of a right to moor at the marinas. The Joint Status Report filed on February 5, 1995, observed: "the [MDNR] has indicated [*23] a willingness to relieve the municipal government defendants of the contractual obligation prohibiting commercial use if requested to do so by these defendants." J.A. at 82. In addition, MDNR filed a memorandum supporting GTB's motion for summary judgment. *Id.* at 405-16. Specifically, MDNR argued that GTB's use of the mooring slips did not violate the commercial use contained in the agreements; maintained that the municipalities had obstructed the 1985 consent order; and requested that the district court enter an order requiring the municipalities to permit GTB to moor. It is within the district court's discretion to apportion fees among defendants. *Anderson v. Flexel Inc., 47 F.3d 243, 251 (7th Cir. 1995); Koster v. Perales, 903 F.2d 131, 139 (2d Cir. 1990).* The court may consider the relative culpability of the parties against whom fees are awarded and the proportion of time spent litigating against each of those parties. *Koster, 903 F.2d at 139.* Taking those factors into consideration, we find that the district court properly declined to apportion fees against MDNR.

### IV.

In the cross-appeal, GTB maintains that the district [*24] court erred in denying its request for attorney's fees for the ancillary proceedings in the *United States v. Michigan* litigation, as well as the state court civil and criminal litigation involving GTB member, George Duhamel. An award of fees for ancillary proceedings is proper if the work was "useful and of a type ordinarily necessary" to secure the relief requested in the primary proceeding. *Webb v. Dyer Cty. Bd. of Ed., 471 U.S. 234, 243, 105 S. Ct. 1923, 85 L. Ed. 2d 233 (1985).* It is within the discretion of the district court to decide whether ancillary fees are appropriate. *Id. at 243-44; see also Pennsylvania v. Delaware Valley Citizens' Council, 478 U.S. 546, 561, 92 L. Ed. 2d 439, 106 S. Ct. 3088 (1986),*

The district court found that although some of the legal work performed in the *United States v. Michigan* case may have aided in the subsequent action against the municipalities, it would be patently unfair and contrary to established law to assess these defendants for such fees since neither defendant appeared as a party in the earlier matter. It further concluded that it was doubtful that the hours were necessary [*25] or useful to the resolution of this litigation. We agree. The district court was within its discretion to deny fees for the ancillary proceedings where neither of the municipalities were parties to that litigation and indeed were informed by the district court

that they would not be permitted to file pleadings in that litigation. J.A. at 42. Moreover, there is no evidence that the work done in the *United States v. Michigan* proceeding was necessary to the primary litigation. Similarly, the district court did not err by declining to award attorney's fees for the state court ancillary proceedings. GTB was never a named party of those criminal proceedings and the work, as the district court noted, was performed largely on behalf of someone other than GTB. Moreover, we generally do not grant attorneys fees when a party chooses to defend criminal proceedings before instituting civil rights litigation relating to the matter. *See Greer v. Holt, 718 F.2d 206, 208 (6th Cir. 1983).*

We **AFFIRM.**

**CONCURBY:** RYAN

**CONCUR:**

**RYAN, Circuit Judge, concurring**. In my dissenting opinion in *Grand Traverse Band of Ottawa & Chippewa Indians v. Director, Michigan Department of Natural Resources, 141 F.3d 635 (6th Cir. 1998),* [*26] I stated:

> In my judgment, the Grand Traverse Band of Ottawa & Chippewa Indians is not entitled to moor its fishing vessels at the marinas at Leland or Northport either by virtue of the Treaties of 1836 and 1855, or by virtue of the consent judgment between the tribe and the State of Michigan.

I explained my reasons for that view, but my colleagues were not persuaded and held otherwise.

Consequently, for the reasons explained in my brother's opinion in this case, I agree that the plaintiff's unaddressed but not insubstantial *42 U.S.C. § 1983* claim justifies an award of attorney fees under § 1988.

# EXHIBIT 5

FOCUS - 1 of 1 DOCUMENT

**JENNIFER SEES, et al., Plaintiffs, v. RONDELL FAGEN, et al., Defendants.**

**Civil Action No. 3:01-CV-2543-R**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

*2002 U.S. Dist. LEXIS 4845*

**March 20, 2002, Decided**
**March 21, 2002, Filed, Entered**

**SUBSEQUENT HISTORY:** [*1] Adopted, costs/fees proceeding, mot. granted, in part, mot. denied, in part, *Sees v. Fagen, 2002 U.S. Dist. LEXIS 4886* (N.D. Tex. Mar. 21, 2002).

**DISPOSITION:** Magistrate recommended that motions for attorney fees and costs be GRANTED in part and DENIED in part.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**COUNSEL:** For JENNIFER SEES, EVA-MARIA SEES, ARVEL D TOTEN, JR, GERRY DAWN TOTEN, NOEL REYNOLDS, plaintiffs: John E Sullivan, Attorney at Law, Law Office of John E Sullivan, Dallas, TX USA.

For RONDELL FAGEN, OSCAR CHAVEZ, JOHN B WARD, defendants: Susan Desmarais Bonnen, Jack Gilbert, Randall K Hill, Attorneys at Law, Attorney General of Texas, Austin, TX USA.

For NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA, defendant: Harrison H Yoss, Jo Allison Stasney, Attorneys at Law, Thompson Coe Cousins & Irons, Dallas, TX USA.

For UNITED STATES FIRE INSURANCE COMPANY, defendant: Scott A Whisler, Attorney at Law, Grau Ashley & Koen, Dallas, TX USA.

For RONDELL FAGEN, OSCAR CHAVEZ, JOHN B WARD, cross-claimants: Jack Gilbert, Randall K Hill,

Attorneys at Law, Attorney General of Texas, Austin, TX USA.

For NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA, cross-defendant: Harrison H Yoss, Jo Allison Stasney, Attorneys at Law, Thompson Coe Cousins & Irons, Dallas, TX USA. [*2]

For UNITED STATES FIRE INSURANCE COMPANY, cross-defendant: Scott A Whisler, Attorney at Law, Grau Ashley & Koen, Dallas, TX USA.

**JUDGES:** JANE J. BOYLE, UNITED STATES MAGISTRATE JUDGE.

**OPINIONBY:** JANE J. BOYLE

**OPINION:**

**FINDINGS,        CONCLUSIONS,        AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to the District Court's Orders of Reference, filed March 5, 2002, and March 11, 2002, respectively, **the Plaintiffs' Motion and Application For Attorney's Fees and Costs and Brief in Support,** filed March 1, 2002, and the TxDOT Individual Defendants' **Supplemental Motion For Attorney's Fees and Brief in Support,** filed March 5, 2002, are before this Court for hearing, if necessary, and for recommendation. Having carefully considered the applicable authorities and the pleadings now on file, the Court recommends that the motions be **GRANTED** in part and **DENIED** in part for the reasons set forth below.

## I. Background

At a February 27, 2002, hearing, this Court recommended that the District Court grant two motions to remand which had been filed by the Plaintiffs and the TxDOT Individual Defendants in December 2001. In addition, the Court established an expedited [*3] briefing schedule to address the issue of attorney fees and costs under *28 U.S.C. § 1447*(c). The two resulting motions for attorney fees and costs are the subject of this recommendation.

## II. Legal Standards

### A. 28 U.S.C. § 1447(c)

"An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." *28 U.S.C. § 1447*(c). However, there is no automatic entitlement to attorney fees under § 1447(c) for an improper removal. *Valdes v. Wal-Mart Stores, Inc., 199 F.3d 290, 292 (5th Cir. 2000). See also Garbie v. DaimlerChrysler Corp., 211 F.3d 407, 411 (7th Cir. 2000)* (holding that § 1447(c) is a fee-shifting statute and that therefore the prevailing party is presumptively entitled to recover attorney fees). Rather, the Court must consider the objective merits of the defendant's case at the time of removal--as opposed to the motive of the defendants--in deciding whether an improper removal warrants an award of attorney fees under § 1447(c). *Valdes, 199 F.3d at 292-93.* [*4] A district court's decision "to award or not to award attorney[] fees is reviewed for abuse of discretion." *Id. at 292.*

### B. "Lodestar" Method For Calculating Attorney Fees

Once a court determines that an improper removal warrants an award of attorney fees, the court employs the "lodestar" method to calculate the amount of fees to be awarded. *Louisiana Power & Light Co. v. Kellstrom, 50 F.3d 319, 324 (5th Cir. 1995).* The "lodestar" method requires the court to "determine the reasonable number of hours expended on the litigation and the reasonable hourly rates for the participating lawyers." *Id.* The court must then "multiply the reasonable hours by the reasonable hourly rates." *Id.* The resulting figure is the "lodestar" fee amount. *Id.* Determinations of reasonable hours and rates are reviewed for clear error. *Id.*

The court may adjust the "lodestar" fee amount upward or downward according to the circumstances of the case. *Id.* In determining whether to adjust the "lodestar" fee amount, the court must consider the twelve factors set forth in *Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974).* [*5] *Wegner v. Standard Ins. Co., 129 F.3d 814, 822 (5th Cir. 1997).* Those twelve factors are:

> (1) the time and labor required for the litigation; (2) the novelty and complication of the issues; (3) the skill required to properly litigate the issues; (4) whether the attorney had to refuse other work to litigate the case; (5) the attorney's customary fee; (6) whether the fee is fixed or contingent; (7) whether the client or case circumstances imposed any time constraints; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) whether the case was "undesirable"; (11) the type of attorney-client relationship and whether that relationship was long-standing; and (12) awards made in similar cases."

*Id. at 822 n.17.* Adjustments to the "lodestar" fee amount are reviewed for abuse of discretion. *Id. at 822.*

The Court now turns to the merits of the motions.

## III. Analysis n1

> n1 The Court will frequently refer to the *Gnade* case in its analysis. References to the *Gnade* case refer to the case of *Gnade et al. v. National Union et al., 2002 U.S. Dist. LEXIS 510, 3*:01-CV-2527-G, which is a companion case to the instant action and which was remanded to state court by Judge Fish on January 9, 2002.

[*6]

As noted above, the Court must first consider the objective merits of the Insurance Defendants' case at the time of removal to determine whether an award of attorney fees is warranted under § 1447(c). *Valdes, 199 F.3d at 292-93.* An objective view of the merits of the Insurance Defendants' case at the time of removal reveals that the Insurance Defendants removed the case to federal court after the one-year removal period had expired and despite having entered into a forum selection agreement that clearly and unambiguously prohibited removal. As such, the Court RECOMMENDS that attorney fees are warranted under § 1447(c) for the objectively improper removal in this case.

### A. Plaintiffs' Motion

#### 1. Attorney Fees

2002 U.S. Dist. LEXIS 4845, *

The Plaintiffs seek $ 46,900 in attorney fees. **(Ps' Mot. at 4.)** Specifically, they seek $ 250 per hour for 187.60 hours of work relating to the improper removal. **(Id. at 5.)** The Insurance Defendants, on the other hand, challenge the reasonableness of both the hours expended and the hourly rate. **(Ds' Resp. at 9, 20.)** For the reasons that follow, the Court **RECOMMENDS** that the Plaintiffs recover $ 33,815.00 **[*7]** in attorney fees.

a. Reasonable Hours

As noted above, the Plaintiffs claim 187.60 hours of work relating to the improper removal. **(Ps' Mot. at 5.)** The Insurance Defendants challenge the reasonableness of these hours generally and specifically. **(Ds' Resp. at 9-20.)** The Court will address each of the Insurance Defendants' challenges in turn.

First, the Insurance Defendants contend that 28.5 hours to prepare the remand brief is excessive because the remand brief in the instant case is nearly identical to the remand brief in the *Gnade* case. **(Id. at 9.)** The Plaintiffs, on the other hand, counter that 28.5 hours was necessary to independently research and adapt the *Gnade* remand brief for use in the instant case. **(Ps' Reply at 2.)** Having reviewed both remand briefs and the arguments of the parties, the Court finds that 14 hours was a reasonable amount of time to adapt the *Gnade* remand brief for use in the instant case. As such, 14.5 hours should be deducted from the Plaintiffs' total claimed hours for this challenge. ***EEOC v. Clear Lake Dodge, 60 F.3d 1146, 1154 (5th Cir. 1995)*** ("Attorneys' fees must not be awarded for attorney **[*8]** hours that are 'excessive, redundant, or otherwise unnecessary.'").

Second, the Insurance Defendants contend that the Plaintiffs have failed to demonstrate that they exercised billing judgment. **(Ds' Resp. at 20.)** In their reply, the Plaintiffs assert that "the undersigned counsel have not included time for work that was actually done, such as frequent conferences regarding the removal, and thus exercised billing judgment in this regard." **(Ps' Reply at 5.)** However, the Court is not convinced that they have carried their burden of showing that they exercised billing judgment. As such, 28.14 hours, or 15% of the total claimed hours, should be deducted from the Plaintiffs' total claimed hours for this challenge. ***Walker v. HUD, 99 F.3d 761, 769 (5th Cir. 1996)*** (reducing the number of claimed hours by 15% for failing to show billing judgment).

Third, the Insurance Defendants contend that the Plaintiffs employed the impermissible technique of "block billing," **(Ds' Resp. at 14),** which is the practice of "enter[ing] the total daily time spent working on a case, rather than itemizing the time expended on specific tasks." n2 ***Harolds Stores, Inc. v. Dillard Dep't. Stores, Inc., 82 F.3d 1533, 1554 n.15 (10th Cir. 1996).*** **[*9]** The

Plaintiffs argue, among other things, that the Insurance Defendants have not cited any Fifth Circuit authority to support their challenge. **(Ps' Reply at 3.)** Indeed, "block billing," by that name, has only been expressly recognized by the Tenth Circuit, *see Harolds Stores, Inc., 82 F.3d at 1554,* although several district courts outside of the Tenth Circuit have also recognized the practice of "block billing." *See, e.g., UAW Local 540 v. Baretz, 159 F. Supp. 2d 954 (E.D. Mich. 2000); McDannel v. Apfel, 78 F. Supp. 2d 944 (S.D. Iowa 1999); United States v. Pennsylvania Blue Shield, 54 F. Supp. 2d 410 (M.D. Pa. 1999); Rodriguez v. McLoughlin, 84 F. Supp. 2d 417 (S.D.N.Y. 1999).* However, the Court finds no authority that "block billing" constitutes a mandatory reduction, even in the jurisdictions that recognize it. Rather, one court recommends "look[ing] at the entire block, comparing the listed activities and the time spent, and determining whether the hours reasonably correlate to all of the activities performed." *Pennsylvania Blue Shield, 54 F. Supp. 2d at 415.* **[*10]** Employing this technique, the Court finds no basis on which to reduce the Plaintiffs' total claimed hours for impermissible "block billing," even if "block billing" were recognized in the Fifth Circuit. Therefore, zero hours should be deducted from the Plaintiffs' total claimed hours for this challenge.

n2 Specifically, the Insurance Defendants challenge the Plaintiffs' billing entries for 11/30/01, 12/21/01, 12/26/01--12/28/01, 12/31/01, 1/18/02, 1/30/02--2/1/02, 2/5/02, 2/8/02, 2/11/02--2/13/02, 2/18/02, 2/19/02, 2/21/02--2/23/02, and 2/25/02-- 3/1/02.

Fourth, the Insurance Defendants challenge the recovery of attorney fees for the time the Plaintiffs spent on an "unsuccessful" deposition attempt. n3 **(Ds' Resp. at 18.)** The Plaintiffs counter that the Insurance Defendants have mischaracterized the deposition attempt as "unsuccessful" because the Plaintiffs in fact withdrew the deposition attempt due to a death in the opposing counsel's family. **(Ps' Reply at 6-8.)** Although the deposition attempt **[*11]** was not "unsuccessful," the hours spent on the deposition attempt were nonetheless unnecessary. *Clear Lake Dodge, 60 F.3d at 1154* ("Attorneys' fees must not be awarded for attorney hours that are 'excessive, redundant, or otherwise unnecessary.'"). Whatever the reason, the Plaintiffs voluntarily withdrew their deposition attempt. As such, 8.7 hours should be deducted from the Plaintiffs' total claimed hours for this challenge.

n3 Specifically, the Insurance Defendants challenge the billing entries for 12/2/01, 12/20/01, 12/21/01, 12/26/01, 12/27/01, 1/3/02, and 1/4/02.

Fifth, the Insurance Defendants challenge the billing entries for administrative tasks performed by the Plaintiffs' counsel. n4 (Ds' Resp. at 17.) The Plaintiffs contend that the administrative tasks were necessary and that the tasks did not take much time. (Ps' Reply at 5-6.) However, it is not apparent from the Plaintiffs' billing records how much time these tasks actually took. Furthermore, although the Plaintiffs [*12] assert that these hours are properly billable, they do not cite any authority for that proposition. Therefore, 1 hour should be deducted from the total claimed hours for this challenge.

n4 Specifically, the Insurance Defendants challenge the billing entries for 1/4/02, 1/9/02, 2/11/02, 2/13/02, 2/15/02, and 2/20/02.

Sixth, the Insurance Defendants challenge the billing entries for the time the Plaintiffs' counsel spent on "another lawsuit." n5 (Ds' Resp. at 19.) Plaintiffs contend that they were not working on "another lawsuit" but rather researching the closely-related *Gnade* case. (Ps' Reply at 8.) The Court finds that this research was necessary and reasonable in light of the close similarities between the instant case and the *Gnade* case. As such, zero hours should be deducted from the Plaintiffs' total claimed hours for this challenge.

n5 Specifically, the Insurance Defendants challenge the billing entries for 11/30/01, 12/2/01, 12/6/01, 12/24/01, 2/1/02, 2/8/02, 2/11/02, and 2/18/02.

[*13]

Finally, the Insurance Defendants generally challenge the adequacy of the Plaintiffs' time records. (Ds' Resp. at 14.) The Plaintiffs do not address this challenge in their reply. However, this challenge is not directed at specific billing entries, and the billing entries do not appear to be facially inadequate. As such, zero hours should be deducted from the Plaintiffs' total claimed hours for this challenge.

In sum, the Court RECOMMENDS that the Plaintiffs expended 135.26 reasonable hours on the improper removal.

b. Reasonable Hourly Rate

Plaintiffs seek $ 250 per hour. (Ps' Mot. at 5.) The Insurance Defendants challenge the hourly rate on the grounds that the Plaintiffs have submitted insufficient evidence to establish the reasonableness of $ 250 per hour. (Ds' Resp. at 20-21.) The Court disagrees. The Plaintiffs submit the Declaration of John E. Sullivan, in which Mr. Sullivan details his own legal experience, as well as the legal experience of co-counsel Stephen W. Kotara. (Ps' App. at 8-9.) Mr. Sullivan and Mr. Kotara have been practicing law in Texas since 1985 and 1987, respectively, and both attorneys have significant experience in tort and [*14] commercial litigation, including personal injury and insurance litigation. (*Id.*) Plaintiffs also submit evidence of the rates customarily charged by attorneys in Dallas with the legal experience of Mr. Sullivan and Mr. Kotara. (*Id.* at 27.) Equity partners in Dallas billed an average of $ 298 per hour in 2001. (*Id.*) Furthermore, equity partners in Texas law firms of less than thirty attorneys billed an average of $ 230 per hour in 2001. (*Id.*) Considering the legal experience of the Plaintiffs' counsel, as well as the evidence of customary rates, the Court finds $ 250 per hour to be a reasonable hourly rate for both Mr. Sullivan and Mr. Kotara.

c. The "Lodestar" Fee Amount

Multiplying the reasonable hours of 135.26 by the reasonable hourly rate of $ 250, the Court RECOMMENDS the "lodestar" fee amount is $ 33,815.00.

d. The *Johnson* Factors

As noted above, the Court may increase or decrease the "lodestar" fee amount according to the circumstances of the case. *Wegner, 129 F.3d at 822.* After considering the twelve *Johnson* factors, the Court RECOMMENDS no adjustment to the "lodestar" fee amount.

Although [*15] the difficulty of the case, the skill required, the time limitations imposed by the Court, and the successful result for the Plaintiffs weigh in favor of increasing the "lodestar" fee amount, other factors weigh in favor of decreasing the "lodestar" fee amount. For example, the Plaintiffs' attorneys are currently working on a contingent fee basis, the extent of the professional relationship between the Plaintiffs and their attorneys is limited to this one case, and the plaintiffs recovered $ 32,500.00 in attorney fees in the *Gnade* case.

As such, the Court RECOMMENDS that the Plaintiffs recover $ 33,815.00 in attorney fees due to the improper removal in this case.

2. Costs

Plaintiffs seek $ 588.50 in copying costs. (Ps' Mot. at 4.) Specifically, Plaintiffs seek $ 0.25 per copy for 2,354 copies. (Ps' App. at 10.) The Insurance Defendants

contend that these copying costs are not recoverable because the purpose of the copies has not been described with sufficient particularity. **(Ds' Resp. at 19.)** However, given the Court's firsthand experience with the voluminous filings in this case, the Court finds 2,354 copies to be reasonable in this case. On [*16] the other hand, the Court finds $ 0.25 per copy to be excessive. n6 Therefore, the Court **RECOMMENDS** that Plaintiffs recover $ 353.10, or $ 0.15 per copy, as "just costs" under § 1447(c).See *Lovell v. Glen Oaks Hospital, Inc., 1999 U.S. Dist. LEXIS 17664, No. 3:97- CV-0318-L, 1999 WL 1029091, at *2 (N.D. Tex. Nov. 10, 1999) (awarding $ 0.15 per copy under 28 U.S.C. § 1920(4)).*

n6 The Court recognizes that the Plaintiffs rely on this Court's decision in *Anderson v. Siemens Med. Sys's, Inc.,* 2002 U.S. Dist. LEXS 1923, No. 3:98- CV-1850, 2002 WL 199878, at *2 (N.D. Feb. 7, 2002), to support its claim for $ 0.25 per copy; however, the Plaintiffs fail to recognize that the *Anderson* decision dealt with copies of transcripts requested from the court, as opposed to copies of pleadings and other filings produced by the Plaintiffs.

**3. Contingent Fees**

The Plaintiffs seek $ 10,000 in the event of an unsuccessful appeal to the District Court and $ 25,000 in the event of an unsuccessful appeal [*17] to the Fifth Circuit. **(Ps' Mot. at 5.)** Although fees may be awarded for unsuccessful appeals, *see News-Texan, Inc. v. City of Garland, Texas, 814 F.2d 216, 221 (5th Cir. 1987),* the Court finds no authority to award contingent fees in the event of unsuccessful appeals in the situation presented by this case. n7 Therefore, the Plaintiffs' request for contingent fees should be **DENIED.**

n7 The Court recognizes that the Plaintiffs have submitted a letter, dated March 12, 2002, in which the Plaintiffs cite to two cases as authority for awarding contingent fees. However, it is inappropriate for the Court to consider these arguments because they were submitted after the Plaintiffs had filed their reply brief. Furthermore, the Court notes that the cited cases are distinguishable from the instant case in that the contingent fees awarded in the cited cases dealt with the appeal of the final disposition of the case in addition to the award of attorney fees. The instant case has not reached a final disposition, and any appeal would deal strictly with the award of attorney fees.

[*18]

**B. TxDOT Individual Defendants' Motion**

**1. Attorney Fees**

The TxDOT Individual Defendants seek $ 33,300 in attorney fees. **(TxDOT Mot. at 1.)** Specifically, they seek $ 250 per hour for 126 hours of work and $ 150 per hour for 12 hours of work, all of which related to the improper removal. **(Id. at 6-7.)** The Insurance Defendants, on the other hand, challenge the reasonableness of both the hours expended and the hourly rate. **(Ds' Resp. at 2, 6.)** For the reasons that follow, the Court **RECOMMENDS** that the TxDOT Individual Defendants recover $ 14,297.50 in attorney fees.

a. Reasonable Hours

As noted above, the TxDOT Individual Defendants claim a total of 138 hours of work relating to the improper removal. **(TxDOT Mot. at 6-7.)** The Insurance Defendants challenge the reasonableness of these hours generally and specifically. **(Ds' Resp. at 2-6.)** The Court will address each of the Insurance Defendants' challenges in turn.

First, the Insurance Defendants allege that the TxDOT Individual Defendants billed for the same work in their *Sees* and *Gnade* billing records. n8 **(Id. at 3.)** The TxDOT Individual Defendants, on the other [*19] hand, explain that the identical billing entries represent split-billing, not redundant billing. **(TxDOT Reply at 2-6.)** After a careful review of the billing statements, the Court finds the TxDOT Individual Defendants' explanation to be persuasive. Most importantly, the Court finds that the total of 38.5 hours, or 19.25 hours each for the *Sees* and *Gnade* cases, represents a reasonable amount of time to prepare, from scratch, the nearly identical motions to remand in the *Sees* and *Gnade* cases. **(TxDOT Mot. at Ex. 2.)** As such, zero hours should be deducted from the TxDOT Individual Defendants' total claimed hours for this challenge.

n8 Specifically, the Insurance Defendants challenge the identical billing entries for 12/12/01, 12/17/01, 12/18/01, 12/21/01, 12/27/01, and 12/28/01. In their reply, the TxDOT Individual Defendants voluntarily retract their request for the 4 hours of "traveling to/from Courthouse" on 12/28/01, identifying this entry as an inadvertent instance of double billing. Furthermore, in their reply, the TxDOT Individual Defendants claim an additional 4 hours for the time it took them to prepare their reply brief. Therefore, the TxDOT

Case 1:01-cv-00109-SSB    Document 54    Filed 10/22/2003    Page 56 of 80

Page 6
2002 U.S. Dist. LEXIS 4845, *

Individual Defendants' total claimed hours of 138 hours remains the same following their reply.

[*20]

Second, the Insurance Defendants challenge several billing entries as containing vague research descriptions. n9 (**Ds' Resp. at 4.**) The TxDOT Individual Defendants do not address this challenge in their reply. The challenged billing entries include several references to "Researching/Reviewing Law" without any further explanation regarding the subject matter of the research. (**TxDOT Mot. at Ex. 2.**) Vague research descriptions can be a basis for reducing the number of reasonable hours for purposes of attorney fee calculations. *LULAC v. Roscoe Ind. Sch. Dist., 119 F.3d 1228, 1233 (5th Cir. 1997).* As such 40.00 hours should be deducted from the total claimed hours for this challenge. n10

n9 Specifically, the Insurance Defendants challenge the vague research descriptions in the billing entries for 12/20/01, 12/21/01, 1/9/02, 2/1/02, 2/2/02, 2/6/02, 2/9/02, 2/25/02, 2/27/02, 2/28/02, and 3/4/02.

n10 The Insurance Defendants also challenge the 37 hours it took Ms. Bonnen to prepare for the motion hearing. Specifically, the Insurance Defendants challenge the TxDOT Individual Defendants' choice of attorneys for the motion hearing, given that Mr. Hill was more familiar with the case. However, the Court notes that out of the 40 hours it deducted for vague research descriptions, 13 of those hours also constituted some of Ms. Bonnen's preparation time. The Court finds that the remaining 24 hours of preparation time for Ms. Bonnen was reasonable. Therefore, the Court will not address the Insurance Defendants' challenge to Ms. Bonnen's preparation time any further.

[*21]

Third, the Insurance Defendants contend that the TxDOT Individual Defendants have failed to demonstrate that they exercised billing judgment. (**Ds' Resp. at 5.**) The TxDOT Individual Defendants do not address this challenge in their reply. There is no indication from the evidence or from the briefing that the TxDOT Individual Defendants exercised billing judgment. As such, 20.7 hours, or 15% of the total claimed hours, should be deducted from the TxDOT Individual Defendants' total claimed hours. *Walker, 99 F.3d at 769* (**reducing the number of claimed hours by 15% for failing to show billing judgment**).

Fourth, the Insurance Defendants contend that several billing entries indicate that the TxDOT Individual Defendants used an excessive amount of time to complete listed tasks. n11 (**Ds' Resp. at 4-5.**) The TxDOT Individual Defendants do not address this challenge in their reply. The Court finds that the TxDOT Individual Defendants used an excessive amount of time in reviewing letters and memos. (**TxDOT Mot. at Ex. 2.**) As such, 2.25 hours should be deducted from the TxDOT Individual Defendants' total claimed hours for this challenge. *Clear Lake Dodge, 60 F.3d at 1154* [*22] ("**Attorneys' fees must not be awarded for attorney hours that are 'excessive, redundant, or otherwise unnecessary.'**").

n11 Specifically, the Insurance Defendants challenge the billing entries for 1/9/02--1/11/02, 1/16/02, 1/24/02, 2/1/02, 2/2/02, 2/6/02, 2/8/02, 2/9/02, and 2/21/02.

Finally, the Insurance Defendants challenge one billing entry as unnecessary because the task had not yet been required by the District Court. n12 (**Ds' Resp. at 5.**) The TxDOT Individual Defendants counter that even if the task was completed early, it was still done for this case. (**TxDOT Reply at 8.**) The Court is not convinced by the TxDOT Individual Defendants' argument; the TxDOT Individual Defendants should not be able to recover attorney fees for work that was not yet required. As such, 2.5 hours should be deducted from the TxDOT Individual Defendants' total claimed hours for this challenge. *Clear Lake Dodge, 60 F.3d at 1154* ("**Attorneys' fees must not be awarded for attorney hours that are 'excessive,** [*23] **redundant, or otherwise unnecessary.'**").

n12 Specifically, the Insurance Defendants challenge the "initial disclosures" billing entry for 2/1/02.

In sum, the Court **RECOMMENDS** that the TxDOT Individual Defendants expended 72.55 reasonable hours on the improper removal. n13

n13 Of the 72.55 reasonable hours, 69.05 hours were billed by Mr. Gilbert, Mr. Hill, and Ms. Bonnen, and 3.50 hours were billed by Ms. Sims.

b. Reasonable Hourly Rate

The TxDOT Individual Defendants seek $ 250 per hour for Mr. Gilbert, Mr. Hill, and Ms. Bonnen and $ 150

per hour for Ms. Sims. **(TxDOT Mot. at 6-7.)** The Insurance Defendants contend that the TxDOT Individual Defendants have submitted insufficient evidence to establish the reasonableness of the claimed hourly rates. **(Ds' Resp. at 6.)** In their reply, the TxDOT Individual Defendants disclose **[*24]** that in the *Gnade* case Magistrate Judge Kaplan established a rate of $ 200 per hour for Mr. Gilbert and Mr. Hill and $ 125 per hour for Ms. Sims. **(TxDOT Reply at 7-8.)** The TxDOT Individual Defendants further state that they would "not object to these rates" if this Court "wishes to remain consistent." *(Id.)* In light of the evidence of legal experience provided by the TxDOT Individual Defendants, and in light of the previous determination as to reasonable hourly rates, the Court **RECOMMENDS** the reasonable hourly rates of $ 200 for Mr. Gilbert, Mr. Hill, and Ms. Bonnen and $ 125 per hour for Ms. Sims.

c. The "Lodestar" Fee Amount

Multiplying the reasonable hours of 69.05 by the reasonable hourly rate of $ 200, and multiplying the reasonable hours of 3.50 by the reasonable hourly rate of $ 125, the Court **RECOMMENDS** the "lodestar" fee amount of $ 14,247.50.

d. The *Johnson* Factors

As noted above, the Court may increase or decrease the "lodestar" fee amount according to the circumstances of the case. *Wegner, 129 F.3d at 822.* After considering the twelve *Johnson* factors, the Court **RECOMMENDS** no adjustment to the "lodestar" **[*25]** fee amount.

Although the difficulty of the case, the skill required, the time limitations imposed by the Court, and the successful result for the TxDOT Individual Defendants weigh in favor of increasing the "lodestar" fee amount, other factors weigh in favor of decreasing the "lodestar" fee amount. For example, the work in this case was very similar to the work in the *Gnade* case, and the TxDOT Individual Defendants recovered $ 11,000.00 in attorney fees in the *Gnade* case.

As such, the Court **RECOMMENDS** that the TxDOT Individual Defendants recover $ 14,247.50 in attorney fees due to the improper removal in this case.

2. Costs

The TxDOT Individual Defendants seek $ 142.87 in travel costs, which were accrued in traveling to and from the motion hearing. **(TxDOT Mot. at 7.)** The Insurance Defendants do not address this claim for costs in their response. The TxDOT Individual Defendants have submitted sufficient evidence of these travel costs. *(Id. at Ex. 3.)* Therefore, the TxDOT Individual Defendants' request for travel costs should be **GRANTED**. *Tenner v. Zurek, 168 F.3d 328, 330 (7th Cir. 1998)* (awarding

travel costs under § 1447(c) **[*26]** following remand to state court).

3. Contingent Fees

The TxDOT Individual Defendants request $ 2,500 in the event of an unsuccessful appeal to the District Court and $ 15,000 in the event of unsuccessful appeal to the Fifth Circuit. **(TxDOT Reply at 10.)** As noted above, although fees may be awarded for unsuccessful appeals, *see News-Texan, Inc., 814 F.2d at 221,* the Court finds no authority to award contingent fees in the event of unsuccessful appeals in the situation presented by this case. Therefore, the TxDOT Individual Defendants' request for contingent fees should be **DENIED.**

IV. Recommendation

For the foregoing reasons, the Court **RECOMMENDS** that the motions for attorney fees and costs be **GRANTED in part** and **DENIED in part.** Specifically, under § 1447(c), the Court **RECOMMENDS** that (1) the Plaintiffs recover a total of $ 34,168.10 in fees and costs from the Insurance Defendants, payable to Mr. John Sullivan for his clients in this case, and (2) the TxDOT Individual Defendants recover a total of $ 14,390.37 in fees and costs from the Insurance Defendants, payable to the Office of the Attorney General.

**SO [*27] RECOMMENDED.** March 20th, 2002.

JANE J. BOYLE

UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND NOTICE OF RIGHT TO APPEAL/OBJECT**

Pursuant to Title *28, United States Code, Section 636(b)(1),* any party who desires to object to these findings, conclusions and recommendation must file and serve written objections within ten (10) days after being served with a copy. A party filing objections must specifically identify those findings, conclusions or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory or general objections. A party's failure to file such written objections to these proposed findings, conclusions and recommendation shall bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn, 474 U.S. 140, 150, 88 L. Ed. 2d 435, 106 S. Ct. 466 (1985); Perales v. Casillas, 950 F.2d 1066, 1070 (5th Cir. 1992).* Additionally, any failure to file written objections to the proposed findings, conclusions and recommendation within ten (10) days after being served with a copy shall bar the aggrieved party from appealing the **[*28]** factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court,

except upon grounds of plain error. *Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).*

JANE J. BOYLE

UNITED STATES MAGISTRATE JUDGE

# EXHIBIT 6

## AFFIDAVIT OF JAMES HILLMANN

The undersigned, James Hillmann, being duly sworn on oath, states as follows:

1.    I am presently, and have been since the company's inception nearly nine years ago (January 1995), the owner and President of Copy Plex, Inc., a reproduction services company specializing in litigation support which has its offices in downtown Cincinnati. I have worked in the field of litigation support providing reproduction services to hundreds of law firms locally and nationally for the past 12 years.

2.    Based upon my experience, the average cost to copy a black and white litigation document, factoring in the costs of equipment, paper, ink, floor plan, and labor, exceeds ten cents per page, and Copy Plex's average charge for copying of that nature is twelve to fourteen cents per page.

3.    I have personal knowledge of many law firms in this community which charge more than ten cents per page and many charge fifteen to twenty cents per page.

4.    Based upon my experience and knowledge of the customary copy charges of local law firms and by my company, it is my opinion that a charge of ten cents per page is more than reasonable for black and white copies of litigation documents.

FURTHER AFFIANT SAITH NAUGHT.

_____
James Hillmann

State of Ohio            :
                        : SS:
County of Hamilton       :

Sworn to before me and subscribed in my presence this 17th day of October 2003.

_____
Notary Public

CHERYL A. PENCE
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES 08-05-08

# EXHIBIT 7

# CHAMPION INTERNATIONAL CORPORATION

## REORGANIZATION SEVERANCE POLICY #828

1.    **Adoption of the Policy**: Champion International Corporation ("Company", as further defined in Section 1.3) hereby adopts the Champion International Corporation Reorganization Severance Policy #828 ("Policy"). The Policy, effective as of the closing date of the Merger, consists of this document and the attached Summary Plan Description (and any amendments thereto) of the Policy, the provisions of which are made a part hereof and incorporated herein by reference.

2.    **Purpose of the Policy**. The purpose of the Policy is to provide certain severance and other benefits to employees of the Company whose employment is Terminated as a result of Reorganization. The Policy is an employee benefit plan under Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

3.    **Amendment and Termination**. The Company shall have the right to amend and/or terminate the Policy at any time for whatever reasons it may deem appropriate without prior notice, except that, (1) the Pension Enhancement described in Paragraph 3, may not be extended beyond one year and (2) for the one-year period immediately following the Merger, (a) the Policy shall not be terminated, and (b) no amendment will be effective if it would adversely affect the rights, expectancies, or benefits of any Eligible Employee provided by the Policy as in effect as of the closing date of the Merger.

4.    **Severability of Provisions**. If any provision of the Policy should be held invalid or unenforceable, such invalidity or unenforceability shall not affect any other provisions of the Policy, and the Policy shall be construed and enforced as if such provision had not been included.

5.    **Applicable Laws**. The Policy shall be construed, administered and governed in all respects under and by the laws of the State of Connecticut, except where such laws are preempted by applicable federal legislation.

**IN WITNESS WHEREOF**, the authorized delegate of the Pension and Employee Benefits Committee of Champion International Corporation, on behalf of said Committee, has executed the Policy by signing this document as evidence of its adoption.

Approved: __May 26, 2000_____

_Paul B. Records_

Paul B. Records

- 1 -                                05/25/00 4:45 PM

# SUMMARY PLAN DESCRIPTION

# CHAMPION INTERNATIONAL CORPORATION

# REORGANIZATION SEVERANCE POLICY #828

The Policy sets forth certain benefits extended to Eligible Employees whose employment is Terminated during the Policy Period as a result of Reorganization.

## Section 1 Definitions

1.1    Administrator is the Company.

1.2    Cause is deliberate unacceptable performance of duties, deliberate unsatisfactory performance (Employee refuses to improve unsatisfactory performance), excessive absenteeism, violation of rules, gross negligence, dishonesty, acts in bad faith, fraud and/or insubordination.

1.3    Company is Champion International Corporation prior to the Merger (including its United States subsidiaries), and after the Merger Company is the corporation that survives the Merger.

1.4    Credited Service is an Eligible Employee's period of employment with the Company to and including the date of Termination, but not including years of service that have been taken into account for a prior severance payment from the Company.

1.5    Earnings is:

(a)    for a salaried employee, the greater of the annual base salary at the commencement of the Policy Period or the highest annual base salary at any time during the Policy Period; a week's Earnings is determined by dividing such annual base salary by 52;

(b)    for a non-represented hourly employee, the greater of the hourly base rate at the commencement of the Policy Period or the highest hourly base rate at any time during the Policy Period; one week's Earnings is determined by multiplying such hourly base rate by 40.

1.6    Eligible Employee is an Employee who is Terminated and who has executed and delivered an effective Release.

1.7    Employee is any non-represented regular or part-time regular salaried or hourly employee of the Company and its domestic subsidiaries except:

    (a)    an employee of a foreign subsidiary of the Company; or

    (b)    an employee who is a party to one of the 14 executive severance agreements referred to in the Company's Disclosure Letter to the Merger Agreement.

1.8    Merger is the merger between International Paper Company or a subsidiary thereof and Champion International Corporation.

1.9    Policy is this Champion International Corporation Reorganization Severance Policy #828.

1.10    Policy Period is the period from the closing date of the Merger to and including its one-year anniversary.

1.11    Release is the Release and Waiver in a form acceptable to the Company.  An effective Release is one that has been executed and delivered and not revoked.

1.12    Reorganization consists of employment action(s) resulting in an Eligible Employee's Termination during the Policy Period.

1.13    Retirement Plan is the Champion International Corporation Salaried Retirement Plan #001, any other Company hourly pension plan and/or any other Company qualified or non-qualified retirement plan in which the Eligible Employee is a member.

1.14    Terminated or Termination is either:

    (a)    a termination by the Company of the employment of an Employee for any reason other than Cause, disability (subject to Section 6 hereof), or death, which Termination occurs within the Policy Period.  Subject to (b) below, it shall not be deemed a termination of employment if after the Merger the Employee is transferred to the employment of International Paper Company or a subsidiary thereof; or

    (b)    a termination during the Policy Period by an Employee of his or her employment under the following circumstances:

        (i)    during the Policy Period there is either a reduction in the Employee's Earnings or a relocation of an Employee's principal place of employment other than to the Borough of Manhattan in the City of New York, New York (if the Employee's principal place of employment immediately prior to the Policy Period is Stamford, Connecticut) or to any other location that is not more than thirty-five (35) miles by automobile from the location of the Employee's principal place of employment immediately prior to the Policy Period; provided that a relocation of an Employee's principal place of employment from a foreign assignment to the Employee's home location will not be deemed a Termination; and

- 3 -                    05/25/00 4:45 PM

(ii)    the Employee elects to terminate his or her employment upon not less than thirty (30) calendar days' advance written notice to the Company given within not more than thirty (30) calendar days after the earlier of either receipt by the Employee of written notice of such reduction or relocation, or the date on which the first payment of the reduced Earnings is received by the Employee or the date on which the relocation of the Employee's principal place of employment becomes effective.

## Section 2 Severance Benefits

An Eligible Employee shall be entitled to receive a severance benefit equal to the greater of an amount payable pursuant to any other severance or termination pay plan or arrangement of the Company (excluding retention pay letters) or the following:

(a)    ten (10) weeks' Earnings; plus

(b)    one (1) week's (or partial week's) Earnings for each year (or partial year) of Credited Service; plus

(c)    one (1) week's (or partial week's) Earnings for each year (or partial year) of Credited Service over fifteen (15) years.

The payment described in this paragraph shall not exceed 78 weeks' Earnings.

## Section 3 Pension Enhancement

If an Eligible Employee has attained age 49 as of the date of Termination and the Eligible Employee's age plus years of service equal at least 59, the Eligible Employee's pension benefit from the Retirement Plan shall be enhanced by crediting the Eligible Employee with the most beneficial combination of an additional six (6) years of age and/or service credit under the Retirement Plan for early or normal retirement. As part of such enhanced benefit the Eligible Employee shall be entitled to post retirement death benefits, life insurance and medical plan coverage.

## Section 4 COBRA

An Eligible Employee who elects COBRA coverage shall have the COBRA medical and dental premium payments waived until the earlier to occur of (i) the last day of the ninth month following Termination, or (ii) the date the Eligible Employee ceases to be eligible for COBRA coverage.

- 4 -                    05/25/00 4:45 PM

Section 5 Form of Payment

(a)    Normal Form of Payment

The severance benefit will be paid according to the applicable pay schedule until the total amount of the severance benefit is received.

(b)    Optional Form of Payment

In lieu of the normal form of payment, at the Company's option and upon the Eligible Employee's request prior to the commencement of the severance benefit payments, the severance benefit may be paid in a lump sum payment.

Section 6 Disability

If an Eligible Employee who was an active employee of the Company on or after January 1, 1995 is receiving or claiming benefits pursuant to workers' compensation law(s), Social Security disability law(s) or a disability plan of the Company during the Policy Period, benefits pursuant to Section 2, Section 3 and Section 7 will not be paid unless and until the Eligible Employee is released by an independent medical examiner or other physician to return to such employee's regular job duties within the Policy Period.

Section 7 Miscellaneous Benefits

7.1    Vacation Pay

An Eligible Employee will receive a lump sum payment for banked vacation, earned but unused vacation and, if eligible to retire (under the provisions of Section 3 or otherwise), accrued vacation.

7.2    Retirement Plan or an Hourly Pension Plan Payout

An Eligible Employee not eligible to retire pursuant to the terms of the Retirement Plan who becomes a terminated vested participant pursuant to the Retirement Plan will receive in a lump sum the actuarial equivalent of such terminated participant's vested benefit determined under the Retirement Plan if such benefit has a present value of $5,000 or less.

7.3    Employee and Family Assistance Program (EAP)

An Eligible Employee will have EAP coverage extended for a maximum of five (5) visits provided that, if the Eligible Employee has not already commenced visits, the first visit occurs within the six-month period following such Eligible Employee's Termination.

7.4    Financial/Retirement Planning

Financial or retirement planning assistance will be available to the Eligible Employee, as described in separate documents.

7.5    Outplacement Assistance

An Eligible Employee will be provided outplacement assistance in seeking new employment after Termination, as described in separate documents.

## Section 8 Release, Time of Payment

(a)    Eligibility for benefits under the Policy are conditioned upon the Eligible Employee's execution and delivery and non-revocation of an effective Release.

(b)    Payments due pursuant to Section 2 of the Policy shall be paid following the later of the date the Eligible Employee delivers an effective Release or the Termination date, provided that payments made under Section 5(a) will be made on normal payroll dates and the lump sum payment under Section 5(b) will be made within eight (8) days.

## Section 9 Amendment and Termination

The Company shall have the right to amend and/or terminate the Policy at any time for whatever reasons it may deem appropriate without prior notice, except that, for the one-year period immediately following the Merger, (a) the Policy shall not be terminated, and (b) no amendment will be effective if it would adversely affect the rights, expectancies, or benefits of any Eligible Employee provided by the Policy as in effect as of the closing of the Merger.

## Section 10 Administration and Interpretation

The Administrator has the authority, responsibility and discretion to determine all questions of eligibility and status and has the right to interpret the provisions of the Policy. Any determination by the Administrator shall be final and conclusive.

## Section 11 Claims Procedure

11.1    Claims

(a)    In the event that a benefit has not been paid under the Policy in whole or in part, the person claiming such payment may apply for payment either individually or through a representative by writing to the Director - Benefits Administration, Champion International Corporation, Knightsbridge Drive, Hamilton, Ohio 45020.

- 6 -

05/25/00 4:45 PM

(b)    The claim will be reviewed within 30 days of the filing of the claim.  If the claim is wholly or partially denied the person claiming payment will receive in writing:

    (i)    specific reasons for denial;

    (ii)    specific reference to Policy provision on which the denial is based;

    (iii)    description of additional information needed before the claim can be processed; and

    (iv)    list of steps to be taken if the denial of the claim is to be reviewed.

## 11.2    Appeal

If the claim has been denied (or if no response from Director - Benefits Administration is received within 30 days), the person claiming payment has the right to request a review of the denied claim, to review pertinent documents and to submit any comments in writing.  The request for review of the denied claim shall be submitted to the Vice President - Employee Benefits at the address set forth in Section 12.1(a) within 60 days of receipt of the claim denial (or within 90 days of filing of the claim if no response from the Director of Benefits was received).  The request for review of the denied claim will be considered and ruled upon within 30 days of the filing of such request.

## 11.3    Limitation Period

Any claim for payment or such other action under the Policy must be made as set forth in this Section 11 and must be made within one year after the occurrence of the event for which the claim is made.  Failure to file the claim within such one-year period shall completely discharge the Policy and the Company of liability and shall bar any and all actions in connection with such claim for payment or other action.

## Section 12 General Policy Information

## 12.1    Policy Sponsor and Administrator

(a)    The Company is the sponsor of the Policy.  The Administrator is the Company.  The Administrator can be reached at:

Vice President - Employee Benefits
Champion International Corporation
One Champion Plaza
Stamford, CT  06921

The telephone number is (203) 358-7056.

05/25/00 4:45 PM

(b)    Policy documents are available for review at the local Human Resources Department. Most day-to-day questions can be answered by the Human Resources representative.

## 12.2   Plan Identification

(a)    The official name of the Policy is the Champion International Corporation Reorganization Severance Policy #828.

(b)    The Employer Identification Number is 13-1427390 and the Plan Number is #828.

## 12.3   Funding

Benefits are paid out of the Company's general assets with respect to the severance benefits and its retirement plans with respect to the pension enhancement.

## 12.4   Financial Records

The Policy's financial records are kept by the Administrator.

## 12.5   Agent for Service of Legal Process

Service of legal process in connection with this Policy shall be delivered to:

Senior Associate Counsel, Human Resources
Champion International Corporation
One Champion Plaza
Stamford, CT  06921

Service also may be made on the Administrator.

## Section 13 ERISA Rights

## 13.1   Legal Rights and Protection

ERISA requires that an employee be informed of rights and protections as a plan participant (for ERISA purposes the Policy is considered a plan).

## 13.2   Examination of Documents

ERISA provides that each participant be entitled to examine on any business day during normal working hours all pertinent plan documents, contracts, collective bargaining agreements and copies of all documents filed for the plan with the United States Department of Labor. These documents can be examined and/or obtained without charge at the local Human Resources Department or at the Corporate Benefits Department located at One Champion Plaza, Stamford, Connecticut, 06921 or by writing to the Vice President - Employee Benefits at the same address.

## 13.3   Fiduciaries

05/25/00 4:45 PM

The individuals who are responsible for the operation and administration of any employee benefit plan such as the Policy are called "fiduciaries". These fiduciaries will continue to operate and administer the plan in a reasonable and prudent manner with the exclusive interests of the employee and other participants in mind.

13.4  Other Rights

(a)  In the unlikely event that there is reason to believe that an employee has been prevented from asserting the rights outlined herein, or that the fiduciaries have misused their trust, an employee is urged to write to the Vice President - Benefits. An employee also has the right to seek assistance from the United States Department of Labor, or such employee can file suit in state or federal court (if a claim for benefits is denied in whole or in part). If a suit is filed, the court will decide who should pay court costs and legal fees.

(b)  Although the Company does not contemplate that it will ever be necessary to resort to governmental or judicial bodies to enforce the right of an employee, the employee's employment status with the Company will not be adversely affected in any manner if such action is taken.

**The above is a "Summary Plan Description" of the Policy.**

05/25/00 4:45 PM

# EXHIBIT 8

FOCUS - 3 of 3 DOCUMENTS

**Day, et al., Plaintiffs, vs. NLO, Inc., et al., Defendants,**

**Case No. C-1-90-67**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO, WESTERN DIVISION**

*1995 U.S. Dist. LEXIS 22316*

**May 19, 1995, Decided**
**May 19, 1995, Filed**

**DISPOSITION:** [*1] Attorneys' fees and costs awarded.

**COUNSEL:** For DAVID DAY, JOHN FITZGERALD, HERBERT L KELLY, FLOYD DAVIS, HILLARY WEBB, SR, JULIA VIRGINIA SANSONE, SHIRLEY SKILES, MILFORD W SKILES, RALPH JONES, ELMER HUST, FERNALD ATOMIC TRADES AND LABOR COUNCIL AFL-CIO, METAL TRADES DIVISION AFL-CIO, BUILDING AND CONSTRUCTION TRADES DEPARTMENT AFL-CIO, GREATER CINCINNATI BUILDING AND CONSTRUCTION TRADES COUNCIL AFL-CIO, INDUS UNION DEPART, plaintiffs: Allen Paul Grunes, Waite, Schneider, Bayless & Chesley, Thomas Joseph Kircher, Kircher Robinson Newman & Welch, Cincinnati, OH.

For DAVID DAY, plaintiff: Paul M De Marco, Waite, Schneider, Bayless & Chesley, Cincinnati, OH.

For WILLIAM E FREY, plaintiff: Thomas Joseph Kircher, Kircher Robinson Newman & Welch, Cincinnati, OH.

For NL INDUSTRIES INC, NLO INC, defendants: William Howard Hawkins, II, Frost Brown Todd LLC, John Stephen Wirthlin, Sr., Beirne & Wirthlin, Cincinnati, OH.

For NL INDUSTRIES INC, NLO INC, defendants: David M Bernick, Kevin T Van Wart, Kirkland & Ellis, Chicago, IL.

For NL INDUSTRIES INC, defendant: Herbert L Fenster, McKenna & Cuneo, L L P, Washington, [*2] DC.

For NLO INC, defendant: Douglas James Kurtenbach, Kirkland & Ellis, Chicago, IL.

RUDOLPH PETER CRAWFORD, JR, movant, Pro se, Harrison, OH.

For ERIC H KEARNEY, Esq, SPECIAL MASTER/TRUSTEE, special master: Eric H Kearney, Cohen Todd Kite & Stanford, Cincinnati, OH.

**JUDGES:** Sandra S. Beckwith, United States District Judge.

**OPINIONBY:** Sandra S. Beckwith

**OPINION:**

### ORDER

Plaintiffs' counsel have requested incentive awards for several classes of persons who contributed time and effort in pursuit of the Plaintiffs' claims (Doc. No. 556) in this matter. Defendants have filed nothing contra.

### Background

Although the settlement agreement in this matter is quite extensive and, indeed, addresses concerns of class members which were not actually at issue in the litigation, it does not provide for incentive awards. Class counsel have, therefore, filed this separate motion for incentive awards.

Plaintiffs have requested that the Court award $ 20,000 to each of the individuals who served as named Plaintiffs or class representatives. Ten persons were named in the original complaint as Plaintiffs: Herbert

1995 U.S. Dist. LEXIS 22316, *

Kelly, David Day, John Fitzgerald, William Frey, Ralph Jones, Hillary [*3] Webb, Shirley Skiles, Julia Sansone, Elmer Hust, and Floyd Davis. Messrs. Kelly, Day, Fitzgerald, Frey, Jones and Webb were dismissed after the verdict in the statute of limitations trial. Mrs. Skiles, Mrs. Sansone and Mr. Hust did not ultimately meet the definition of the class certified for the merits trial. The Court anticipates that all or most of those named Plaintiffs who were excluded from the class certified for purposes of the merits trial were restored to the class in the settlement redefinition. Class representatives were Martha Jones, James Johnson, Jim Dorton, Angelo Gallina, Roy Brown and Harry Hollerbach. n1

n1 Harry Hollerbach was replaced after his death by L.C. Nolan.

Plaintiffs have requested that the Court award $ 20,000 to each of the key union officials who produced records, attended meetings, gave depositions and provided information and support: Gene Branham, Robert Schwab and Ron Lee. Plaintiffs have also requested that the Court award $ 5,000 to each of the individuals who gave crucial [*4] depositions and/or submitted important affidavits, produced records, testified at either the statute of limitations or merits trial and otherwise cooperated in the preparation of the case for trial, but who were not class representatives: Floyd Grubb, Raymond Ruhe, Dorothy Smith Robinson and Art Harris.

Plaintiffs have requested that the Court award $ 400 to each of the individuals who gave depositions, submitted affidavits and/or provided important information to class counsel, but who were not class representatives: George Bassett, David Chalk, Andrew Levandusky, Bernie Sizemore, Gene Taylor, Stanley Dane, Sheldon Samuels, Margaret Seminario, Thurman Wenzl, George Taylor, Harriet Applegate, Al O'Connor, David Ortlieb, Daniel Kimble, Paula Campbell, Al Loos, William Perkins, George Williams, Don Radford, Paul Burnsky, Glenn Ballou, August Baltes, James Mays, Leonard Bauer, B.W. Hensley, John Nickell, John Webster, Elisa Crawford, Kathy Meyer, Lawrence Davis and Doris J. Tolbert.

### Discussion

Numerous courts have granted incentive awards to representative plaintiffs who have been able to effect substantial relief for the classes they represent. See *Thornton v. East Texas Motor Freight, 497 F.2d 416, 420 (6th Cir. 1974)* [*5] (approving theory behind incentive awards); *Enterprise Energy Corp. v. Columbia Gas Transmission Corp., 137 F.R.D. 240, 250-51 (S.D. Ohio 1991)* (court approved $ 50,000 to each of the six class

representatives); *In re Dun & Bradstreet Credit Serv. Customer Lit., 130 F.R.D. 366, 373-74 (S.D. Ohio 1990)* (court approved two incentive awards of $ 55,000 and three of $ 35,000 to five class representatives); *In re Smith Kline Beckman Corp. Securities Litigation, 751 F. Supp. 525 (E.D. Pa. 1990)* (court approved an award of $ 5,000 to each of several representative plaintiffs); *Basile v. Merrill Lynch, P.F. & S., 640 F. Supp. 697, 702 (S.D. Ohio 1986)* (court awarded $ 948,000 separate case award for representative plaintiffs and intervening plaintiffs from a $ 12.6 million settlement fund); *Bogosian v. Gulf Oil Corp., 621 F. Supp. 27, 32 (E.D. Pa. 1985)* (court approved an award of $ 20,000 to each of two representative plaintiffs in antitrust case)," In re Fernald, Doc. No. 1396 at page 2.

Upon the record, as presented by class counsel, the Court is unable to discern the magnitude or value of the contributions made [*6] by the individuals whom counsel wish to remunerate. Certainly, whatever expenses named Plaintiffs or class representatives incurred on behalf of the entire class can be fairly labeled as "expenses" incurred in pursuing this lawsuit. However, it is unclear to the Court whether these expenses were among those for which reimbursement has already been granted by this Court's separate order for attorneys' fees and costs. If counsel wish to submit a supplemental memorandum on this issue within ten (10) days of the date of this Order, the Court will consider such additional information as counsel deem necessary.

On the related issue of outright incentive awards, the Court notes that the Sixth Circuit Court of Appeals has viewed such awards favorably, n2 and the Seventh Circuit has said that "since without a named Plaintiff there can be no class action, such compensation as may be necessary to induce him to participate in the suit could be thought the equivalent of the lawyers' nonlegal but essential case-specific expenses. . . ." In *Matter of Continental Illinois Securities Litigation, 962 F.2d 566, 571 (7th Cir. 1992)* (emphasis added). In In re Fernald, Judge Spiegel [*7] acknowledged that "the appropriate purpose for the class representatives' compensation would be under expenses." n3 (emphasis added)

n2 *Thornton, supra at 420.* "We also think there is something to be said for rewarding those drivers [class representatives] who protest and help to bring rights to a group of employees who have been the victims of discrimination." As quoted by Spiegel, J. in In re Fernald (emphasis added).

n3 Case No. C-1-85-149, Doc. No. 1396 at page 4.

Plaintiffs' counsel have cited numerous cases wherein incentive awards were made to prevailing representative Plaintiffs. (See Attachment A, Doc. No. 556). However, the Court finds no case suggesting that non-prevailing Plaintiffs or, indeed, non-Plaintiffs should be the recipients of incentive awards.

### Conclusion

The Court notes that the total of the incentive awards sought by class counsel is $ 436,400, which constitutes about three percent of the so-called supplemental fund of $ 15 million under [*8]  the settlement of this case. However, the class members were encouraged to accept the settlement on the understanding that the per capita compensation recovery in this matter would exceed the per capita compensation recovery in In re Fernald. The Court does not lightly undertake to diminish the supplemental fund Without a firm foundation in either statutory or caselaw and compelling policy reasons therefore. n4 The Court commends the many non-parties who contributed time and effort toward the successful conclusion of this matter, including especially the dedicated union officials who worked diligently in behalf of their fellow union members. However, there are times when one must do the right thing simply because it is the right thing, without regard to any anticipated reward.

n4 "The Ninth Circuit has stated that courts should consider all pending fee applications to ascertain whether the combined effect of granting the fee applications in toto would be to reduce substantially the size of the common fund available for distribution to the plaintiff class." Alan Hirsch and Diane Shukey, *Awarding Attorneys' Fees and Managing Fee Litigation* at page 69 (Federal Judicial Center 1994)(internal quotation marks and citation omitted).

[*9]

The Court concludes that no one who is not a prevailing named Plaintiff, or class representative and who qualifies as a class member, should receive an incentive award in this matter. Therefore, the Court hereby authorizes the trustee to pay the following incentive awards upon the favorable determination of class eligibility as to each:

A. Original named Plaintiffs

| | |
|---|---|
| Herbert Kelly | $ 20,000 |
| David Day | 20,000 |
| John Fitzgerald | 20,000 |
| William Frey | 20,000 |
| Ralph Jones | 20,000 |
| Hillary Webb | 20,000 |
| Shirley Skiles | 20,000 |
| Julia Sansone | 20,000 |
| Elmer Hust | 20,000 |
| Floyd Davis | 20,000 |

B. Class Representatives chosen in 1992 after the class certification

| | |
|---|---|
| James Johnson | $ 10,000 |
| Jim Dorton | 10,000 |
| Angelo Gallina | 10,000 |
| Roy Brown | 10,000 |
| Harry Hollerbach | 5,000 |
| (Estate or personal representative) | |
| L.C. Nolan | 5,000 |
| (the late Mr. Hollerbach's replacement). | |

This Order shall become final unless any party, within ten (10) days hereof, files and serves on all parties objections, specifically designating the portion of this Award to which the party objects and the legal or factual basis for the objections. In the event objections [*10] are filed, the Court will schedule a prompt hearing to resolve the issues raised.

**IT IS SO ORDERED.**

Sandra S. Beckwith

United States District Judge

May 19, 1995

### AWARD OF ATTORNEYS' FEES AND COSTS

This matter comes before the Court for consideration of the application of class counsel for an award of attorneys' fees and costs (Doc. No. 557), and upon the application of objectors' counsel for an award of attorneys' fees and expenses (Doc. No. 558). Five law firms shared the responsibility for the prosecution of this class action litigation which terminated during trial in the successful settlement of plaintiffs' claims. The law firms representing the plaintiff class are: Waite, Schneider, Bayless & Chesley Co., L.P.A.; Manley, Burke, Fischer, Lipton & Cook; Connerton, Ray & Simon; Berger & Montague; and Kircher, Robinson, Newman & Welch. The settlement has led to the creation of a substantial common fund. The structure of the settlement, however, raises questions concerning what constitutes the common fund for purposes of determining a percentage attorneys' fees award.

Plaintiffs' attorneys have obtained a monetary settlement, designated as the supplemental [*11] fund, in the sum of $ 15 million, together with an open-ended medical monitoring fund in a minimum sum of $ 5 million. The supplemental fund is the fund from which members of the four subclasses of class members are to receive cash compensation. The medical monitoring fund is to pay for administrative costs, including eligibility determinations and medical examinations, for the living class members. The nature of the respective funds and the purposes for which they have been established indicates that the medical monitoring fund should remain inviolate. n1 The medical monitoring fund should not be depleted for any purpose other than the legitimate expenses of the medical monitoring program itself and its attendant costs. The Court concludes that it is the supplemental fund which should be deemed to be the common fund from which the attorneys' fees and costs of class counsel should be paid and which should be used for purposes of calculating an appropriate percentage attorneys' fees award.

n1 Indeed, the Settlement Agreement specifically so provides in Section V, (G) Fee Awards:

> Class Counsel shall submit to the Court their application for attorneys' fees and expenses. The Court shall then determine an appropriate award. Neither NLO, NLI nor the DOE will take any position regarding fees and expenses sought by Class Counsel, but NLO, NLI and the DOE reserve their right to respond to statements of fact made in Class Counsel's application. Any amount awarded by the Court shall be paid solely from the Supplemental Fund.

[*12]

### Background

This class action was commenced on January 30, 1990. From its inception, the five law firms have cooperated to pool their resources to efficiently investigate and prosecute the class claims. Although one or more of the law firms may have had a special affinity for a particular plaintiff subclass, the Court is satisfied that the synergy between counsel has contributed to the effective development and presentation of this matter. Additionally, the familiarity of lead counsel, Stanley M. Chesley, with the issues raised in the prior related litigation (In Re: Fernald Litigation, Master File No. C-1-85-149) has provided substantial groundwork and historical context for the pursuit of the Plaintiffs' claims in this litigation.

The extraordinary depth of expertise amongst Plaintiffs' counsel, as well as the high degree of professionalism exhibited by all of Plaintiffs' counsel throughout these proceedings, has insured complete examination of the issues and minimized duplication of effort.

The course of this litigation is recounted at some length in this Court's previous order approving the settlement (Doc. No. 548). In brief, the Plaintiffs' counsel plowed much [*13] new ground in their quest to secure compensation for Plaintiffs' emotional distress claims and intentional tort/medical monitoring claims. The case went to the Sixth Circuit Court of Appeals on two interlocutory appeals before the trial on the merits commenced.

Numerous potentially dispositive motions dot the record. Plaintiffs' counsel were surely tested in their commitment to this difficult case by the range and extent of the pretrial motion practice.

Plaintiffs' counsel conducted an initial threshold trial on the question of the statute of limitations, prepared for a summary jury trial which was ultimately cancelled, and then proceeded to a merits trial which terminated after two weeks of testimony with the settlement agreement. The parties executed a Memorandum of Understanding on July 25, 1994, through counsel, which incorporated the terms of the settlement. Subsequently, the Court conducted a fairness hearing, following notice and an opportunity to object, on October 11, 1994. At the fairness hearing, Plaintiffs' counsel and Defendants' counsel addressed the Court in support of the proposed settlement, as did various class members and other interested parties. Objections were [*14] also heard from class members and others. After due deliberation, the Court concluded that the proposed settlement was fair, adequate and reasonable, notwithstanding the various purported shortcomings alleged in the various objections (Doc. No. 548).

The Court's consideration of an award of attorneys' fees and costs is a separate matter from the approval of the settlement. Indeed, the settlement agreement specifically reserved the matter of attorneys' fees and costs for the later consideration of the Court. None of the Defendants take any position regarding the fees and expenses sought. However, the Defendants reserved the right to respond to statements of fact in class counsels' application and have exercised that right (Doc. No. 559).

### Legal Standards

Judge Spiegel of this Court has previously set forth the state of the law regarding the award of attorneys' fees and costs in a "common fund case" such as the present litigation, *Basile v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 640 F. Supp. 697 (S.D. Ohio 1986). Payment of attorneys' fees and expenses from a common fund created by the settlement of a class action is an accepted method by which to compensate [*15] and reimburse counsel. It is in the tradition of the American rule and ensures that "persons who obtain the benefit of a lawsuit without contributing to its cost are [not] unjustly enriched at the successful litigants' expense." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 62 L. Ed. 2d 676, 100 S. Ct. 745 (1980). The payment of class counsels' fees and expenses from the common fund disperses the burdens of the cost of the litigation evenly across the Plaintiff class, requiring each class member to contribute a portion of the recovery toward the cost of generating the fund.

Frequently, the attorneys' fees are calculated as a percentage of the common fund or benefit created in these cases, *Blum v. Stenson*, 465 U.S. 886, 900 n.16, 79 L. Ed. 2d 891, 104 S. Ct. 1541 (1984). A review of the cases speaking to this issue shows the percentage generally ranges from 20 percent to 50 percent of the fund created. See, *In Re Warner Communications Securities Litigation*, 618 F. Supp. 735, 749-50 (S.D.N.Y 1985). See generally, Court Awarded Attorney's Fees, Report of the Third Circuit, 108 F.R.D.237 (1985). "Most district courts [*16] select a percentage in the 20% to 30% range, and the Ninth Circuit has indicated that 25% is the 'benchmark' award." Alan Hirsch and Diane Shukey, *Awarding Attorneys Fees and Managing Fee Litigation*, Federal Judicial Center (1994) (internal citations omitted).

In determining the appropriate percentage to be applied in the calculation of class counsels' fees, the Court must consider essentially the same factors as those in the lodestar method of calculating attorney fees. The lodestar method, simply put, is a mathematical calculation whereby the Court multiplies the hours reasonably expended by counsel times a reasonable hourly rate for the attorney's services. The process tracks the manner in which most attorneys and law firms bill the average private client. After the basic calculation, the Court may increase or decrease the attorney fee award in light of various unique aspects of the case, such as quality of representation, risks involved in the litigation, complexity and questions of first impression presented, the contingent nature of the fee, the likelihood of success, the undesirability of the case, the results obtained and future services, if any, required. See *Hensley v. Eckerhart*, 461 U.S. 424, 434, 76 L. Ed. 2d 40, 103 S. Ct. 1933 (1983); [*17] *Northcross v. Board of Education of Memphis City Schools*, 611 F.2d 624, 642-43 (1979).

### Analysis

Class counsel seek an award for their services in the sum of $ 5.4 million, which equates to 27% of what they call the "fixed common fund." The "fixed common fund" being the $ 15 million supplemental fund and the $ 5 million deposit toward the medical monitoring fund, combined for a total of $ 20 million. Class counsel calculate this sum to be slightly in excess of their lodestar calculation, n2 but direct the Court's attention to the likelihood that there will be significant time and labor to be expended by class counsel in the future.

n2 Class counsel calculate by the lodestar method that the fees earned in this litigation are as follows:

1995 U.S. Dist. LEXIS 22316, *

| | |
|---|---|
| Waite, Schneider, Bayless & Chesley | $ 1,452,917.00 |
| Connerton, Ray & Simon | $ 113,563.00 |
| Kircher, Robinson, Newman & Welch | $ 16,612.00 |
| Berger & Montague | $ 14,976.00 |
| Manley, Burke, Fischer, Lipton & Cook | $ 391.04 |
| (These fees are sought by objectors' counsel (Doc. No. 558) | $ 1,598,459.04 |

[*18]

Defendants, however, have filed a brief addressing the statements of fact contained in class counsels' fee application (Doc. No. 559). In particular, Defendants assail class counsels' claims for services in connection with pre-filing investigation for the complaint, as well as the drafting of the complaint. Defendants point out that the complaint in this matter, in large part, duplicates the complaint previously filed in 1985 in In Re Fernald by class counsel. Defendants further point out that some of class counsel participated in the fee and expense award in that previous matter, which amounted to more than $ 17 million. Defendants also assail class counsels' pleading ambiguity and failure to clearly articulate Plaintiffs' claims in this matter. Defendants point out that Plaintiffs were never able to show any property damage as first alleged in their complaint and that none of the named Plaintiffs were able to adduce evidence of the "severe and debilitating emotional distress" alleged in their complaint. Defendants point out that five of the six named Plaintiffs' claims were determined to be time-barred at the statute of limitations trial in this matter -- a 17% success rate [*19] for Plaintiffs. Defendants also point to "extensive duplication" of effort by members of the class counsel team, where three to six attorneys attended various hearings and conferences with the Court.

Defendants assail class counsels' decision to take an interlocutory appeal from the jury verdict in the statute of limitations trial with its attendant expenditures of time and effort. Lastly, Defendants point out that the videotape about the history of the Fernald plant that was shown during Plaintiffs' opening statement was "identical" to the videotape that was prepared for the In Re Fernald summary judgment trial. (9/16/91 Tr. at 164).

As an initial matter, the Court has reviewed the attachments to class counsels' fee and expense application in order to determine for itself whether Defendants' allegations are substantiated and, if so, what affect should they have upon the award of fees and expenses to class counsel.

A review of the underlying documents reveals very limited pretrial investigation, and the time reflected for the drafting of the complaint is well within reason.

Defendants' concerns about class counsel overbilling for these efforts are unsupported by the record. [*20] A matter of this complexity, even though similar to or related to prior litigation, is not quickly or easily launched.

Review of class counsels' time sheets does not reflect unneeded counsel attending "routine hearings and conferences with the Court" (Doc. No. 559 at p.5). Indeed, the records do not reveal any hearings or conferences with the Court that could be fairly characterized as "routine." Defendants' counsel was aggressive, prepared and poised at each meeting to exploit any shortfall of personnel or expertise on the part of class counsel. The Court cannot fault class counsel for their full mobilization of resources at the various pivotal hearings and conferences. Nor can the Court fault class counsel for their strategic decision to seek interlocutory review of the jury's verdict on the statute of limitations issue. There are many tactical considerations that may have propelled that decision. The Court will not attempt to second guess the professional decision of an entire panel of distinguished litigators.

Along the same lines, the Court views class counsels' pleading ambiguities as having been, as likely as not, the product of considered professional judgment. One can perceive [*21] a certain value to the Plaintiff class in retaining the broadest possible spectrum of recovery theories. Indeed, Plaintiffs' failure to support their property damage claims and limited anecdotal support for their emotional distress claims highlights counsels' need to keep every avenue for recovery open. The Court cannot fault class counsel for their tenacious and ultimately successful strategy in this regard.

The Court notes that the videotape that class counsel used in opening statement does not appear to be "identical" to the one used in In Re Fernald. While certain similarities may exist, class counsel have produced billing documentation from Wing Media, Inc. commencing in September, 1991 for the videotape presentation in this matter. Clearly the billings post-date the filing of this complaint and are well after the settlement of In Re Fernald. The Court is not convinced that there has been any double billing here.

Having considered the Defendants' comments, the Court concludes that an assessment of class counsels'

application for an award of fees should be undertaken in light of the broad criteria established in *Northcross, supra.* With regard to the time [*22] and labor required, the Court is satisfied that the hours of service dedicated to this litigation by counsel were reasonable, necessary and appropriate, resulting in a uniquely favorable settlement for the Plaintiff class. The case was unusual in several respects. It broke new ground in addressing Plaintiffs' claims for emotional distress resulting from fear of developing illnesses or conditions associated with radiation exposure and in Plaintiffs' intentional tort and fraud claims for medical monitoring brought against these particular Defendants. In the end, Plaintiffs' settlement encompassed more than the relief that was being sought within the parameters of the merits trial. It also included extensive provisions dealing with the Plaintiff class workers' compensation concerns and the preservation of Plaintiffs' other claims which may be brought in separate lawsuits in the future.

While the case was pending, the state of factual and scientific knowledge regarding Plaintiffs' claims continued to develop. Class counsel were obliged to remain abreast of the results of various scientific research and continually reevaluate their position. Defendants' counsel engaged in vigorous motion [*23] practice. The filings in this matter now approach 600 in number. The statute of limitations issue, with its potentially dispositive consequences, gave rise to a trial preceding the merits trial, and the aborted summary jury trial further unavoidably absorbed class counsels' time and attention in large blocks.

The hourly rates of lead counsel and his firm are perhaps higher than those of other litigators in this community. However, they are commensurate with the experience and expertise of lead counsel and his team. The Court finds that they are appropriate and acceptable. The rates of other counsel are also appropriate and acceptable. Moreover, it is apparent that all counsel utilized the services of law students, paralegals and other lower salaried personnel whenever possible in order to contain the costs of the services rendered to the Plaintiff class by counsel.

Plaintiffs' lead counsel committee undertook this litigation on a contingent fee basis, and although its predecessor, In Re Fernald, had established many new precedents, this case posed significant risk. The statute of limitations question stood squarely in Plaintiffs' path to a successful resolution of the matter. [*24] If class counsel had been unsuccessful in overcoming that obstacle, they might well have been unable to settle this matter or achieve a final judgment in favor of the Plaintiff class. In short, they could have received no payment for their thousands of hours of work over four and one-half years of intense activity. Class counsel undertook the huge financial burden of the entirety of the litigation expenses incurred, including the expense and salaries of the attorneys and support staff. They sought out the most respected experts available, whose services were remunerated at rates commensurate with their standings in their respective fields. They underwrote those expert consultant fees as they were incurred for the preparation of the case and the marshalling of evidence. All the while, as class counsel shouldered these financial burdens, the billing statements, including expenses, of Defendants' able and talented counsel were being regularly paid by the government. Defendants' counsel assumed no financial risk by reason of their participation in this case.

Discovery was extensive, on-going and frequently only secured through the most innovative of alternative methods. Preparation of [*25] class counsel was meticulous -- involving expert-assisted witness selection, evidence selection, demonstratives selection, and development of presentation and argument in the context of six mock jury trials. Counsel perused and evaluated hundreds of thousands of pages of documents and took more than one hundred depositions of lay and expert witnesses.

This case presented a confluence of many difficult aspects, many of which have been mentioned or alluded to in the Court's prior discussion. Additionally, the apparent hopelessness of the claims of deceased workers (there being no discovery rule in Ohio wrongful death cases), the thirty-year time lapse between the commencement of radiation exposure of the Plaintiffs' class and the commencement of this litigation, the technical complexity of the factual issues, the issues of first impression (e.g., class action for emotional distress, medical monitoring for an intentional tort) combined to form an undesirable case for other law firms. Class counsel were indeed faced with an uphill battle.

The results that lead counsel obtained in this litigation are impressive, especially when viewed in the context of the daunting nature of the case. [*26] The settlement in the sum of $ 15 million, plus an open-ended medical monitoring program initially funded at a level of $ 5 million, is an excellent settlement. In addition, lead counsel succeeded in broadening the class definition and addressing the concerns of the class in regard to their potential future workers' compensation claims. The medical monitoring program and the epidemiological data that will be generated from it will be the source of both legal precedent and medical enlightenment. Through the medical data generated, the effects of radiation contamination upon Plaintiffs caused by Defendants' operation of the Fernald plant can be appropriately evaluated. This will be a significant benefit of the settlement. Plaintiffs' fears of developing deleterious

medical conditions as a result of their work at Fernald will either be confirmed or assuaged.

The public is also served by this litigation. A government-owned nuclear facility has been called to account to the citizenry for the manner in which it has managed a dangerous facility.

The special nature of the settlement in this matter distinguishes it from the typical common fund case, where the fund is created, a plan for logical [*27] allocation to the various class members is devised, and the distribution is carried out over a relatively short period of time, whereupon the settlement is complete. This case will require on-going legal services over many years as class counsel assist in the selection of the membership of the Workers' Compensation Expert Review Panel to be established pursuant to the settlement and as the medical monitoring program continues. Class counsel have indicated that a similar settlement in In Re Fernald has absorbed in excess of 3,000 hours of class counsels' time since its inception.

The professional skill and reputation of lead counsel has undoubtedly contributed mightily to the favorable settlement of this matter. The dogged persistence and clever strategy of class counsel which resulted in this settlement, where a trial on the merits may well have failed, is a tribute to the level of practice exhibited by class counsel and a goal toward which every member of the bar should aspire.

The Court does, however, consider the success rate reflected in the results of the statute of limitations trial as having a potential impact upon the percentage to be awarded class counsel for their fees. [*28]

Moreover, the Court notes that class counsel persuasively argued at the fairness hearing that the proposed settlement would provide a per capita recovery of compensatory damages for the members of the Plaintiff Class which exceeds the per capita recovery of the In re Fernald plaintiffs. The requested $ 5.4 million award of attorneys fees, exceeds 30% of the distributable supplemental fund. To make such an award in addition to reimbursement of the expenses incurred by Plaintiffs' counsel and incentive awards to named plaintiffs and class representatives n3 would substantially deplete the common fund. See *Florida v. Dunne, 915 F.2d 542, 546 (9th Cir. 1990).*

n3 Expenses are $ 1,598,459.04 as discussed, infra. Incentive awards in the sum of $ 250,000 in the Court's separate, but contemporaneous order.

The Court concludes, in light of the above, that Plaintiffs' class counsel are entitled to a fee of $ 3 million, representing 20% of the supplemental funds, to be divided amongst all of Plaintiffs' [*29] counsel, including Timothy Burke, n4 as counsel may deem equitable without the further intervention of the Court. This award is at the low end of the percentage award of attorneys' fees in comparison to other cases nationwide. See *In re Warner Communications Securities Litigation, 618 F. Supp. 735 (S.D.N.Y. 1985)* (citing cases where contingent fee awards ranged from 20-50%). This award includes anticipated future services to be provided, as well as the fees already earned.

n4 The Court recognizes that Timothy Burke has not contributed to the creation of the common fund. However, in successfully representing those sub-contractors who would have been excluded from the original proposed settlement, he has created a significant benefit for that new subclass of plaintiffs. We, therefore, include him in the group of attorneys whose efforts are to be rewarded by the terms of this order and his expenses are added to those presented by class counsel.

Counsel are directed to reserve $ 450,000.00 of this [*30] award for future distribution as attorneys' fees to be earned in connection with the administration of the settlement, including distribution of the supplemental fund to Plaintiff class members, and management of the medical monitoring program. This reserve amount represents 3% of the supplemental fund, leaving 17% for immediate distribution to Plaintiffs' class counsel.

The Court is mindful that a document captioned Plaintiffs (sic) Opposition to Class Counsel's Fee Application (Doc. No. 575) was filed more than three months after the application of class counsel for an award of attorneys' fees and costs was filed in this matter. Although a considerable period of time has elapsed, the Court has reviewed the issues raised in that pleading and taken them into consideration in this Order.

This Order shall become final unless any party, within ten (10) days hereof, files and serves on all parties objections, specifically designating the portion of this Award to which the party objects and the legal or factual basis for the objections. In the event objections are filed, the Court will schedule a prompt hearing to resolve the issues raised.

**IT IS SO ORDERED.**

Sandra S. Beckwith [*31]

1995 U.S. Dist. LEXIS 22316, *

United States District Judge

May 19, 1995