**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **SCOTT D. DALESANDRO, et al.,** | : | **Case No. C-1-01-109** |
| **On behalf of themselves and** | : | |
| **all others similarly situated,** | : | **Judge Sandra S. Beckwith** |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **PLAINTIFFS' MOTION FOR** |
| | : | **SUPPLEMENTAL NOTICE** |
| **THE INTERNATIONAL PAPER** | : | **and** |
| **COMPANY,** | : | **MEMORANDUM IN SUPPORT OF** |
| | : | **INCLUSION OF VACATION PAY AS** |
| **Defendant.** | : | **DAMAGES** |
| | : | |
| | : | **(Exhibits attached)** |

**MOTION**

Plaintiffs' move the Court for an order authorizing the Supplemental Notice attached hereto (Exhibit 1) to be sent to the class members to inform them of the calculation of each member's accrued vacation pay as of February 9, 2001; and for an order directing Defendant to provide such calculations for each class member to be attached to the Supplemental Notice.

**MEMORANDUM**

**I.    BACKGROUND**

Plaintiffs filed this ERISA action for the recovery of benefits under Champion International Corporation Reorganization Severance Policy #828. On March 21, 2003, the Court entered its Amended Order granting Plaintiffs' motions for judgment and for class certification (Doc. #40). The parties then worked toward determining the damages figure, and they briefed their disputes over attorneys' fees, costs, interest, and incentive awards, so that the final judgment entry could be specific and complete.  The latter issues have been fully briefed and

submitted to the Court; the damages calculation is the subject of this Motion and Memorandum. Plaintiffs are attempting to obtain the calculations of each employee's accrued vacation time to include as damages pursuant to Section 7.1 of Policy #828; Defendant has refused to provide those calculations contending that Plaintiffs' claims for vacation benefits are not a part of this lawsuit, and that they received their vacation pay from their subsequent employer.

By Court Ordered Notice dated September 24, 2003 (Doc. # 50), the approximate 150 members of the Class were informed that this action had been certified, that the Court had rendered its opinion on the merits, and that they had certain rights and obligations related to their participation or exclusion from the action. This Notice also included Defendant's calculation of each employee's severance benefits (provided by Section 2 of Policy #828), and Pension Enhancement (provided by Section 3 of the Policy), but did not include any calculation of the employees' earned but unused vacation pay (provided by Section 7.1 of Policy #828).

This Notice instructed the class members to review the calculation attached to their Notice and to send a letter within 30 days to Defendant (Sharon Barger is the contact person provided by International Paper) if they believed the calculation was incorrect, and it directed the objecting employee to explain why the calculation was incorrect. More than 70 employees sent letters to Defendant within the required time objecting to the calculations based on the omission of their earned but unused vacation time that they had accrued while under Defendant's employ.[1] The Notice also stated that International Paper Company would respond to those objections setting forth a reviewed determination and explanation of the calculation no later than 20 days after the receipt of any such letter.

Only days after the Court's Notice was mailed, Plaintiffs' counsel began receiving phone calls with questions about the omission of their accrued vacation time; Plaintiffs counsel also

---

[1] Groh Declaration (Exh. 16).

received multiple calls from class members who have not received the promised response from International Paper within the 20 day period stated in the Notice.[2]    Upon receiving copies of those letters and phone calls from class members, Plaintiffs contacted Defendant in early October to alert it to the problem and to inquire as to how Defendant had responded or intended to respond to those letters.[3]    Plaintiffs suggested that the parties work toward an agreed supplemental notice wherein Defendant would provide the employees its calculation of the amount of earned and unused vacation time each employee had accrued as of their termination on February 9, 2001, in a similar fashion as Defendant provided the calculation of each employee's years of service and pension enhancement.[4]

The parties were unable to reach agreement and the Court granted Defendant's request to conduct discovery and ordered the simultaneous filing of briefs (Doc. #55).  The parties served expedited discovery requests related to the vacation pay issue upon each other, and Defendant obtained documents from Plaintiffs' present employer, Smart Papers, LLC.

## II.    ARGUMENT

This case is about Severance Policy #828. Policy #828 includes a section entitled Miscellaneous Benefits which includes a provision that Defendant will make a lump sum payment to a terminated employee for   accrued vacation time.[5]

" [T] he issue at hand is one of plan interpretation, not the legality of any actions taken or not taken by IP."[6]  This is a direct quote from Defendant and has always been its view of this case.  Defendant has always argued that the resolution of all issues turned on the language of

---

[2]  Id.; see also Defendant's Objections and Responses to Plaintiffs' Document Request Nos. 1 & 2 seeking all letters received and sent by Sharon Barger to which Defendant objected and has not produced documents in response (Exh. 15).
[3]  Groh Declaration (Exh. 16).
[4]  Id.
[5]  Champion International Corporation Reorganization Severance Policy #828 (Exh. 2) at Section 7 and 7.1.
[6]  Defendant's Motion to Stay (Doc. #10) at p. 8.

Severance Policy #828 and the reasonableness of its interpretation. Now, for the same reasons, and based upon the simple language of the same Plan, it is clear that vacation pay is a benefit under Policy #828. Since Defendant made no monetary payment to Plaintiffs for their accrued vacation, the amount of this benefit should be included in the damages calculation.

This is merely a damages issue since the Court has already ruled and set forth the factual and legal reasoning as to why Plaintiffs are entitled to Severance Policy #828 benefits. Defendant admits it denied vacation pay for the same reasons it denied the other Policy #828 benefits.[7] Plaintiffs are entitled to vacation pay for the same reasons as the Court found them to be entitled to Section 2 severance benefits because both categories of benefits are part of the same severance policy which promised that employees would receive the benefits contained therein if they were terminated without cause within the one year guaranteed time period.[8] No further analysis is necessary.

The Plan is clear:

An Eligible Employee will receive a lump sum payment for banked vacation, earned but unused vacation and, if eligible to retire (under provisions of Section 3 or otherwise), accrued vacation.[9]

This is not a case where the employees are trying to incorporate some separate document or language or vacation plan into the severance plan – *vacation pay is a part of Severance Policy*

---

[7] See, Defendant's Objections and Responses to Plaintiffs' discovery requests (Exh. 15) at responses to Interrogatory No. 7 and Document Request No. 6.

[8] The Court has found that: the plan administrator failed to adhere to, and in fact ignored, the plain meaning of the Plan's unambiguous language; the plan administrator's interpretation of the Plan was arbitrary and capricious; the plan administrator read out of the Plan's clear provisions that made the payment of benefits contingent upon "termination" as that term is defined in the Plan and instead made payment contingent upon his own interpretation; International Paper's position that employees who received subsequent employment with the purchaser of the Mill were ineligible for severance benefits was unsupported by any language in the Plan; and International Paper could have included a specific provision to that effect as it had in an earlier severance plan. See, Amended Order dated March 20, 2003 (Doc. #40) at pp. 14-16, 21.

[9] Policy #828 (Exh. 2) at Section 7.1.

**#828.** This is not a case where the employees are trying to characterize vacation pay as a benefit – *vacation pay is specifically listed as a "miscellaneous benefit".*

Plaintiffs, like Defendant, have interchangeably referred to the benefits sought in this case as "severance benefits", "benefits under the Plan", "benefits under Policy #828", and "Policy #828 benefits." But Plaintiffs never, expressly or impliedly, confined the benefits sought to those set forth in <u>only</u> Section 2 of the Plan; nor did they waive their right to the benefits provided for in Section 7 of the Plan merely because that section does not have the title "Severance" in its heading. Nor has Defendant ever indicated that its repeated use of the phrase "benefits under the Plan" was restricted to only certain portions of the Plan.

From the beginning and throughout this case, Defendant has maintained that the discovery and use of evidence outside of the Plan and the Administrative Record are unnecessary and inappropriate.[10] If proof, beyond the Plan itself, that vacation pay is a benefit that has always been a part of this case is needed, the Court need only review the record. Defendant's argument that this claim has not been properly raised is contrary to logic, to its own Plan, to its own pleadings, and to the record:

1) <u>The Plan itself</u> [11] Severance Policy #828 is **Defendant's** plan. Defendant drafted this Plan; Defendant decided to offer this Plan to the employees at the Hamilton B Street Mill when it merged with Champion; Defendant chose to apply this Plan when it sold the mill to Smart Papers. Policy #828 is a **severance** plan. All benefits provided therein are arguably "severance

---

[10] See, Defendant's Motion for Judgment on Administrative Record (Doc. #23), Reply in Support thereof (Doc. #30); see also, Defendant's refusal to produce documents or information in response to requests made at the administrative level contained in the exhibits to Plaintiffs' Motion to Compel (Doc. #27), and in objecting to Plaintiffs' formal discovery requests before this Court, Defendant's Opposition to Plaintiffs' Motion to Compel (Doc. #31); Defendant made the same representations to the Court in the February 6, 2003 phone conference with Judges Beckwith and Weber when Defendant successfully precluded Plaintiffs' attendance at the deposition of their key witness (See, Doc. #38).
[11] Severance Policy #828 (Exh. 2).

benefits" for the reason that they are benefits to be provided a terminated employee. This severance plan provides for different types of benefits, among which is vacation pay.

2) <u>Defendant's Questions & Answers</u>.[12]  Defendant published and distributed information explaining Policy #828 to Plaintiffs in the form of Questions and Answers.  This is a six-page document, which deals only with Policy #828, and which includes vacation pay in its description of the benefits that would be paid upon termination.  Defendant reiterated Section 7.1 of the Plan and informed the employees they would receive a lump sum payment for their earned but unused vacation time.

3) <u>Plaintiffs' claim letters</u>[13] From the very first time they made their claims, as early as February 16, 2001 and within a week of their termination, Plaintiffs included and specified that they were seeking payments for their earned vacation pursuant to Section 7.1 of the Policy.

4) <u>Defendant's Answer</u>[14] Defendant repeatedly referred to the benefits at issue as "benefits under the Plan" and did not restrict its view or the case to any one provision, category, section or type of benefit in the Plan.

5) <u>Other employees' claim letters</u>[15] Nearly one hundred other employees included vacation pay specifically in their claim letters.

6) <u>March 2001 Determination of Administrator</u>[16] The Plan Administrator referred to all "benefits under Policy #828" and recognized vacation pay as one of those benefits as early as March 2001.  His determination was made "with respect to Policy 828 as it applies to the sale of the Mill" and was not confined to any certain provision, section or type of benefit in the Plan.

---

[12] Champion International Corporation Merger with International Paper Company / Reorganization Severance Policy # 828 / Questions and Answers, dated May 25, 2000 (Exh. 3 & Admin Record at # IPD300262-267).
[13] Plaintiffs' claim letters dated 2-16-01 (Exh. 4 & Admin Record at # IPD300093-94 & IPD300100-101).
[14] Defendant's Answer (Doc. #8) at ¶¶ 39 & 40 and Seventh Defense.
[15] See, List of other employees' claims letters and where they are found in the Administrative record (Exh. 5).
[16] Determination of Administrator Florio dated 3-12-01 (Exh. 6 & Admin Record # IPD300271-273).

7)  <u>May 2001 decision letters from Plan Administrator to Plaintiffs</u>[17]  The Plan Administrator again referred to all "benefits under Policy #828" and explained specifically why the Plaintiffs' claims for the vacation pay benefit was denied.

8)  <u>October 2001 Warner Memorandum</u>[18]  The Plan Administrator, Robert Florio, and the International Paper employee who decided the appeals of Florio's decision, Paul Karre, both consulted with counsel about this case and Plaintiffs' claims; both were both advised by Charles Warner of Porter Wright Morris & Arthur.[19]  Mr. Warner wrote a memo to both Florio and Karre containing multiple references to vacation pay as a benefit under Policy #828 and how to deal with all of claims for vacation pay. Further, Defendant has acknowledged that the Plan Administrator considered the individual "facts concerning the employment of each claimant,"[20] so the many claims for vacation pay were reviewed and considered by both Florio and Karre.

9)  <u>December 2001 decision letter from Karre to Plaintiffs</u>[21]  When Karre informed Plaintiffs that he affirmed Florio's denial of benefits, he referred to all "benefits under Policy 828" and devoted one entire paragraph to the explanation of the denial of Plaintiffs' claims for the vacation pay benefit.

---

[17] Florio letters to Plaintiffs denying benefits dated 5-01 (Exh. 8 & Admin Record # IPD 300106-107 & IPD 301395-396).

[18] Warner Memorandum to Florio & Karre dated 10-8-01 (Exh. 10 & Admin Record # IPD 301087-93).

[19] Defendant's Reply in Support of Motion to Stay (Doc. #12 at pp. 2 & 5), and the Affidavit of Robert Florio dated 4-19-01 attached thereto (attached hereto as Exh.7) at ¶ 7; see also, Determination of Administrator (Exh. 6 & Admin Record # IPD 300271-273); see also, Defendant's Motion for Judgment (Doc. #23) at pp. 10; see also, Defendant's Responses to Plaintiffs' Discovery Requests related to the merits No. 18 (attached as Exh. B to Doc. #23).

[20] Defendant's Reply in Support of Motion to Stay (Doc. #12 at p. 9), and the Affidavit of Robert Florio attached thereto (attached hereto as Exh. 7) at ¶ 9.

[21] Karre letter to Groh dated 12-7-01 affirming Florio's denial of benefits (Exh. 11 & Admin Record # IPD 301097-100).

10) <u>November & December decision letters from Karre to other employees</u>[22]   Similarly, Karre explained in detail his affirmance of the denial of the vacation pay benefit in letters to over 70 other employees who had made claims for vacation pay.

11) <u>Defendant's Motion for Judgment</u>[23]   Defendant acknowledged that the parties' dispute involves all of the "benefits under Policy #828", repeatedly using that phrase, including the vacation pay benefit.  In its Memorandum in Support of its Motion for Judgment, Defendant set out the various categories of benefits at issue:

> D.  <u>The Severance Policy Provides Benefits to Terminated Employees</u>
> The Policy provides a series of benefits to assist employees terminated from their employment, including:
> 1.  <u>Severance Benefits</u> …
> 2.  <u>Pension Enhancement</u> …
> 3.  <u>COBRA</u> …
> 4.  <u>***Vacation Pay***</u> … [24]

12) <u>Defendant's discovery requests</u>[25]  Defendant admitted as recently as two weeks ago in its objections and responses to Plaintiffs' discovery requests related to vacation pay that:

> Vacation pay is a Policy #828 benefit:
>
> [F]ormer salaried employees of International Paper who were not offered employment by Smart Papers, or who were offered employment at a reduced salary and rejected such offer, ***were paid lump sum monetary payments for earned but unused vacation time pursuant to Reorganization Severance Policy #828***.[26]
>
> * * *
>
> And that vacation pay was considered by the Defendant and the Administrator in this case.[27]
>
> * * *

---

[22]  See, List of Karre letters to other employees and where they are found in the Administrative record (Exh. 12).
[23]  Defendant's Motion for Judgment (Doc. #23).
[24]  Defendant's Motion for Judgment (Doc. #23) at p. 9 (emphasis added).
[25]  Defendant's Objections and Responses to Plaintiffs' discovery requests (Exh. 15).
[26]  Id. at Response to Interrogatory No. 3.
[27]  Id. at Response to Interrogatory No. 7.

And that all documents that relate to vacation pay "are already in the possession of Plaintiffs" – Defendant then lists all the evidence and pleadings ***already in this case*** where vacation pay has been addressed.[28]

There should be no dispute that the vacation pay benefit has been properly raised and presented in this case.

As to Defendant's contention that Plaintiffs received this benefit from Smart Papers, all those same arguments were made by Defendant in the context of contesting the award of other Policy #828 benefits, and were rejected by the Court. Nowhere in Policy #828 does it make eligibility for any benefit contingent upon anything that any subsequent employer – whether that be Smart Papers or any other employer – gives or does not give to the former International Paper employees. Severance Policy #828 was drafted by Defendant, could have and did not contain such language, and instead clearly gives several benefits upon severance if the employees were terminated before June 20, 2001. Plaintiffs were terminated on February 9, 2001. No further analysis is necessary. It is irrelevant that Defendant tried to pass its obligation to pay monetary sums for the vacation its terminated employees had accrued to those employees' new employer.

Second, paying these employees the vacation time they accrued with International Paper in the time preceding their termination on February 9, 2001 does not result in a windfall or double recovery because the employees worked the entire year of 2001 for Smart Papers without earning any vacation; Smart Papers changed the vacation policy effective January 1, 2002 so that they earned no vacation time in 2001:

When a company's ownership changes (and in our case, an entirely new company is formed) changes in policy generally result. One such change is the Vacation Policy for Salaried Employees.[29]

* * *

---

[28] Id. at Response to Document Request No. 6.

[29] Declaration of Milton E. Lewis and November 26, 2001 letter and attachments thereto, explaining Smart Papers' vacation policy (Exh. 14).

Under the SMART Papers policy, effective January 1, 2002, vacation time for salaried employees accrues on an ongoing basis during the year in which the vacation is was taken. Under the former owners [International Paper] vacation time accrued during the prior year.[30]

* * *

As a salaried SMART Papers employee, you will begin accruing vacation for 2002 as of your first day of work in January 2002.If you were formerly employed by Champion or IP, any vacation time you have taken or will take during 2001 was earned during 2000 as an employee of one or both of those companies.[31]

* * *

Under the Asset Purchase Agreement SMART Papers was created as a new business this past February. No vacation time for salaried employees accrued during 2001. Vacation eligibility for all salaried employees begins in calendar year 2002.[32]

Thus, Plaintiffs did not get paid for the vacation time they had accrued prior to February 9, 2001: Defendant did not pay Plaintiffs a monetary sum as was required by Policy #828; Smart Papers did not pay any monetary sum to Plaintiffs. Smart Papers only gave the employees the time off that they had earned in the previous year, but did not give them any credit for the time they worked in 2001 toward any paid vacation time in 2002. The employees may have received paid vacation in 2001 while at Smart Papers, but they did so at the expense of working for more than ten and one half months without earning any vacation time; Plaintiffs started over at zero on January 1, 2002. Therefore, the employees would not enjoy an unfair windfall or double recovery if they receive a their monetary sum for the vacation they had earned prior to February 9, 2001 pursuant to Policy #828.

In a similar case, the Sixth Circuit explained that the crediting of vacation time by a subsequent employer did not discharge the former employer's obligation to pay the employees

---

[30] Id.
[31] Id.
[32] Id.; see also International Paper's vacation policy at Exh. 14, and Defendant's Response to Plaintiffs' Interrogatory No. 2 (Exh.15).

for the work they had performed prior to their termination.[33]  The *Adams* Court explained that the vacation benefits had vested according to the plan and that a recovery of those benefits against the former employer did not result in a double recovery or windfall.[34]

 Moreover, Plaintiffs accrued vacation time was not Defendant's to give or sell or transfer to ANY subsequent employer in lieu of making a monetary payment to the employees.  Plaintiffs should have been given the choice whether to take all the benefits available pursuant to Policy #828, including a monetary payment for their earned unused vacation, and to work for whomever they chose, or for no one.  If Plaintiffs had taken a job with any employer other than Smart Papers (which they should and would have been able to do if Defendant honored its obligations under Policy #828), immediately after being terminated, Defendant would have denied them their Policy #828 benefits (for the reason that they would have refused the job with Smart Papers).  However, Defendant could not and would not have transferred its ERISA obligation to pay a benefit under it Plan to all other subsequent employers[35], just as it should not have tried to pass that obligation to Smart Papers.

 The Plan told the employees that, if they were terminated and no longer worked for International Paper, they would get certain lump sum monetary payments in hand.  Had Defendant fulfilled its obligations under Policy #828, the employees would have been able to make their own decisions about working for Smart Papers, working for another company locally or elsewhere, or retiring from employment all together – decisions Policy #828 told them they would be able to make if they were terminated by International Paper before June 20, 2001.  The

---

[33] *Adams v. Avondale Industires, Inc.,* 905 F.2d 943 (6th Cir ), cert denied, 498 U.S. 984 (1990).

[34] *Id.* at 952-953.

[35] Defendant acknowledges the tenuousness of its own position by objecting on the basis of relevancy to Plaintiffs' Interrogatory asking for a description of all inquiries made as to the vacation policy any subsequent employer would provide to Plaintiffs (Exh. 15 at Interrogatory No. 6).

Sixth Circuit has explained that employers must fulfill the obligations they undertake in written benefits plans:

> [E]mployees count on them to provide an accurate picture of their current benefits situation, as well as for information which will allow them to make intelligent decisions about their future benefits needs. . . .In this circuit, under Edwards [v. State Farm, 851 F.2d 134 (6th Cir. 1988)], companies are held to the promises they make in their [Summary Plan Descriptions]."[36]
>
> * * *
>
> When making decisions about where and how long to work, employees, like the plaintiffs in this case, rely on the promises made to them, particularly when those promises are in writing.[37]

Plaintiffs reasonably read the guaranteed provision of specified benefits in Policy #828 to mean that they would receive those benefits if they were terminated before June 20, 2001. Rather than fulfill those promises, Defendant ignored Policy #828 and now urges the Court to reward it for transferring its obligation to another company.  Again, if Defendant had intended to retain that right, it could and should have drafted and included language to that effect in the Plan to inform the employees of that contingency.  Absent any such language, Plaintiffs are entitled to a lump sum payment for vacation time they earned and did not use as of their termination on February 9, 2001.  Defendant cannot contract away its obligation under ERISA and its own severance plan through any sales agreement or otherwise.  If Defendant believes that it is unfair for it to pay the vacation benefits, it has only itself to blame, or it can seek recourse from Smart Papers rather than making Plaintiffs pay the price of their earned vacation.

ERISA subjects to federal regulation plans providing employees with fringe benefits and is a comprehensive statute designed to promote the interests of employees in employee benefit

---

[36] *Helwig v. Kelsey-Hayes Co.*, 93 F.3d 243, 247, 249 (6th Cir. 1996), cert. denied, 519 U.S. 1059 (1997), citing *Edwards v. State Farm*, 851 F.2d 134, 136 (6th Cir. 1988).

[37] *Id.*

plans.[38]  The statue specifically states that the term "employee welfare benefit plan" means "any plan, fund, or program . . . established or maintained by an employer . . . for the purpose of providing for its participants . . . *vacation benefits*."[39] And, although a vesting requirement does not exist under ERISA for a <u>welfare</u> benefits plan (as compared to a <u>pension</u> benefits plan), employers may vest welfare benefits if they choose to do so.[40]  To determine whether welfare benefits have vested, the court ascertains the parties' intent and looks to the written terms of the plan documents which control.[41]  "The language of the plan's 'written instrument' determines whether the benefits are vested."[42]    In this case, as the Court has already found, Policy #828 is unambiguous and sets forth and guarantees certain welfare benefits, including the monetary payment for earned vacation, and that they would vest upon termination if that termination occurred before June 20, 2001.

ERISA does not require employers to establish employee benefits plans, nor does it mandate what types of benefits employers must provide if they choose to offer a benefits plan. But, as the United States Supreme Court has explained, "ERISA does, however, seek to ensure that employees will not be left emptyhanded once employers have guaranteed them certain benefits."[43]

## III.    CONCLUSION

Based upon the foregoing, Plaintiffs respectfully move the Court to:  1) Order Defendant to provide the calculations of each class member's earned and unused vacation time that employee had accrued as of February 9, 2001, and 2) to approve the attached Supplemental

---

[38] *Alessi v. Raybestos-Manhattean, Inc.*, 451 U.S. 504, 510 (1981).
[39] 29 U.S.C §1002(1)(A)(emphasis added).
[40] *Boyer v. Douglas Components Corp.*, 986 F.2d 999, 1005 (6th Cir. 1993).
[41] *Id.*; *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1297-98 (6th Cir. 1991); *Musto v.  American Gen. Corp.*, 861 F.2d 897, 910 (6th Cir. 1988).
[42] *In Re White Farm Equip. Co.*, 788 F.2d 1186, 1193 (6th Cir. 1986).
[43] *Lockhead Corp. V. Spink*, 517 U.S. 882, 887 (1996).

Notice to be mailed to all class members forthwith, so that the Court can determine the complete and accurate damage figure to be included in the Final Judgment Entry.

Respectfully submitted,

s/Theresa L. Groh
Theresa L. Groh (0029806)
John C. Murdock (0063749)
Murdock Goldenberg Schneider & Groh, L.P.A.
700 Walnut Street, Suite 400
Cincinnati, Ohio 45202-2011
Telephone: (513) 345-8291
Facsimile: (513) 345-8294
**Trial Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2003, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Michael Roberts, Esq., Graydon, Head & Ritchey LLP, 1900 Fifth Third Center, 511 Walnut Street, Cincinnati, Ohio 45202, and I hereby certify that I have mailed the document by United States Postal Service to the following non CM/ECF participants: W. Carter Younger, Esq. and James P. McElligott, Esq., McGuire Woods, LLP, One James Center, 901 East Cary Street, Richmond, VA 23219-4030.

s/Theresa L. Groh
Theresa L. Groh