Exhibit 9

# LIST OF OTHER MAY 2001 FLORIO LETTERS TO OTHER EMPLOYEES DENYING CLAIMS FOR BENEFITS UNDER POLICY #828

**FLORIO'S 5/01 DENIAL OF EMPLOYEES' CLAIMS FOR VACATION PAY**
**FOUND IN THE ADMINISTRATIVE RECORD**
**LISTED BY BATES #**

| | |
|---|---|
| IPD301263-63 | Adams, Barbara |
| IPD301263-64 | Adams, Dennis |
| IPD301265-266 | Adsit, Spencer |
| IPD301267-68 | Ahner, Richard |
| IPD301269-70 | Allen, Mike |
| IPD301272-272 | Allen, Sharon |
| IPD301273-274 | Anderson, Wes |
| IPD301275-76 | Androski, Bret |
| IPD301277-78 | Angst, Andrea |
| IPD301279-80 | Bernard, Rick |
| IPD301281-82 | Betz, Jeffrey |
| IPD301283-84 | Bieker, David |
| IPD301285-86 | Bokeno, Tom |
| IPD301287-88 | Bowling, Mary |
| IPD301289-90 | Brandenburg, Arch |
| IPD301291-92 | Brisbebois, David |
| IPD301293-94 | Brockman-Jester, Deborah |
| IPD301295-96 | Brockway, Anita |
| IPD301297-98 | Brunner, William |
| IPD301299-300 | Bryant, Joel |
| IPD301301-02 | Buchanan, Bob |
| IPD301303-04 | Bunn, Cheryl |
| IPD301305-06 | Burns, Brenda |
| IPD301307-08 | Cagle, Russell |
| IPD301309-10 | Campbell, Donald |
| IPD301311-12 | Campbell, Elmer |
| IPD301313-14 | Carpenter, Susan |
| IPD301315-16 | Cathers, Susan |
| IPD301317-18 | Citro, Nicole |
| IPD301319-20 | Cooper, Stuart |
| IPD301321-22 | Cornette, Gary |
| IPD301323-24 | Crawford, Lonnie |
| IPD301325-26 | Croucher, Clarence |
| IPD301329-30 | Dempsey, Janet |
| IPD301331-32 | Dixon, Terrance |
| IPD301333-34 | Dunn, Richard |
| IPD301335-36 | Elliott, Gary |
| IPD301337-38 | Etter, Nancy |
| IPD301339-40 | Fasse, Nancy |
| IPD301341-42 | Fields, Teresa |

{00008950; 1}

| IPD301343-44 | Forsythe, Martin |
| IPD301345-46 | Geist, Garth |
| IPD301347-48 | Getz, Walter |
| IPD301349-50 | Glaab, Michael |
| IPD301351-52 | Grantz, James |
| IPD30153-54 | Hardesty, Kenneth |
| IPD301355-56 | Hendershot, Waymond |
| IPD301357-58 | Hensley, Jewel |
| IPD301359-60 | Hobbs, Jennifer |
| IPD301361-62 | Hofferberth, James |
| IPD301363-64 | Ivey, Richard |
| IPD301365-66 | Jester, Ralph |
| IPD301367-68 | Johnson, Anetta |
| IPD301369-70 | Jones, Thomas |
| IPD301371-72 | Kaup, Kenneth |
| IPD301373-74 | Keating, Joseph |
| IPD301375-76 | Kidd, Pam |
| IPD301377-78 | Lacey, Deborah |
| IPD301379-80 | Laslo, Christina |
| IPD301381-82 | Lehman, Barbara |
| IPD301383-84 | Lopane, Michael |
| IPD301385-86 | Louden, Mary |
| IPD301387-88 | Martin, Jeffrey |
| IPD301389-90 | Meyer, Michael |
| IPD301391-92 | Murray, Alexis |
| IPD301393-94 | Neumann, Joanne |
| IPD301397-98 | Peace, June |
| IPD301399-400 | Peacock, Gary |
| IPD301401-02 | Philley, James |
| IPD301403-04 | Ramsey, Henry |
| IPD301405-06 | Reiff, Faye |
| IPD301407-08 | Rice, John |
| IPD301409-10 | Rose, Debra |
| IPD301411-12 | Sandlin, Omar |
| IPD301413-14 | Santamaria, John |
| IPD301415-16 | Schindler, Lawrence |
| IPD301417-18 | Seider, Jamie |
| IPD301419-20 | Sloneker, Suzanne |
| IPD301421-22 | Smith, Julie |
| IPD301423-24 | Sorrell, Chris |
| IPD301425-26 | Sowders, Hope |
| IPD301427-28 | Spears, Karen |
| IPD301429-30 | St. Pierre, Felix |
| IPD301431-32 | Stanifer, Charles |
| IPD301433-34 | Takalo, Lawrence |

| IPD301435-36 | Taylor, James |
|---|---|
| IPD301437-38 | Theobald, Donna |
| IPD301439-40 | Thomas, Manoj |
| IPD301441-42 | Truster, Jonathon |
| IPD301443-44 | Von Bargen, Charles |
| IPD301445-46 | Warrell, Brian |
| IPD301447-48 | Weiser, Thomas |
| IPD301449-50 | Welch, Dawn |
| IPD301451-52 | Wilburn, Renee |
| IPD30153-54 | Wilhelm, Patricia |
| IPD30155-56 | Wocher, Thomas |
| IPD30157-58 | Wulker, David |
| IPD30159-60 | Yiznitsky, Kenneth |
| IPD30061-62 | Young, Christian |
| IPD30163-64 | Zeek, Daniel |
| IPD30165-66 | Bruce, Raleigh |

Exhibit 10

# OCTOBER 8, 2001 MEMORANDUM FROM CHARLES WARNER TO BOB FLORIO AND PAUL KARRE RE: POLICY #828 APPEALS

OCT-08-01  13:50  From:                                         T-429  P.02/08  Job-527



PORTER
WRIGHT
MORRIS &
ARTHUR LLP
Attorneys and
Counselors at Law

MEMORANDUM

**VIA FACSIMILE**

**TO:**     Bob Florio
            Paul Karre

**FROM:**   Charles C. Warner

**DATE:**   October 8, 2001

**RE:**     Policy No. 828 Appeals

---

First, enclosed are copies of our listing of appeal letters by category, broken down into A. Stand Alone Letters and B. Group Letters, with Group 1 (31 identical letters) beginning with Richard Ahner, Group 2 (9 almost identical letters) beginning with C.E. Von Bargen, Group 3 (5 letters) beginning with Mike Allen and Group 4 (not really a group, but a husband and wife who wrote letters close to those in Group 1). Also, I would flag that the following letters in Group A have adopted paragraphs from the same letters in Group B. 1) David Bieker, James Grantz, Kenneth Kaup and Faye Reiff. Thus, of the 73 total letters, approximately half have identical or largely similar language to the Ahner letter.

Second, as an initial matter, we need to determine the timeliness of the various appeals, specifically including that of Gary Peacock (list A.) and David Brisebois (list B.1.).

Third, enclosed is a synopsis of the points made in the letters in Groups B.1., 2. and 3. to facilitate our analysis and response. In advance of our telephone conference on Tuesday morning, I will also attempt to identify any additional/different points made in the stand alone letters as well.

I look forward to conferring with you Tuesday morning beginning at 8:00 a.m. Central Time.

Best regards.

CCW

tlk

Enclosures

COLUMBUS/994547 v.03

IPD301087

# APPEAL LETTERS

A.    **Stand Alone Letters**

| Name of Claimant | Date of Letter |
|---|---|
| Adsit, Spencer M. | June 12, 2001 |
| Allen, Sharon N. | July 10, 2001 |
| Anderson, Wes | July 11, 2001 |
| Betz, Jeffrey R. | July 9, 2001 |
| Bieker, David J. | July 10, 2001 |
| Bokeno, Tom | July 10, 2001 |
| Buchanan, Bob | July 9, 2001 |
| Campbell, Elmer<br>     (sent by Elmer's attorneys, Freking & Betz) | July 11, 2001 |
| Cathers, Carla | July 3, 2001 |
| Cornette, Gary D. | May 29, 2001 |
| Crawford, Lonnie | July 10, 2001 |
| Dalesandro, Scott | May 24, 2001 |
| Dixon, Terrence L. | July 11, 2001 |
| Grantz, James A. | July 11, 2001 |
| Hardesty, Kenneth L. | June 10, 2001 |
| Jones, Thomas R.<br>     (marked: on "offered" & "accepted" lists 5/30) | May 22, 2001 |
| Kaup, Kenneth G. | July 6, 2001 |
| Lacey, Deborah J. | July 12, 2001 |
| Laslo, Christina | July 3, 2001 |
| Meyer, Michael L. | July 4, 2001 |
| Murray, Alexis<br>     (marked "on A list - offered & accepted") | May 25, 2001 |
| Murray, Alexis<br>     (same person as above) | July 13, 2001 |
| Peacock, Gary | July 24, 2001 |
| Philley, James M. | July 6, 2001 |
| Reiff, Faye | July 9, 2001 |
| Rose, Debra A. | July 2, 2001 |
| St. Pierre, Felix | July 3, 2001 |
| Truster, Jonathon H. | July 13, 2001 |
| Wilburn, Renee | July 12, 2001 |
| Zeek, Daniel W.<br>     (marked "offered & accepted") | June 20, 2001 |

IPD301088

# APPEAL LETTERS

B.    Group Letters

Group 1:

| Name of Claimant | Date of Letter |
|---|---|
| Ahner, Richard J. | July 10, 2001 |
| Androski, Bret | July 6, 2001 |
| Angst, Andrea | July 10, 2001 |
| Bowling, Mary M. | July 6, 2001 |
| Brandenburg, Arch Wayne | July 9, 2001 |
| Brisebois, David | August 8, 2001 |
| Bruce, Raleigh Jr. | July 9, 2001 |
| Bryant, Joel | July 9, 2001 |
| Buchanan, Bob | July 10, 2001 |
| Bunn, Cheryl A. | July 6, 2001 |
| Carpenter, Susan D. | July 9, 2001 |
| Etter, Nancy | July 9, 2001 |
| Fasse, Brett | July 12, 2001 |
| Fields, Teresa | July 6, 2001 |
| Forsythe, Martin B. | July 11, 2001 |
| Geist, Garth | July 10, 2001 |
| Getz, Walter C. | July 9, 2001 |
| Glaab, Michael P. | July 9, 2001 |
| Hensley, Jewel | July 6, 2001 |
| Kidd, Pam | July 13, 2001 |
| Louden, Mary | July 6, 2001 |
| Peace, June S. | July 6, 2001 |
| Ramsey, Henry E., Jr. | July 9, 2001 |
| Sloneker, Suzanne | July 10, 2001 |
| Smith-Welch, Dawn L. | July 11, 2001 |
| Sowders, Hope | July 12, 2001 |
| Spears, Karen | July 9, 2001 |
| Taylor, James Brent | July 9, 2001 |
| Wilhelm, Patricia | July 13, 2001 |
| Wocher, C. Thomas | July 9, 2001 |
| Wulker, David R. | July 6, 2001 |

IPD301089

Group 2:

| Name of Claimant | Date of Letter |
| --- | --- |
| von Bargen, C.E. | May 26, 2001 |
| Cagle, Russell L. | July 9, 2001 |
| Hofferberth, Todd J. | June 19, 2001 |
| Hofferberth, Todd J. (marked "offered & accepted") | June 19, 2001 |
| Martin, Jeffrey L. | June 22, 2001 |
| Rice, John R. | July 12, 2001 |
| Schindler, Lawrence W. | July 8, 2001 |
| Stanifer, Charles O. (marked "offered & accepted") | June 30, 2001 |
| Thomas, Manoj K. | July 7, 2001 |
| Yiznitsky, Kenneth A. | July 12, 2001 |

Group 3:

| Name of Claimant | Date of Letter |
| --- | --- |
| Allen, Mike | June 29, 2001 |
| Burns, Brenda Gail | July 9, 2001 |
| Hendershot, Waymond R. | July 9, 2001 |
| Lehman, Barbara | July 9, 2001 |
| Weiser, Tom | June 29, 2001 |

Group 4:

| Name of Claimant | Date of Letter |
| --- | --- |
| Brockman-Jester, Deborah K. | July 8, 2001 |
| Jester, Ralph   *paid* | July 8, 2001 |

COLUMBUS:014428 v 01

IPD301090

## SYNOPSIS OF POINTS IN GROUP LETTERS

**B. 1.**  <u>Ahner, et al. (31 identical and 5 similar)</u>

¶ 1:   Request for Review.

¶ 2:   § 10 of the Policy, cited as basis for right to interpret, "contradicts" § 9 which
states that for one year after merger (a) Policy cannot be terminated and (b) no
amendment permitted if adversely affects "rights, expectancies or benefits."

*interpretation not an amendment*

¶ 3:   Although I was "clearly terminated" by IP, which would make me eligible under
§ 1.14(a), benefits were denied which appears to be an amendment not permitted
under § 9.

¶ 4:   Understand not eligible if transferred to a sub of IP; is Smart Papers a sub?; if not,
then eligible.

¶ 5:   While denial states intent of policy is presumably to help employees cope with the
stress of unemployment, I was technically unemployed for a short period between
IP and Smart and suffered stress associated with process of divestiture of
Hamilton Mill and it is a small operation which could close at any time.

*continuity*

**B.2.**  <u>Von Bargen, et al. (9 letters)</u>

¶ 1:   Received Denial.

¶ 2:   Various comments, including that Plan Administrator "utilized his amendments to
maximize International Paper's benefit while completely eliminating the benefits
of the former employees in question" contrary to § 9 of the Policy.

¶ 3:   Challenges conclusion that employees who continue employment "suffer no such
adverse action" based on emotional and psychological effects of not knowing
whether will have a job, reduction of healthcare and loss of dental benefits, loss of
one week of vacation and fact had to apply for healthcare benefits three different
time with three different organizations.

*change in benefit level does not subject to change in IP.*

¶ 4:   Smart not a sub of IP;  asset transaction (only).

¶ 5:   "Earned" vacation at IP; payment would not be "windfall".   *Protected*

¶ 6:   Plan Administrator has right to interpret but has attempted to amend Plan contrary
to § 9 since employed "additional requirements", including:  severance not
contingent on whether employed with another company, only if sub of IP; and
should have been paid for accrued vacation (IP usually does when terminations
occur) and then would have four more weeks from Smart (IP must have
negotiated cost-saving measure at my expense).

IPD301091

*Does not effect mis-perint*

¶7:    Employees should have right to choose and make decision in their own best interests, and nowhere along the following line of progression of my termination was I allowed to "make a decision in my best interest":

- August, 2000:  Continued employment with IP because assured that would receive severance if the mill was sold or closed, and declined [four] offers of employment in hopes of receiving compensation for [21] years of service and to aid IP in selling a fully operational mill (not allowed to volunteer for severance).

- January, 2001:  Informed by Johnson and Maheu that had to apply and interview for job with Smart in order to receive severance (no choice).

*Open*

- February, 2001:  Told by Mill Management to tell "certain individuals" that should tell interview service that wish to take severance, which was not offered to me and many others.  ?

- 02/09/01:  Offered position by Smart at same base salary (and told if position offered, would not get severance whether took position or not).

- 02/10/01:  Terminated without cause from IP "as a result of reorganization."

¶8:    Summary:  Plan Administrator used "revisions" to deny claim.

B.3.    <u>Allen, et al. (5 letters)</u>

¶1:    Request Review.

¶2:    Prior to sale by IP to Sun Capital, employees were mandated to attend meeting where severance presented; IP needed people to stay on so could sell mill as an operating asset.

¶3:    Severance Policy says covered if employment with IP terminated; received 02/09/01 letter from IP saying employment terminated; also said if want to be considered by new owners, had to apply, be interviewed, etc., just like with any other company.

¶4:    Went through interview process; base salary same; but totally compensation greatly reduced; also job content changed dramatically and now ([2] doing job of [7]) [each letter varies].   *policy*

¶5:    Plan Administrator based decision on "intent" which is not written anywhere.

¶6:    Fact that accepted employment with Smart no different from accepting employment anywhere else.   *Same employment w/ continuing operations*

IPD301092

¶ 7:   Some people told that if not want a job with Smart and wanted severance, just let them know; and now some of these people are employed by Smart as consultants.

COLUMBUS/921471 v.01                                          IPD301093

Exhibit 11

# DECEMBER 7, 2001 LETTER FROM KARRE TO GROH AFFIRMING FLORIO'S DENIAL OF BENEFITS UNDER POLICY #828

# INTERNATIONAL ⒶPAPER

**PAUL J. KARRE**
VICE PRESIDENT
HUMAN RESOURCES

6400 POPLAR AVENUE
MEMPHIS, TN 38197
PHONE 901 763 7667
FAX 901 763 6356

December 7, 2001

<u>Via Facsimile to:</u>
Theresa L. Groh, Esq.
Murdock Goldenberg Schneider & Groh
700 Walnut Street, Suite 400
Cincinnati, Ohio 45202-2011
Fax: (513) 345-8294

Re: Claims under Champion International Corporation Reorganization Severance Policy # 828

Dear Ms. Groh:

I have received and reviewed the appeal for benefits you have filed under Champion International Corporation's Reorganization Severance Policy #828 ("the Policy" or "the Plan") on behalf of Stuart Cooper, Jr., Scott Dalesandro, Janet Dempsey, Jennifer Hobbs, Joseph Keating, Diane Noonan, Julie Smith, and Donna Theobald. For the reasons discussed below, I have concluded that Plan Administrator Robert Florio correctly denied your clients' claims for benefits.

Your letter begins by asserting that Mr. Florio violated your clients' right to due process by denying certain information requests. I have reviewed both your requests and the information Mr. Florio provided to you. It appears that many of your requests are based on recent changes to the law that are not applicable to your clients' claims. Additionally, your letter mischaracterizes the position Mr. Florio has taken in response to several of your information requests. Rather than recount that position here, I will simply refer you back to Mr. Warner's July 30, 2001 and September 18, 2001 correspondence to you. Based on my review of that correspondence, I believe you have been provided with all the documents to which your clients are presently entitled.

You next assert that "there is substantial evidence that the Administrator's determinations and denial of benefits was tainted by self-interest and that he operated under a conflict of interest." In support of this assertion, you speculate that, because of Mr. Florio's position with the company, he had a "financial incentive to deny benefits and promote the interests of the Company at the expense of the interests of its employees." I am not aware of any such financial incentive provided by the Company either to Mr. Florio or myself, nor am I aware of any actual evidence of bias on his part. Moreover, although you attempt to bootstrap your claim that your clients' information requests were improperly denied into evidence of alleged bias, because Mr. Florio produced all documentation that he was required to produce, I do not believe his response to your information requests supports your claim of bias in any way.

On this point, your letter not only mischaracterizes Mr. Florio's responses to your information requests, but it also demonstrates strained logic at points. To take but one example of the first point, you assert that "[t]he Administrator refused to provide any information or response to Claimants' June 5, 2001 Requests relating to the appointment of the Plan Administrator.". Yet Mr. Warner's July 30th correspondence enclosed the Appointment of Administrator for Champion International Corporation Reorganization Severance Policy No. 828, which to my knowledge was the only document evidencing that appointment.

Theresa Groh
Page 2

Additionally, as to the second point, you reason that because you requested information relating to calculations of the cost of paying the benefits at issue and no such documents were provided to you, the Administrator must have intentionally kept those documents from you because they would evidence a conflict of interest. Yet this argument assumes both that such calculations were made and that Mr. Florio ever sought to review such calculations. Both assumptions are erroneous. My review of Mr. Florio's determinations shows that he based his determinations on the language and intent of the Plan as well as his understanding – based on conversations he had with Champion representatives – of the company's past practice when confronting similar circumstances under other severance plans. I have not found any evidence that Mr. Florio based his decision on – or even considered – the costs to International Paper of paying benefits to your clients or other claimants.

Your appeal next takes issue with the Administrator's exercise of his discretion in interpreting the Plan. Although you assert that the Plan's unambiguous terms leave no questions concerning your clients' eligibility for benefits, I respectfully disagree. While your appeal correctly points out that Smart Papers is not a subsidiary of International Papers, this misses the point. The Plan nowhere expressly states what result should obtain if employees receive continued employment at the Mill following a merger or asset sale after the initial merger between Champion and International Paper that gave rise to the Plan's creation. Consequently, the Administrator had to interpret—based on the Plan's definition of "Termination" in Section 1.14 and other Plan provisions—whether employees offered continued employment as a result of such mergers or sales were intended to be covered by the Plan. Because the Plan expressly excluded employees who were offered continued employment as a result of the Champion-International Paper merger that gave rise to the Plan's creation (see Section 1.14(a), which provides that "it shall not be deemed a termination of employment if after the Merger the Employee is transferred to the employment of International Paper Co. or a subsidiary thereof . . . ."), the Administrator fairly determined that employees who were offered continued employment in later transactions similarly involving continued employment were not intended beneficiaries of the Policy.

Notwithstanding your assertions to the contrary, this interpretation is not only consistent with the Plan's definition of "termination" in Sections 1.14(a) and 1.14(b), but it is also consistent with the Plan's stated purpose and other Plan provisions. The Policy's stated purpose is to provide severance and other benefits to employees whose "employment is terminated as a result of Reorganization," which is defined to mean "employment action(s) resulting in an Eligible Employee's Termination during the Policy Period." Because your clients were offered continued employment, they have not suffered any such employment action. Based on my knowledge of Champion's and International Paper's practices as well as my (and the Plan Administrator's) conversations with representatives of each company, this determination is consistent with the companies' past practices under similar circumstances.

Your letter disputes the Administrator's interpretation of the Plan's purpose by claiming that the purpose of Policy 828 was not to compensate employees who lose their employment at the Mill within one year as a result of the Champion-International Paper merger, but rather to "reward" them "for their many years of service" and "entice them to stay with a reorganized company" through International Paper's sale of the Mill to Smart Papers. But if your interpretation were correct and Policy 828 was intended simply as a reward for years of service to Champion, it would make little sense for the drafters to include a provision allowing the Plan to be terminated or amended after one year without restriction. Moreover, you have presented no evidence – nor am I aware of any evidence – that International Paper was even contemplating a subsequent sale of the Mill when Policy 828 was put in place. Accordingly, it makes little sense to ascribe to the drafters a purpose of "entic[ing] [employees] to stay with a reorganized company . . . through International Paper's sale of the Mill to Smart Papers."

Moreover, as noted in the Administrator's determination, the Policy provides for outplacement benefits, EAP benefits to help severed employees cope with the stress of unemployment, financial and retirement assistance which is generally offered in circumstances such as these only to employees suffering loss of continued employment, and a lump-sum payment for banked, earned, and accrued vacation.

IPD301098

Theresa Groh
Page 3

These benefits clearly show the Plan was designed to help employees with issues associated with unemployment, not to provide a windfall for employees who suffer no loss of continued employment. On this latter point, it is again worth noting that Smart Papers and International Paper agreed that employees' earned accrued vacation would be honored by Smart Papers. Accordingly, employees who received both a lump-sum payment for such vacation and the ability to take such vacation at Smart Papers would, in fact, receive a windfall benefit. Based on this and the other language in the Plan discussed above, I do not believe the Administrator erred in finding that the Plan's purpose was to compensate employees who lose their employment at the Mill within one year as a result of the Champion-International Paper merger. Because your clients did not lose their continued employment at the Mill, the Administrator properly denied their claim for benefits.

Your appeal also takes issue with the Administrator's reliance on "extraneous information" such as the terms of the asset sale between International Paper and Smart Papers and the past practices of Champion and International Paper in administering severance plans under similar circumstances. Once again, though, the main reason you cite as to why such reliance was improper is that you were allegedly denied access to information you requested concerning these issues. My review of the documents produced to you by the Administrator, however, shows that you were provided all relevant documents concerning the terms of the sale between International Paper and Smart Papers that were relied upon by the Administrator. And, as to the past practices of Champion and International Paper in administering severance plans, both the Administrator's understanding of these past practices and my own understanding are based on our personal knowledge of the companies' experiences and on conversations we have had with company officials. Because the Administrator did not deem it necessary to gather documentation of these practices in making his determinations, no such documentation was provided in response to your requests.

The fifth major argument raised in your appeal expresses your belief that the Administrator improperly amended the Plan in contravention of Section 9, which provides that the Plan may not be terminated or amended in a way that adversely affects an Eligible Employee's rights, expectances or benefits for one year immediately following the Champion-International Paper merger. Here, though, the Plan Administrator in no way terminated the Plan, nor did he amend the Plan. Rather, as discussed above, the Administrator exercised his power to interpret the Plan—a power that is clearly granted to him by Section 10—to determine that your clients are not Eligible Employees as that term is used in the Policy. Because the Administrator's exercise of his power to interpret the Plan was entirely consistent with his obligation not to terminate or adversely amend the Plan under Section 9, his decision should be affirmed.

Your appeal goes on to recite a host of alleged representations and purported facts that you believe further entitle your clients to severance benefits under Policy 828. However, your appeal does not present, nor am I aware of, any representations made by anyone acting on behalf of the Plan or in their capacity as Plan Administrator that would have the effect of modifying the Plan's terms or requiring an interpretation of the Plan that is different from the one adopted by Mr. Florio. Additionally, many of the facts you recite focus on the reduction in benefits your clients suffered as a result of continuing their employment with Smart Papers. As at-will employees of International Paper prior to the sale, however, your clients' benefits were subject to change regardless of any sale of the Hamilton Mill, and nothing in the Plan's definition of "termination" makes a reduction in benefits a qualifying event under the Plan.

Your appeal also complains generally that the Administrator arbitrarily applied Policy 828. In support of this assertion, you claim that there are salaried employees who were not hired by Smart Papers and received full severance benefits. This, however, is entirely consistent both with the Plan's language and with the Administrator's interpretation of the Policy as applied to your clients' claims, as these employees would have suffered loss of continued employment at the Mill during the Policy's one-year policy period. You next point out that some employees were given the opportunity to inform Smart Papers that they did not want a job offer so they could elect to receive severance benefits under Policy 828.

IPD301099

Page 4

Once again, though, I am not aware of any such representations being made by someone with authority to interpret, administer, or act on behalf of the Plan, nor do such representations, if made, require a different interpretation or application of the Plan. Next, you allege that some employees were hired by Smart Papers and still received full severance benefits. I am not aware of any employee, however, who received continued employment with Smart Papers through the policy period and who also received severance benefits under Policy 828. However, if an employee initially received continued employment by Smart Papers but was later involuntarily terminated within the one-year policy period, the employee likely did qualify for benefits. Again, however, this is consistent with both the Plan's language and the Administrator's interpretation of the Policy as applied to your clients' claims, as your clients suffered no loss of continued employment during the one-year policy period.

Your letter also claims that some employees who were hired by Smart Paper quit their employment and still received full severance benefits. I am not aware of any employee, however, who received benefits as a result of voluntarily resigning his or her employment with Smart Papers.

I understand and sympathize with the stress and concern your clients may have experienced in connection with the sale of the Hamilton Mill. For all the reasons discussed above, though, your clients are not entitled to receive benefits under Policy 828. Accordingly, their appeal of Mr. Florio's determinations must be denied.

Sincerely,

Paul J. Karre
Vice President, Human Resources

Exhibit 12

# LIST OF NOVEMBER AND DECEMBER 2001 LETTERS FROM KARRE TO OTHER INTERNATIONAL PAPER EMPLOYEES AFFIRMING FLORIO'S DENIAL OF BENEFITS UNDER POLICY #828

**KARRE'S 11/01 AND 12/01 DENIAL OF EMPLOYEES' APPEALS FOR
VACATION PAY
FOUND IN THE ADMINISTRATIVE RECORD
LISTED BY BATES #**

| | |
|---|---|
| IPD301101-102 | Adsit, Spencer |
| IPD301103-104 | Ahner, Richard |
| IPD301105-106 | Allen, Mike |
| IPD301107-108 | Allen, Sharon |
| IPD301109-110 | Anderson, Wes |
| IPD301111-112 | Androski, Bret |
| IPD301113-114 | Angst, Andrea |
| IPD301116-117 | Bieker, David |
| IPD301118-119 | Bokeno, Tom |
| IPD301120-121 | Bowling, Mary |
| IPD301122-123 | Brandenburg, Arch |
| IPD301124-125 | Brisebois, David |
| IPD301126-127 | Brocman-Jester, Deborah |
| IPD301128-129 | Bruce, Raleigh |
| IPD301130-131 | Bryant, Joel |
| IPD301132-133 | Buchanan, Bob |
| IPD301134-135 | Bunn, Cheryl |
| IPD301136-137 | Burns, Brenda |
| IPD301138-139 | Cagle, Russell |
| IPD301140-141 | Carpenter, Susan |
| IPD301142-143 | Cathers, Carla |
| IPD301144-145 | Crawford, Lonnie |
| IPD301147-148 | Dixon, Terrence |
| IPD301149-150 | Etter, Nancy |
| IPD301151-152 | Fasse, Brett |
| IPD301153-154 | Fields, Teresa |
| IPD301155-156 | Forsythe, Martin |
| IPD301157-158 | Geist, Garth |
| IPD301159-160 | Getz, Walter |
| IPD301161-162 | Glaab, Michael |
| IPD301163-164 | Grantz, James |
| IPD301165-166 | Hardesty, Kenneth |
| IPD301167-168 | Hendershot, Waymond |
| IPD301169-170 | Hensley, Jewell |
| IPD301171-172 | Hofferberth, Todd |
| IPD301173-174 | Jones, Thomas |
| IPD301175-176 | Kaup, Kenneth |
| IPD301177-178 | Kidd, Pamela |
| IPD301179-180 | Knobeloch- Plentz, Sandy |

{00008950; 1}

| IPD301181-182 | Lacey, Deborah |
|---|---|
| IPD301183-184 | Laslo, Christina |
| IPD301185-186 | Lehman, Barbara |
| IPD301187-188 | Louden, Mary |
| IPD301189-190 | Marcus, Curtis |
| IPD301199-200 | Martin, Jeffrey |
| IPD301201-202 | Meyer, Marcus |
| IPD301203-204 | Miller, Adam |
| IPD301205-206 | Murray, Alexis |
| IPD301207-208 | Peace, June |
| IPD301210-211 | Philley, James |
| IPD301212-213 | Phillips, Hocutt |
| IPD301214-215 | Ramsey, Henry |
| IPD301216-217 | Reiff, Faye |
| IPD301218-219 | Rose, Debra |
| IPD301221-222 | Rice, John |
| IPD30123-224 | Schnindler, John |
| IPD301225-226 | Sicking, Bryan |
| IPD301227-228 | Sloneker, Suzanne |
| IPD301229-230 | Sloneker, Timothy |
| IPD301231-232 | Smith-Welch, Dawn |
| IPD301233-234 | Sowders, Hope |
| IPD301235-236 | Spears, Karen |
| IPD301237-238 | Stanifer, Charles |
| IPD301239-240 | Taylor, James |
| IPD301241-242 | Thomas, Manoj |
| IPD301243-244 | Truster, Jonathon |
| IPD301245-246 | Von Bargen, Charles |
| IPD301247-248 | Weiser, Thomas |
| IPD301249-250 | Wilburn, Renee |
| IPD301251-252 | Wilhelm, Patricia |
| IPD301253-254 | Wocher, Thomas |
| IPD301255-256 | Wulker, David |
| IPD301257-258 | Yiznitsky, Kenneth |
| IPD301258-260 | Zeek, Daniel |

Exhibit 13

# INTERNATIONAL PAPER COMPANY
# VACATION POLICY

**Holidays**

Eligible employees will receive holiday pay for the following named holidays:

| | |
|---|---|
| New Year's Day | Thanksgiving Day |
| Good Friday | Day after Thanksgiving Day |
| Memorial Day (Monday) | Christmas Eve |
| Fourth of July | Christmas Day |
| Labor Day | |

Two (2) personal, floating or designated holidays.

The Company reserves the right to designate a set holiday, or holidays, for any of the two personal, floating or designated holidays.

# VACATIONS

**Eligibility**

Active salaried employees are eligible for vacation based on their length of service with Smart Papers. Employees must work at least one (1) day in a year to receive any vacation in that year.

**Length of Vacations**

The number of weeks of vacation for the current year is calculated as of December 31 of the prior year. The following table summarizes the current vacation schedule. Employees who formerly worked for International Paper B Street Mill as of the Closing of the transaction to sell the assets of the Mill to Smart Papers will be granted service credit for vacation eligibility up to the maximum of 4 weeks starting in 2002:

| Length of Continuous Service as of Dec. 31 | Length of Vacation |
|---|---|
| 1 year, but less than 2 years | 1 week |
| 2 years of service but less than 8 years | 2 weeks |
| 8 years of service but less than 15 years | 3 weeks |
| more than 15 years | 4 weeks |

Employees hired before July 1, will be entitled to one (1) week of vacation during the year in which they are hired after they have completed six (6) months of employment. Employees hired on or after July 1, will not be entitled to any vacation during the calendar year in which they are hired, but will be entitled to two (2) weeks of vacation after they have completed six (6) months of employment.

5

Notwithstanding the above, employees hired by Smart Papers who worked for International Paper B Street Mill as of the Closing of the transaction to sell the assets of the Mill to Smart Papers, shall retain all earned but unused vacation that they earned under International Paper's vacation plan in effect as of the Closing. Such employees shall be permitted time off for those vacation days at reasonable times as approved by the Company, and the employees shall receive vacation pay for such time off at the rate that such employees would have received as of the day prior to Closing for accrued unused vacation earned prior to but not after the Closing. This one-time retention of prior annual unused vacation is totally separate and apart from the Smart Papers' vacation policy described in the other paragraphs of this section. The Smart Papers' vacation policy described in the other paragraphs of this section governs all vacation time earned after the Closing.

Vacation pay does not count as hours worked for overtime calculation.

### Non-Accumulation – Non-Accrual

Neither vacations nor vacation pay shall carry over from one calendar year to the next, except for unused vacation retained by employees who formerly worked for International Paper as of the closing of the sale of the mill to Smart Papers. Any unused vacation, (except that carried over from International Paper) will be paid by March 1 following the year in which it is earned.

It should be noted that vacation is a benefit earned through continuing employment, and entitlement to vacation pay is conditioned upon active employment. Upon separation from employment, employees will receive pay for all earned and unused vacation as of the date of their separation from employment, but not for the vacation they would have earned for the remainder of the year. Such employees will receive their vacation paid on a pro-rata basis, at the rate of 1/12 for each month they actually worked during the year.

### PAY PERIOD

The pay period for salaried employees will be semi-monthly on the 15th and last day of the month, but can be changed by the company at any time with reasonable notice. Direct deposit is available to employees who wish to take advantage of this service. Direct Deposit may be required at the discretion of the company.

6

Exhibit 14

# SMART PAPERS VACATION POLICY
# AND LEWIS DECLARATION

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

|  |  |  |
|---|---|---|
| DALESANDRO, *et al.*, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. C-1-01-109 |
| | ) | |
| INTERNATIONAL PAPER COMPANY, | ) | |
| Defendant. | ) | |

## DECLARATION OF MILTON E. LEWIS

I, Milton E. Lewis, hereby declare as follows:

1.  I am Vice President and General Counsel of Smart Papers LLC ("Smart Papers" or

the "Company"). I am familiar with the vacation policies and practices of Smart Papers with

respect to those salaried employees hired by Smart Papers who formerly worked for International

Paper ("IP") at the Hamilton B Street Mill (the "Mill") at the time of the Closing of the

Transaction to Sell the assets of the Mill to Smart Papers. The Closing occurred on or about

February 9, 2001.

2.  In the Asset Purchase Agreement dated December 29, 2000 between Champion

International Corporation ("Seller") and Smart Papers, LLC ("Buyer"), Smart Papers agreed to

the following:

> "To the extent Seller Employees become Hired Employees of the
> Buyer (including those employees hired as Temporary Employees),
> Buyer (x) shall be responsible for all earned but unused vacation for
> Hired Employees as each such Hired Employee shall have earned
> under Seller's vacation plan in effect for such Hired Employee as of
> the Closing (it being understood that a corresponding dollar-for-
> dollar accrual for such liability shall be made on the Closing
> Balance Sheet, (y) shall permit all such Hired Employees time off
> for such vacation days at reasonable times as approved by Buyer's

> managers, and (z) shall pay each such Hired Employee vacation pay
> for the time taken off at the rate that such Hired Employee would
> have received as of the day prior to the Closing Date for accrued
> unused vacation earned prior to the Closing, but not after the
> Closing; *provided, however,* that the provisions of this Section
> 4.1(c) shall not affect Buyer's right to establish a new vacation
> policy for all Hired Employees for vacation timed earned after the
> Closing."

3.    Pursuant to the Asset Purchase Agreement, the salaried employees from IP who were hired by Smart Papers when it purchased the Mill were permitted to carry over to Smart Papers all earned but unused vacation that they had earned under IP's vacation plan in effect as of the Closing.  Under Smart Papers' vacation policy, such employees were permitted time off for those vacation days at reasonable times as approved by the Company, and the employees received vacation pay for their time off at the salary such employees would have received as of the day prior to the Closing.

4.    The former IP salaried employees who were hired by Smart Papers were encouraged to take their carried over IP vacation by December 31, 2001.  However, if Company business precluded such employees from taking their unused IP vacation by December 31, 2001, Smart Papers extended the date for taking such vacation to March 1, 2002.  By copy of the Company's vacation policy sent from me to salaried employees dated November 26, 2001, all salaried employees were informed that if they did not take their unused IP vacation by March 1, 2002, it would be forfeited.  See Attached November 26, 2001 letter and vacation policy attached thereto.

5.    To the best of my knowledge, information, and belief, no former IP salaried employees came forward stating that they were unable to take their unused IP vacation by March 1, 2002.  To the best of my knowledge, information, and belief, all former IP salaried employees who were hired by Smart Papers at the time of the sale of the Mill have been paid by Smart

Papers for the earned but unused vacation that they carried over from IP to Smart Papers when the Mill was sold.

6.    Smart Papers has produced to International Paper the relevant timesheets for nonexempt salaried employees who were hired by Smart Papers from the former IP workforce. Smart Papers did not require exempt salaried employees to submit timesheets and thus does not have such records.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

_November 26, 2003_
Date

Milton E. Lewis



November 26, 2001

Dear Employee:

When a company's ownership changes (and in our case, when an entirely new company is formed) changes in policies generally result. One such change is the Vacation Policy for Salaried Employees. A number of questions have arisen out of this policy, which is attached in its entirety.

Two questions in particular have emerged frequently concerning the Salaried Vacation Policy. I will address them here for clarification purposes:

**Q.** How do salaried vacations accrue? Do we earn vacation time during the year preceding the one in which vacation is taken?

**A.** Under the SMART Papers policy, effective January 1, 2002, vacation time for salaried employees accrues on an ongoing basis during the year in which the vacation is taken. Under former owners, vacation time accrued during the prior year. In other words, if you were employed by Champion in 1999, you would have taken the vacation earned that year in 2000. International Paper continued that policy.

As a salaried SMART Papers employee, you will begin accruing vacation for 2002 as of your first day of work in January 2002. If you were formerly employed by Champion or IP, any vacation time you have taken or will take during 2001 was earned during 2000 as an employee of one or both of those companies.

Under the Asset Purchase Agreement SMART Papers was created as a new business this past February. No vacation time for salaried employees accrues during 2001. Vacation eligibility for all salaried employees begins in calendar year 2002. However, this policy does not result in former Champion/IP employees "losing" any vacation, since all eligible employees have been taking their vacation earned in 2000 under the former company's vacation policy.

In other words, if you are eligible for two weeks vacation in 2002, you will accrue vacation at a rate of 1/12th of your vacation eligibility per month.

**Q.** As a salaried employee, can I carry over any vacation time, or take pay in lieu?

**A.** Beginning in 2002, salaried employees will not be eligible to carry over vacation time, or to take pay in lieu, except as approved by the CEO or COO. For vacation year 2001, IP vacation carryover will be permitted if company business necessitates the employee be at work, and if the employee is unable to use his or her earned vacation time for that reason. In this case, the carried-over vacation time must be taken by March 1, 2002. Please note this is on a one-time-only basis.

**Q.** If a salaried employee is eligible for four weeks of vacation in 2002 under the SMART Papers policy, can these weeks be taken any time during the year?

**A.** Yes, even though the employee has not technically earned all four weeks of vacation eligibility, the company will approve vacation requests during the vacation year. However, if the employee terminates prior to the end of that vacation year, the company must be reimbursed for vacation used but not earned, on a prorated basis.

If you have further questions, the attached policy should answer them in detail.

Sincerely,

Milton E. Lewis,
Vice President and General Counsel

601 NORTH B STREET
HAMILTON, OHIO 45013

SMART PAPERS
VERSATILITY, CHOICE AND PERFORMANCE

WWW.SMARTPAPERS.COM
F 513.863.5062  P 513.869.5336

11/26/01 LETTER — PG. ②

# VACATION

### Eligibility

Active salaried or salaried nonexempt employees are eligible for vacation based on their length of service with Smart Papers LLC, effective January 1, 2002. Vacation will be accrued during the year in which it is to be used. Salaried employees will not accrue vacation in calendar year 2001.

### Vacation Accruals

The number of weeks of vacation an employee may accrue begins on the first day of work effective January, 2002. Accrual is based on the whole month which is 1/12th of the vacation eligibility in the year in which it is to be taken. The following table summarizes the Smart Papers vacation schedule. [Employees who formerly worked for International Paper B Street Mill as of the Closing of the Transaction to sell the assets of the mill to Smart Papers LLC will be granted service credit for vacation eligibility up to the maximum of four (4) weeks commencing in calendar year 2002.]:

| Length of Continuous Service | Length of Vacation |
| --- | --- |
| 1 year, but less than 2 years | 1 week |
| 2 years of service but less than 8 years | 2 weeks |
| 8 years of service but less than 15 years | 3 weeks |
| more than 15 years | 4 weeks |

Employees hired before July 1, will be entitled to one (1) week of vacation during the year in which they are hired after they have completed six (6) months of employment. Employees hired on or after July 1, will not be entitled to any vacation during the calendar year in which they are hired, but will be entitled to one (1) week of vacation after they have completed six (6) months of employment.

Notwithstanding the above, employees hired by Smart Papers who worked for International Paper B Street Mill as of the Closing of the Transaction to sell the assets of the Mill to Smart Papers, shall retain all earned but unused vacation in calendar year 2000, that they earned under International Paper's vacation plan in effect as of the Closing.  Such employees shall be permitted time off for those vacation days at reasonable times during calendar year 2001 as approved by Smart Papers' management. These employees shall receive vacation pay for such time off at the rate they would have received as of the day prior to Closing for accrued unused vacation earned prior to but not after the Closing.  This one-time retention of prior annual unused vacation is totally separate and apart from the Smart Papers' vacation policy and should be used prior to December 31, 2001. However, any unused vacation retained by former employees of

*11/26/01 LETTER — Pg. ③*

International Paper must be taken by March 1, 2002, or the unused vacation will be forfeited. The Smart Papers' vacation policy described in the other paragraphs of this section governs earned vacation time which will become effective as of January 1, 2002.

Vacation pay does not count as hours worked for overtime calculation.

### Non-Accumulation – Non-Accrual

Neither vacations nor vacation pay shall carryover from one calendar year to the next, except as approved by the CEO or COO.

It should be noted that vacation is an accrued benefit earned through continuing employment, and entitlement to vacation pay is conditioned upon active employment. Employees who leave Smart Papers before they are eligible to retire, will be entitled to receive pay for any earned but unused vacation that they are eligible to receive in that calendar year.

If an employee retires or dies, that employee or his/her beneficiary will receive pay for any earned but unused vacation due in the current year.

## PAY PERIOD

The pay period for salaried and non-exempt employees will be on a bi-weekly basis, but can be changed by the company at any time with reasonable notice. Direct deposit is available to employees who wish to take advantage of this service. Direct Deposit may be required at the discretion of the company.

Exhibit 15

# DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS RELATED TO VACATION PAY

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

SCOTT D. DALESANDRO and DIANE      :
NOONAN, on behalf of themselves and    :
others,                                  :

        Plaintiffs,                    :

                                    :        Case No. C-1-01 109
        vs.                      :
                                    :        Judge Sandra S. Beckwith

INTERNATIONAL PAPER COMPANY,      :

        Defendant.                   :

### DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS RELATED TO VACATION PAY

Defendant International Paper Company ("Defendant" or "IP"), by counsel and pursuant to Federal Rules of Civil Procedure 33 and 34, responds to Plaintiff's Interrogatories and Requests for Production of Documents Related to Vacation Pay as follows:

### GENERAL OBJECTIONS

IP's specific objections and responses set forth below to Plaintiff's Interrogatories and Request for Production of Documents (hereinafter "Requests") are subject to the following general objections. The production at any time of information or documents encompassed within IP's General Objections shall not be deemed a waiver of other objections.

IP objects to these Requests in their entirety on the grounds that Plaintiff did not request nor receive approval from the Court to issue discovery requests on this issue, therefore there is no authority for the requests served beyond the close of discovery.

Notwithstanding this objection, Defendant will provide responses to reasonable and relevant requests.

IP objects to the Requests to the extent they seek documents protected by the attorney-client privilege and/or the work product doctrine, or are otherwise immune from discovery. Inadvertent production of any such document or information shall not constitute a waiver of any privilege with respect to the subject matter thereof or the information contained therein, and shall not waive the right of IP to object to the use of any document or the information contained therein during any subsequent proceeding.

IP objects to the Requests to the extent they are overly broad, unduly burdensome, or seek information which is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence or otherwise exceed the scope of permissible discovery under the Federal Rules of Civil Procedure.

IP objects to the Requests to the extent they seek information and/or documents already in Plaintiff's knowledge or possession.

IP objects to the Requests to the extent they seek information and/or documents obtainable from some other source that is more convenient, less burdensome, or less expensive.

IP objects to the Requests to the extent they call for the production or identification of "each" or "any" or "all" or "every" document or documents of a specified nature or type, when a limited number of such documents will provide the requested information, on the grounds that such a requirement makes the Request overly broad, unduly burdensome, and oppressive.

IP objects to the Requests to the extent they call for the production or identification of documents or disclosure of information which "reference", "refer to", "implicate", "discuss", "concern", or "relate to" a particular entity, subject, or object, and to all duplicative or cumulative Requests, on the grounds that such Requests are vague, overly broad, unduly burdensome, oppressive, and not reasonably calculated to lead to the discovery of admissible evidence.

IP objects to the Requests to the extent they call for a legal conclusion and/or assume facts not in evidence.

IP objects to the Requests to the extent they are not properly limited in time and scope.

The foregoing general objections are incorporated into IP's responses to each and every Request, whether or not express reference is made to the general objections in response to any particular Request.

IP has responded to these Requests based on its understanding of the Requests and to the best of its knowledge and recollection as of the date these responses are served. IP expressly reserves the right to amend, supplement, or correct these responses should that become appropriate.

## OBJECTIONS AND RESPONSES TO INTERROGATORIES

1.    Identify the people answering these interrogatories and involved in obtaining, compiling and producing documents responsive to Plaintiffs' discovery requests.

    Diane Meess
    Sharon Barger
    Steve Patterson
    International Paper

International Place I
6400 Poplar Avenue
Memphis, TN 38197

Counsel for Defendant
McGuireWoods LLP

2.      Identify the amount of unused and/or banked vacation time each

International Paper salaried employee at the Hamilton B Street Mill had accrued as of

February 9, 2001, regardless of whether or not that employee was subsequently hired by

Smart Papers, LLC.

Defendant objects to Interrogatory No. 2 on the grounds that it is overly broad,

unduly burdensome, and not reasonably calculated to lead to the discovery of relevant or

admissible evidence.  Without waiving these objections, and subject to same, Defendant

states that the Hamilton B Street Mill, up to the date of the sale of the Mill effective

February 9, 2001, did not offer or utilize banked vacation time, therefore this benefit is

inapplicable to any employees to this action.  Pursuant to International Paper's vacation

policy, as of January 1, 2001, each salaried employee was entitled to his or her full year's

vacation earned during the previous year.  The amount of vacation an employee was

entitled to was determined by his or her length of continuous service as of December 31,

2000 as follows:

| | |
|---|---|
| 1 week of vacation after | 2 years of service |
| 3 weeks of vacation after | 5 years of service |
| 4 weeks of vacation after | 12 years of service |
| 5 weeks of vacation after | 18 years of service |
| 6 weeks of vacation after | 25 years of service |

Therefore, as of February 9, 2001, salaried employees were entitled to vacation pursuant

to their length of continuous service, minus any vacation days taken between January 1,

2001 and February 9, 2001.  In addition to annual vacation entitlements earned during

calendar year 2000, employees eligible for retirement were entitled to accrued vacation for the period January 1, 2001 until their resignation or termination from employment.

      3.      Identify the International Paper salaried employees at the Hamilton B Street Mill who were paid, at any time after February 9, 2001, lump sum monetary amounts by International Paper for the employee's unused and/or banked vacation time, and include the amounts and dates of payment.

      Defendant objects to Interrogatory No. 2 and subpart (a) on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant or admissible evidence.  Without waiving these objections, and subject to same, Defendant states that former salaried employees of International Paper who were not offered employment by Smart Papers, or who were offered employment at a reduced salary and rejected such offer, were paid lump sum monetary payments for earned but unused vacation time pursuant to Reorganization Severance Policy #828 and interpreting documents and IP's vacation policy summarized above in response to Interrogatory No. 2.  Payments were made as soon as practicable after hiring decisions were made by Smart Papers and the closing of the sale of the Mill was completed.

      a.      Explain the reasons those payments were made.

      Payments were made to salaried employees who were not hired by Smart Papers.

      b.      Identify the source of the funds used for those payments.

      Payments were made from monetary assets of the Company.

      4.      Identify the source of the funds used to pay International Paper salaried employees for their vacation time prior to February 9, 2001, either as paid time off or as lump sum monetary payments.

Defendant objects to Interrogatory No. 4 on the grounds that it is overly broad and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Specifically, Defendant objects to this Interrogatory on the grounds that it is not limited to the Hamilton B Street Mill or to any reasonable or relevant time period. Without waiving these objections, and subject to same, Defendant states that vacation payments for salaried employees at the Hamilton B Street Mill were made through IP's payroll system from monetary assets of the Company.

5.    Describe all inquiries made by International Paper as to the vacation policy Smart Papers LLC would provide to former International Paper salaried employees at the Hamilton B Street Mill.

Defendant objects to Interrogatory No. 5 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Without waiving these objections, and subject to same, Defendant states that it had discussions with Smart Papers regarding the handling of vacation pay upon the sale of the Mill, and that their agreement culminating from such discussions was memorialized in the Asset Purchase Agreement. Pursuant to this Agreement, Section 4.1(c)(ii), Smart Papers was

> responsible for all earned but unused vacation for Hired Employees as each such Hired Employee shall have earned under Seller's vacation plan in effect for such Hired Employee as of the Closing (it being understood that a corresponding dollar-for-dollar accrual for such liability shall be made on the Closing Balance Sheet), (y) shall permit all such Hired Employees time off for such vacation days at reasonable times as approved by Buyer's managers, and (z) shall pay each such Hired Employee vacation pay for the time taken off at the rate that such Hired Employee would have received as of the day prior to the Closing Date for accrued unused vacation earned prior to the Closing, but not after the Closing; *provided, however,* that the provisions of this Section 4.1(c) shall

not affect Buyer's right to establish a new vacation policy for all Hired
Employees for vacation time earned after the Closing.

Therefore, IP, through its negotiations with Smart Papers, contractually secured that

Smart Papers would assume the obligation to provide former IP salaried employees hired

by Smart Papers with vacation benefits earned but not yet used under IP's policy.

      6.      Describe all inquiries made by International Paper as to the vacation

policy any subsequent employer would provide to former International Paper salaried

employees at the Hamilton B Street Mill.

      Defendant objects to Interrogatory No. 6 on the grounds that it is vague and

ambiguous, overly broad, and not reasonably calculated to lead to the discovery of

relevant or admissible evidence.

      7.      Describe the reasons International Paper did not pay salaried employees at

the Hamilton B Street Mill any lump sum monetary amount under Severance Policy #828

after February 9, 2001 for the employee's unused and/or banked vacation time.

      Defendant objects to Interrogatory No. 7 on the grounds that it is overly broad,

duplicative, and misstates the facts in evidence. Subject to these objections, and without

waiving same, see generally responses to Interrogatories No. 2, 3, and 5 above. See also

Defendant's Motion for Judgment on Administrative Record and Defendant's Response

to Plaintiff's Motion for Judgment previously filed in this action and the reasons stated

therein with regard to the Administrator's decision and IP's position that former salaried

employees hired by Smart Papers are not entitled to severance benefits under

Reorganization Severance Policy #828. Defendant further states that it did not pay

former IP salaried employees hired by Smart Papers any lump sum monetary amount

under Severance Policy #828 because their entitlement to earned but unused paid

vacation was contractually assumed and preserved for their use by agreement between IP and Smart Papers. Vacation was accordingly paid as it was taken during their employment with Smart Papers in lieu of a lump sum payment by IP.


## OBJECTIONS AND RESPONSES TO DOCUMENT REQUESTS

1.    Please produce all documents received by International Paper employee Sharon Barger from any former International Paper salaried employee at the Hamilton B Street Mill relating to the employee's claim(s) for benefits under Severance Policy #828.

Defendant objects to Request No. 1 on the grounds that it is overly broad and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant further objects to this Request to the extent it seeks documents already within the possession of Plaintiffs. Without waiving these objections, and subject to same, Defendant will produce documents within its possession for members of the class in this action.

2.    Please produce all documents sent by International Paper employee Sharon Barger to any former International Paper salaried employee at the Hamilton B Street Mill relating to the employee's claim(s) under Severance Policy #828.

Defendant objects to Request No. 2 on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant further objects to this Request to the extent it seeks documents already within the possession of Plaintiffs. Without waiving these objections, and subject to same, Defendant will produce documents within its possession for members of the class in this action.

3.    Please produce all documents International Paper has received in the past from Smart Papers LLC relating to the vacation time accrued by the former International Paper salaried employees at the Hamilton B Street Mill.

Defendant objects to Request No. 3 on the grounds that it is overly broad and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Subject to these objections, and without waiving same, Defendant is unaware of any responsive documents.

4.    Please produce all documents International Paper receives from Smart Papers LLC pursuant to any subpoena issued by International Paper relating to the vacation time accrued by the former salaried employees at the Hamilton B Street Mill.

Defendant has produced these documents.

5.    Please produce all documents International Paper has received from any subsequent employer of any former International Paper salaried employees at the Hamilton B Street Mill relating to the vacation time accrued by that employee.

Defendant objects to Request No. 5 on the grounds that it is vague and ambiguous. Subject to this objection, and without waiving same, Defendant is not aware of any documents responsive to this Request that are not encompassed within Requests related to Smart Papers.

6.    Please produce all documents that relate to International Paper's position that the former salaried employees at the Hamilton B Street Mill are not entitled under Severance Policy #828 to lump sum monetary payments for the vacation time that employee had not used and/or banked as of February 9, 2001.

Defendant objects to Request No. 6 on the grounds that it is overly broad, unduly burdensome, and misstates the facts in evidence, and to the extent such documents are already in the possession of Plaintiffs. Defendant further objects to this Request to the extent it seeks documents protected by the attorney client or attorney work product privileges. Without waiving these objections, and subject to same, see generally responses to Interrogatories No. 2, 3, 5, and 7 above. See also Asset Purchase Agreement between Champion International Corporation and Smart Papers LLC dated December 29, 2000; Champion International Corporation Reorganization Severance Policy #828 dated May 26, 2000; Champion International Corporation Merger With International Paper Company Benefit Plans Questions and Answers dated May 30, 2000; Champion International Corporation Merger with International Paper Company Reorganization Severance Policy #828 Questions and Answers dated May 25, 2000; Documents included with Claim Letters and Determination Letters by Administrator regarding vacation benefits under Reorganization Severance Policy #828; Letter from Paul Karre to Theresa Groh dated December 7, 2001; Smart Papers 2000 and 2001 Vacation Policies for Salaried Employees; Letter from Milton Lewis/Smart Papers to Smart Papers employees dated November 26, 2001 regarding Vacation Policy for Salaried Employees; Defendant's Motion for Judgment on Administrative Record and Response to Plaintiff's Motion for Judgment, and exhibits thereto; any documents contained in Administrative Record related to vacation pay.

7.     Please produce all documents not produced in response to any other Document Request which relate to any of the foregoing Interrogatories.

Defendant objects to Request No. 7 on the grounds that it is vague, overly broad, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant further objects to this Request to the extent it seeks documents protected by the attorney client or attorney work product privileges.

Respectfully submitted,

INTERNATIONAL PAPER CO.

By: *James P. McElligott, Jr.*
    Of Counsel

**COUNSEL FOR DEFENDANT**
**INTERNATIONAL PAPER CO.**

Michael A. Roberts (OH Bar No. 0047129)
Graydon Head & Ritchey, LLP
1900 5th 3rd Center
511 Walnut Street
Cincinnati, Ohio 45202
(513) 629-2799

W. Carter Younger (VSB 01147)
(Admitted Pro Hac Vice)
James P. McElligott, Jr. (VSB 014109)
(Admitted Pro Hac Vice)
McGuireWoods LLP
One James Center
Richmond, VA 23219
(804) 775-4363

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of November 2003, a true and complete copy of this document was delivered via first class mail and telecopy to Counsel for Plaintiff, Theresa L. Groh, Esq., and John C. Murdock at Murdock, Goldenberg, Schneider & Groh, L.P.A., 700 Walnut Street, Suite 400, Cincinnati, Ohio, 45202.

James P. McUft

Exhibit 16

# DECLARATION OF THERESA L. GROH

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

SCOTT D. DALESANDRO, et al.,           :     Case No.: C-1-01-109
   on behalf of themselves and         :
   all others similarly situated,      :     Judge Sandra S. Beckwith
                             :
          Plaintiffs,          :
                             :
   v.                                  :
                             :
THE INTERNATIONAL PAPER                 :
COMPANY,                                :
                             :
          Defendant.           :

## DECLARATION OF THERESA L. GROH

     I, Theresa L. Groh, under penalty of perjury pursuant to 28 U.S.C. 1746, declare as

follows:

     1.     I am an attorney admitted to practice in the Courts of Ohio and the United States

District Court for the Southern District of Ohio, and I represent the Plaintiffs in this case.

     2.     I have received copies of more than 70 letters sent by employees to Defendant

objecting to International Paper's calculations of their benefits based on the omission of their

earned but unused vacation time that they had accrued while under Defendant's employ.

     3.     Upon receiving copies of those letters and phone calls from class members, I

contacted defense counsel in early October to alert him to the problem and to inquire as to how

Defendant had responded or intended to respond to those letters.  I suggested that the parties

work toward an agreed supplemental notice wherein Defendant would provide the employees the

calculation of the amount of earned and unused vacation time each employee had accrued as of

{00009189; 1}

their termination on February 9, 2001, in a similar fashion as Defendant provided for the calculation of each employee's years of service.

5.     Although the Court Ordered Notice stated that International Paper "will send you a return correspondence setting forth a reviewed determination of your severance pay as well as an explanation of the calculation" no later than 20 days after the receipt of any such letter, I have not received copies of any responses sent by International Paper to any employees' objections and, to my knowledge, no class member has received any such response.  Further, I have not received any such documents in response to the two Document Requests I served on October 29, 2003 specifically seeking those letters received and sent by Sharon Barger or International Paper.

6.     The two pages attached to Plaintiffs' Motion for Supplemental Notice at Exhibit 15 are, to the best of my knowledge and belief, true and accurate copies of the International Paper vacation policy which I received from a former International Paper salaried employee.


So declared this _12th_ day of December 2003, Cincinnati, Ohio.


_____
Theresa L. Groh