IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| SCOTT D. DALESANDRO and DIANE NOONAN, on behalf of themselves and others, | ) : ) : | |
| Plaintiffs, | ) : | Case No. C-1-01 109 |
| vs. | ) : | Judge Sandra S. Beckwith |
| INTERNATIONAL PAPER COMPANY, | ) : | |
| Defendant. | ) | |

**DEFENDANT'S BRIEF IN SUPPORT OF ITS POSITION
THAT CLASS MEMBERS HAVE ALREADY BEEN PAID
INTERNATIONAL PAPER VACATION BENEFITS**

International Paper ("IP" or "Defendant") respectfully urges the Court to deny Plaintiff's request to amend the class notice to add claims for "vacation benefits" that Plaintiffs belatedly assert.

IP's obligation to pay "earned but unused vacation" has already been discharged. Employees not hired by Smart Papers received their earned but unused IP vacation in a lump sum. IP employees who continued working at the Hamilton Mill were paid their earned but unused vacation by Smart Papers, who expressly assumed IP's vacation payment obligation and received a reduction in purchase price for assuming this liability. IP clearly advised IP employees in writing that if they accepted an offer from Smart Papers, they would be paid their earned but unused vacation from Smart Papers.

In written communications to its employees, Smart Papers acknowledged its obligation to pay IP's vacation benefits to former IP employees at the employee's IP rate of pay, even if Smart Paper employed the individual at a lower salary. Smart Paper's Vice President and General Counsel has submitted an affidavit confirming that Smart Paper paid all IP earned but unused vacation and knows of no employee who did not receive his or her IP earned vacation. (Ex. 8 attached hereto.)

With express written notice to class members, Smart Paper assumed and performed IP's obligation to pay earned but unused vacation. IP is therefore relieved of that obligation and has no duty to pay these vacation amounts a second time. Moreover, the Plan Administrator specifically noted that IP vacation benefits were honored by Smart Papers under Smart Papers' agreement with IP. (Exhibit 10 attached hereto).

Plaintiffs have never challenged the Plan Administrator's specific determination that vacation benefits were paid by Smart Papers, and this Court's March 18, 2003 ruling did not consider this issue. The Plan Administrator's determination that Smart Papers paid these IP benefits is reasonable and must be upheld by this court in light of the Plan Administrator's discretionary authority.

**FACTS**[1]

Section 7.1 of the Reorganization Severance Policy #828 ("Policy #828") provides that "[a]n Eligible Employee will receive a lump sum payment for banked vacation, earned but unused vacation and, if eligible to retire (under the provisions of Section 3 or otherwise), accrued vacation.

---

[1] Defendant incorporates by reference its Introduction and Statement of Undisputed Facts contained in its *Memorandum in Support of Motion for Judgment on the Administrative Record*.

2

Before Smart Paper purchased the Hamilton B Street Mill, vacation pay accrued during the preceding calendar year. Under this policy, "vacation time accrued during the prior year. In other words, if you were employed by Champion in 1999, you would have taken the vacation earned in that year in 2000. International Paper continued that policy." (Smart Papers' letter to employees, November 26, 2001, Exs. 7 and 8 attached hereto.)

The amount of vacation each employee was entitled to was governed by their continuous years of service as follows:

| | |
|---|---|
| 1 week of vacation after | 2 years of service |
| 3 weeks of vacation after | 5 years of service |
| 4 weeks of vacation after | 12 years of service |
| 5 weeks of vacation after | 18 years of service |
| 6 weeks of vacation after | 25 years of service |

(See Ex. 2, IP's Responses to Pls' Interrogatories, Response No. 2.)

Employees were not allowed to carry over vacation from year to year, and forfeited any accrued but unused vacation at the end of the year. Therefore, as of January 1, 2001, salaried employees were entitled to two (2) to six (6) weeks of vacation earned during calendar year 2000 pursuant to their length of continuous service, and as of February 9, 2001, the date of the sale of the Mill to Smart Papers, salaried employees were entitled to this amount minus any vacation days taken between January 1, 2001 and February 9, 2001. (Id.) In addition to annual vacation entitlements earned during calendar year 2000, employees eligible for retirement were entitled to accrued vacation for the period January 1, 2001 until their resignation or termination from employment. (Id.)

In the Asset Purchase Agreement between Champion International Corporation and Smart Papers LLC, Dated December 29, 2000, (relevant portions of which are attached as Ex. 3),

3

Smart Papers agreed to pay the IP earned but unused vacation of any IP employee it hired at their IP wage rate:

* * * *

>Seller recognizes that Buyer intends to make offers of employment to a substantial number of employees of the Business, at terms and conditions of employment different from that provided by Seller, and that it is uncertain how many employees of the Seller will accept employment with Buyer. The number of offers of employment made by Buyer, and the terms and conditions of such offers, shall be determined by Buyer in its sole discretion and in accordance with applicable law; _provided_, that all such offers shall provide that all earned but unused vacation of such employees who accept offers of employment from the Buyer as of the Closing shall be honored by Buyer as set forth in Section 4.1(c). As set forth in Section 4.1(c), the Seller shall be responsible for any and all wages, bonuses, commissions, employee benefits and other compensation (including all obligations under any Benefit Plans, other than earned but unused vacation as set forth in Section 4.1(c)) due to the employees of the Business arising out of their employment with Seller prior to and as of the Closing, subject to the reimbursement requirements of Section 4.1(f).[2] Buyer shall be responsible for any and all (i) wages, bonuses, commissions, employee benefits and other compensation that become due to the Hired Employees arising out of their employment with Buyer after the Closing, and (ii) any earned but unused vacation for Hired Employees as set forth in Section 4.1(c).

* * * *

>To the extent Seller Employees become Hired Employees of the Buyer (including those employees hired as Temporary Employees), Buyer (x) shall be responsible for all earned but unused vacation for Hired Employees as each such Hired Employee shall have earned under Seller's vacation plan in effect for such Hired Employee as of the Closing (it being understood that a corresponding dollar-for-dollar accrual for such liability shall be made on the Closing Balance Sheet),[3] (y) shall permit all such Hired Employees time off for such vacation days at reasonable times as approved by Buyer's managers, and (z) shall pay each such Hired Employee vacation pay for the time taken off at the rate that such Hired Employee would have received as of the day prior to the Closing Date for

---

[2] Section 4.1(f) provides for reimbursement by the Buyer to the Seller of severance benefits paid by Seller to employees who did not receive job offers from Buyer in the event the Buyer does not offer employment to the specified number of represented and unrepresented employees under the terms set forth in that section.

[3] The Accrued Liabilities for Salaried Vacation was set forth on the Hamilton Premium Papers Estimated Working Capital, attached as Exhibit 4.

4

<u>accrued unused vacation earned prior to the Closing, but not after the Closing</u>; *provided, however,* that the provisions of this Section 4.1(c) shall not affect Buyer's right to establish a new vacation policy for all Hired Employees for vacation time earned after the Closing.

Exhibit 3, Section 4.1(a) and (c) (Emphasis added).

Absent this Agreement, employees were subject to the new terms and conditions set by Smart Papers with no vacation entitlement. In addition, Plaintiffs received their vacation pay *"at the rate that such Hired Employee would have received as of the day prior to the Closing Date."* Therefore any employees who received offers of employment at a salary lower than that earned with IP retained the higher salary for the purposes of vacation pay.

IP advised employees in writing of Smart Papers' assumption of these vacation benefits before the sale of the Mill. For example, IP published Q&A's on the "Smart Transition" in the Mill's newsletter "Paper Clips." (Attached hereto as Exhibit 5. Previously submitted to the Court in the Administrative Record Bates Nos. IPD 300708.) The following Q&A's are contained in this newsletter:

> Q:   What will happen for vacation for 2001?
>
> A:   If not hired by Smart Papers, IP will pay you for any unused vacation time. If hired by Smart Papers, any unused vacation you had with IP can be taken as vacation with Smart Papers.

In the January 23, 2001, "Paper Clips," IP again advised employees that Smart Papers would assume IP's vacation obligation for anyone it hired:

> Q:   I am an hourly employee with five weeks vacation I earned last year, to be taken in 2001. If I am hired by SMART Papers, at a lower hourly wage rate than under the current contract, will my vacation be worth that lesser amount? Would it be better to request five weeks' pay in lieu of vacation now, while I am still at the current wage rate?

5

> A: You accrued your five weeks vacation due for 2001 in the year 2000. <u>SMART Papers will assume the accrued vacation obligation for anyone hired</u>. In other words, the five weeks of vacation you earned in 2000 are worth the amount as stated in the current labor agreement, whether you take them before or after the sale of the Mill.

(Attached hereto as Exhibit 5. Previously submitted to the Court in the Administrative Record Bates Nos. IPD 300467). IP's "Guidelines for International Paper Exit Process" informs employees that during the exit process they "*will need to verify the remaining amount of unused vacation to be either paid if not returning with Smart Papers or documented so that Smart Papers has the correct amount and rate for 2000 vacation to be taken this year.*" (Exhibit 6 attached hereto. Previously submitted to the Court in the Administrative Record at IPD300963.) IP's Exit Administrative Process form includes a verification line that "[t]he employee has indicated _____ unused vacation." (Exhibit 6, IPD300971-300972.)

Smart Papers acknowledged in writing its obligation to pay former salaried IP employees hired by Smart Papers the vacation benefits they earned at IP. (See, e.g., Exs. 7 and 8.) Smart Papers' vacation policy clearly informed former IP employees of their rights to take vacation earned but unused with IP prior to the sale of the Mill. (<u>Id.</u>) Milton Lewis, Vice President and General Counsel of Smart Papers, avers that "to the best of [his] knowledge, information, and belief, all former IP salaried employees who were hired by Smart Papers at the time of the sale of the Mill have been paid by Smart Papers for the earned but unused vacation that they carried over from IP to Smart Papers when the Mill was sold." (Ex. 8, ¶ 5.)

6

**ARGUMENT**

    A.    <u>Even Under de novo Review, Smart Papers' Payment of IP Vacation Benefits Discharges IP from Any Further Obligation to Pay Vacation Benefits</u>

Smart Paper's performance of its agreement to pay the IP vacation benefits of the IP employees it hired is 1) a delegation of IP's obligations to Smart Papers (*see* Rest. of Contracts § 160; Rest. 2d of Contracts §§ 318, 329); 2) an assumption of IP's obligations by Smart Papers (<u>Id.</u>); 3) a novation; 4) a third-party beneficiary contract; and 5) a substituted contract or substituted performance (*see* Rest. 2d of Contracts § 279). "An obligor may effectively delegate performance to another who is willing to perform the delegated duty, though the obligor remains liable as surety unless the obligee consents to the delegation," but "'if the delegate performs the duty, the duty is discharged,' and obligor owes obligee nothing." <u>Headrick v. Rockwell Int'l Corp.</u>, 24 F.3d 1272, 1278 (10th Cir. 1994). *See also* Rest. 2d of Contracts § 318 ("An obligor can properly delegate the performance of its duty to another unless the delegation is contrary to public policy or the terms of his promise.")

A novation, substituted contract, or substituted performance, in contrast, requires the knowledge and consent of all parties, which may be implied from the party's conduct. Such consent substitutes the delegate for the obligor and discharges the original obligor entirely, whether or not the substituted contract is performed.

> When there is a previous valid and unconditional obligation that is extinguished by a new valid contract, effected by substitution of parties or of undertaking, with the consent of all the parties . . . all intending such a result, and based upon a valid consideration, a substitution in the debt, the debtor, or the creditor is accomplished . . . Intent, knowledge and consent are the essential elements in determine[ing] whether a purported novation has been accepted. A party's

7

>knowledge and consent to the terms of a novation need not be express, but may be implied from the party's conduct.

18 Ohio Jur. Contracts § 247.  See also Rest. 2d of Contracts § 279a ("A substituted contract is one that is itself accepted by the obligee in satisfaction of the original duty and thereby discharges it . . . If a substituted contract brings in a new party it is called a 'novation.' (§ 280)."); and Rest. 2d of Contracts § 280 and 280b ("A novation is a substituted contract that includes as a party one who was neither the obligor nor the obligee of the original duty" and "discharges the original duty . . . so that breach of the new duty gives no right of action on the old duty.")  Class members accepted Smart Paper's offer of employment with knowledge that they would receive their IP vacation and benefits would be paid by Smart Papers.  Their acceptance of Smart Paper's offer therefore constitutes a novation or substituted contract.

Regardless of the label applied, however, the legal result in the instant action is the same:  Smart Papers contractually assumed IP's obligation for the payment of earned but unused vacation to former IP employees hired by Smart Papers.  Smart Papers performed its obligation under the Agreement and paid the earned but unused IP vacation benefits that IP owed.  Plaintiffs have received and accepted all vacation benefits to which they were entitled.  Because all earned but unused IP vacation has been paid, IP has no further obligation to make additional payments.  See also 18 Ohio Jur. Contracts § 247; Rest. 2d of Contracts § 279a.

In Armstrong v. Diamond Shamrock Corp., 455 N.E.2d 702 (Ohio Ct. App. 1982), Diamond Shamrock ("Seller") entered into a sales agreement to sell one of its divisions to Arco Polymers, Inc. ("Buyer").  As part of the sales agreement, Buyer agreed to offer Seller's

employees equivalent or more favorable employment, and to pay for employees' vacations taken on or after the sale date under the same vacation policy utilized by the Seller with credit for years employed with Seller. Id. at 703. Plaintiffs, all of whom accepted employment with Arco, claimed they were entitled to additional vacation pay for accrued but unused vacation at the time of the sale and severance pay from Seller.

The trial court held that "[p]laintiffs incurred no loss of vacation benefits as a result of their voluntary transfer from [Diamond Shamrock] to ARCO" and rejected their claim for additional vacation pay. Id. at 704. The Court of Appeals agreed with the trial court and noted that "*[i]n effect, plaintiffs have no 'accrued but unused vacation,' because they used all vacation accrued in defendant's employ after they transferred to ARCO's employ, pursuant to ARCO's contractual responsibility for defendant's vacation obligations to these employees*." Id. at 704 (emphasis added). The court found that:

> Defendant unquestionably made a third-party beneficiary contract with ARCO, under which ARCO agreed to satisfy defendant's vacation benefit obligations to these creditor-beneficiary employees. [Cits. omitted.] Since plaintiffs impliedly assented to the substitution of ARCO for defendant to provide the promised vacation benefits, there may well have been a novation which eliminated defendant's obligation to perform . . . . Whether plaintiffs are considered as creditor-beneficiaries who had rights against both defendant and ARCO, or parties to a novation who had rights against ARCO alone, their rights have been fully satisfied.

Id. at 705.

For the same reasons, Plaintiffs in the instant action are not entitled to payment for additional vacation benefits. Smart Papers agreed in the Asset Purchase Agreement to pay the earned but unused vacation of former IP employees that it hired. Although it was not obligated

9

to do so, Smart Papers also gave former IP employees full credit for their time of service with IP in determining future vacation benefits.[4]  (See Ex. _, Smart Papers Vacation Policy.)

IP advised all class members in writing that their unused vacation would be paid by Smart Papers if they accepted employment at Smart Papers and paid in a lump sum if they did not receive or did not accept an offer from Smart.  (Exs. 5 and 6, IPD300963, 300972).  Smart Papers acknowledged its obligation to former IP salaried employees in its employee handbook issued to all employees at the outset of their employment and reissued for calendar year 2002.  (See Exs. 7 and 8.)  Class members who accepted employment at Smart Papers received payment from Smart Papers for all vacation earned under IP's previous policy.  Just as in Armstrong, class members have no remaining vacation claims against IP because IP's obligation was paid by Smart Papers.

In addition, just as in Armstrong, there is no evidence that anyone at IP or Smart Papers promised former IP employees hired by Smart Papers that they would receive their accrued and unused vacations from IP *and also* receive duplicate benefits from Smart Papers during their first year of employment. Id.  There is also no evidence in the record that Plaintiffs did not receive their two to six weeks' earned but unused vacation during their first year of employment.  (Id.)  Smart Papers' Vice President and General Counsel has testified that to the best of its knowledge and information, all former IP salaried employees hired by Smart Papers

---

[4] Effective January 1, 2002, Smart Papers implemented a new vacation policy providing for 1 week to a maximum of four weeks' vacation based upon length of continuous service.  (See Ex. 8, p. 4-6, and duplicate copy of policy at Ex. 9.)  This policy granted full service credit to all former salaried IP employees.  This change is not material to the instant dispute since Plaintiff's received all vacation earned under IP's former policy, and had no entitlement to future vacation benefits.

10

have been paid for all earned but unused vacation carried over from IP to Smart Papers, and there is no evidence to the contrary. (Ex. 8, ¶ 5.)

In another similar case, <u>Headrick v. Rockwell International Corp.</u>, Rockwell transferred its responsibilities under its Management and Operating Contract with the United States Department of Energy (DOE) to a new contractor, EG&G Rocky Flats, Inc. ("EG&G"). EG&G assumed Rockwell's assets and liabilities relating to the plant's operations, and did so with the expectation that it would operate the facility with Rockwell's former employees. 24 F.3d at 1273-74. Former employees of Rockwell sued Rockwell seeking, among other things, severance pay and accrued vacation benefits they claimed were due when Rockwell terminated operations. <u>Id.</u> at 1274-75. The employees brought the vacation pay claim pursuant to the Colorado Wage Claim Act which requires an employer to provide his employees with payment for all earned compensation whenever "an interruption of the employer-employee relationship by volition of the employer" occurs. Colo. Rev. Stat. § 8-4-104. The district court noted that EG&G had "voluntarily assumed from Rockwell the Plaintiffs' levels of seniority and their earned as well as future entitlement to vacation benefits," and as a result, Plaintiffs' accrued vacation benefits, which would have been paid by Rockwell, were in fact paid by EG&G. <u>Headrick</u>, 24 F.3d at 1278. The salaried employees accepted from EG&G all the vacation pay due them, therefore the court concluded that the obligation had been discharged, and no cause of action lay against Rockwell. The Tenth Circuit Court of Appeals agreed and affirmed the district court's decision. <u>Id.</u>

In <u>Adams v. Avondale Industries</u>, 905 F.2d 943, 952 (6th Cir. 1990), the Sixth Circuit reached a different conclusion regarding plaintiffs' vacation pay claim because the evidence

11

showed that the purchaser did not assume the seller's obligation to pay for vacation. Avondale sold its facility in Mount Orab to Trinity. The Court noted that the seller imposed no contractual obligation on the purchaser to offer its former employees credit for years of service, and that the Purchase and Sale Agreement specifically stated that "Purchaser is not intended to be a successor to the Seller for any purpose unless expressly set forth herein, and that Purchaser has not assumed, and expressly denies assumption hereby of, any other liability, obligation or commitment of Seller other than as set forth above or otherwise expressly set forth herein." Id. The Court noted that the purchaser had simply followed its established practice in previous acquisitions giving employees of the acquired entity credit for service with this entity, Id.

The instant action is clearly distinguishable from Adams because the Asset Purchase Agreement expressly sets forth Smart Papers' contractual assumption of IP's obligation to provide payment to its former employees for vacation earned during 2000 and unused as of the sale of the Mill in 2001. In addition, Smart Papers had no practice of awarding service or vacation credit. Smart Papers did not even exist as an entity before its purchase of the Hamilton B Street Mill.

IP's vacation obligation to its former employees extended no further after Smart Papers paid the earned but unused vacation benefits for its former employees. Policy #828 did not create rights to vacation that was unearned under IP's policy.

The fact that IP's vacation was not paid in a lump sum does not change the fact that its obligation was in fact paid. IP believed (and still believes) that Policy #828 did not apply to persons who accepted employment with Smart Papers. However, IP clearly acknowledged its

vacation pay obligation to employees hired by Smart Papers and obtained Smart Papers' written agreement to assume that obligation.

Class members who accepted employment offers with Smart Papers knew that their IP vacation would be paid by Smart Papers and not in a lump sum. Their acceptance of Smart Papers' offer constitutes a substituted contract that relieved IP of any obligation to pay an additional amount for this vacation.

Even if the Court were to conclude that no substitute contract was formed, class members hired by Smart were still paid their earned but unused vacation, although not in a lump sum. This is an insubstantial delay in payment, not a failure of payment.

In summary, Plaintiffs had a choice: 1) they could accept a job with Smart Papers and take their paid vacation throughout the calendar year; or 2) they could turn down the job and get a lump sum payout of all earned but unused vacation. Plaintiffs now seek to obtain a lump sum payout for vacation that they have already taken and been paid for. Plaintiffs have received all vacation benefits to which they are entitled.

B. **The Plan Administrator's Denial of Vacation Benefits, Which Was Not Previously Challenged by Plaintiffs, Can Be Reversed Only if Found to Be "Arbitrary and Capricious"**

This Court has ruled that it was not reasonable for the Plan Administrator to determine that plaintiffs were not "terminated" as the result of an "employment action." However, the plaintiff has not until now disputed the Plan Administrator's specific determination with respect to claims for vacation benefits:

> On this latter point, it is again worth noting that Smart Papers and International Paper agreed that employees' earned accrued vacation would be honored by Smart Papers. Accordingly, employees who received both a lump-sum payment

13

for vacation and the ability to take such vacation at Smart Papers would, in fact, receive a windfall benefit.

(Letter of Peter J. Karre, December 7, 2001, Exhibit 10 attached. Submitted as part of Administrative Record).

This Court has ruled the Severance Plan "unquestionably gives the plan administrator discretionary authority to determine eligibility for benefits and construe the Plan's provisions . . . . Under this standard, the decision of the Plan Administrator will be upheld if it is possible to offer a reasoned explanation, based on the evidence, for the decision." <u>Dalesandro v. International Paper Co.</u>, 2003 U.S. Dist. LEXIS 3936, *16-17 (S.D. Ohio March 18, 2003) (citations omitted).

Plaintiffs did not challenge the Plan Administrator's determination that Smart Papers agreed to honor IP's vacation obligations and that employees received these vacation benefits from Smart Papers. Plaintiff's brief and the Court's decision never addressed the Plan Administrator's separate determination that Smart Papers paid IP's vacation obligations to employees hired by Smart Papers.

As discussed in Section 1, even under a <u>de novo</u> review, Smart Paper's payment of IP vacation benefits extinguished IP's obligation under standard contract analysis. Under an arbitrary and capricious review, there can be no questions that the plan's denial of benefits was proper.

The evidence clearly supports the Plan Administrator's determination that these vacation benefits were paid by Smart Papers to IP employees who accepted Smart Papers' employment offer. The administrator's determination was reasonable that in light of Smart

14

Paper's performance of this obligation, IP had no obligation to pay vacation benefits a second time. Having chosen to accept these benefits delegated by IP to Smart Papers, Plaintiff's have by their actions consented to substituted performance by Smart Papers. <u>Armstrong</u>, 455 N.E.2d at 706. The Severance Plan does not provide for double vacation benefits to persons employed by Smart Papers.

     IP respectfully submits that the record and plan language fully supports the Plan Administrator's decision and is fully consistent with this Court's March 18, 2003 ruling. If the Court concludes there is any inconsistency, the proper remedy would be remand to the Plan Administrator. See <u>University Hospitals v. Emerson Electric Co.</u>, 202 F.3d 839, 852 (6th Cir. 2000) (ordering district court to remand to the plan administrator where the plan administrator's denial was found to be arbitrary and capricious for failing to consider all the evidence.)

     Plaintiffs have additionally waived their claim to this vacation pay by their failure to challenge the Administrator's determination in their Motion for Judgment on the Administrative Record and their failure to include vacation benefits or vacation pay calculations in their proposed notices to class members. After exhaustive briefing on these issues, and full opportunity to raise this issue on numerous occasions, Plaintiffs have failed to do so until after the issuance of this Court's Orders, including approval of the Class Notice which excludes any calculation of vacation benefits. IP had every reason to believe that Plaintiffs had accepted this benefit from Smart Papers and that their obligation has been contractually discharged. After having taken and received these benefits, Plaintiffs should not be allowed to lodge this belated attack as an afterthought. Their failure to raise this issue during the course of this litigation should be deemed a waiver and foreclosure of this claim.

**CONCLUSION**

For the foregoing reasons, IP respectfully requests the Court reject Plaintiff's claims for vacation pay or in the alternative to remand this specific issue to the Plan Administrator for further findings.

Respectfully submitted,

INTERNATIONAL PAPER CO.

By: s / Michael Roberts
**COUNSEL FOR DEFENDANT
INTERNATIONAL PAPER CO.**

Michael A. Roberts (OH Bar No. 0047129)
Graydon Head & Ritchey, LLP
1900 5th 3rd Center
511 Walnut Street
Cincinnati, Ohio 45202
(513) 629-2799
(513) 651-3836 – fax
email: mroberts@graydon.com

W. Carter Younger (VSB 01147)
(Admitted Pro Hac Vice)
James P. McElligott, Jr. (VSB 014109)
(Admitted Pro Hac Vice)
McGuireWoods LLP
One James Center
Richmond, VA  23219
(804) 775-4363

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of December 2003, a true and complete copy of this document was delivered via electronic filing to Counsel for Plaintiff, Theresa L. Groh, Esq., and John C. Murdock at Murdock, Goldenberg, Schneider & Groh, L.P.A., 700 Walnut Street, Suite 400, Cincinnati, Ohio, 45202.

s/ Michael A. Roberts
