**EXHIBIT 3**

Execution Copy

ASSET PURCHASE AGREEMENT

between

CHAMPION INTERNATIONAL CORPORATION

and

SMART PAPERS LLC

Dated as of

December 29, 2000

## ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT, dated as of December 29, 2000, between CHAMPION INTERNATIONAL CORPORATION, a New York corporation ("*Seller*") and SMART PAPERS LLC, a Delaware limited liability company ("*Buyer*").

Seller owns and operates a paper mill located in Hamilton, Ohio at which Seller engages in the manufacture of certain premium cast-coated and uncoated papers (the "*Business*"). Buyer desires to purchase, and Seller desires to sell, the Business as a going concern and substantially all of the assets related to the Business located at the Facility upon the terms and conditions set forth herein.

Accordingly, in consideration of the mutual agreements contained herein, and intending to be legally bound hereby, the parties hereto agree as follows:

### ARTICLE I. DEFINED TERMS

1.1  <u>Defined Terms</u>. As used in this Agreement, the following terms have the meanings indicated:

"*Actual Working Capital*" means the sum of all current assets of the Business transferred to Buyer pursuant hereto minus all current liabilities of the Business assumed by Buyer pursuant hereto, as reflected on the Closing Balance Sheet and calculated in accordance with Section 2.5(a) hereof and GAAP, except as set forth on Section 5.4 of the Disclosure Schedules. In addition, all Inventory of the Business shall be recorded on the Closing Balance Sheet at the lower of cost or market value on a first-in-first-out basis, in accordance with GAAP.

"*Affiliate*" has the meaning set forth in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act of 1933, as amended.

"*Benefit Plans*" means, with respect to Seller, each employee benefit plan, program, arrangement and contract (including, without limitation, any "employee benefit plan", as defined in Section 3(3) of ERISA, and any bonus, incentive, deferred compensation, stock bonus, stock purchase, restricted stock, stock option, employment, termination, stay agreement or bonus, change in control and severance plan, program, arrangement and contract) in effect on the date of this Agreement to which Seller or any ERISA Affiliate of Seller is a party and which is maintained or contributed to by Seller or any ERISA Affiliate of Seller in which present or former employees of Seller who are or were employed in the Business participate.

"*Business Day*" means any day other than a Saturday, Sunday or legal holiday on which banks in the States of Florida and New York are or may elect to be closed.

"*Environmental Laws*" means all federal, state and local, provincial and foreign, civil and criminal laws, regulations, rules, ordinances, codes, decrees, judgments, directives or

judicial or administrative orders relating to pollution or protection of the environment, natural resources or human health and safety, including, without limitation, laws relating to releases or threatened releases of Hazardous Substances (including, without limitation, releases to ambient air, surface water, groundwater, land, surface and subsurface strata) or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, release, transport, disposal or handling of Hazardous Substances. "*Environmental Laws*" include, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. §§ 601 et seq.) ("CERCLA"), the Hazardous Materials Transportation Act (49 U.S.C. §§ 1801 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. §§ 6901 et seq.), the Federal Water Pollution Control Act (33 U.S.C. §§ 251 et seq.), the Clean Air Act (42 U.S.C. §§ 7401 et seq.), the Toxic Substances Control Act (15 U.S.C. §§ 2601 et seq.), the Oil Pollution Act (33 U.S.C. §§ 2701 et seq.), the Emergency Planning and Community Right-to-Know Act (42 U.S.C. §§ 11001 et seq.), the Occupational Safety and Health Act (29 U.S.C. §§ 651 et seq.) and all other state laws analogous to any of the above.

"*Environmental Liabilities*" means all liabilities of Seller relating to the Business, the Assets or the Facility that (i) arise under or relate to violations of Environmental Laws (including, without limitation, those liabilities disclosed in any environmental inspection report for the Facility prepared prior to the Closing by an independent environmental consultant engaged by Buyer) or arise in connection with or related to any matter disclosed or required to be disclosed on Section 5.23 of the Disclosure Schedules and (ii) are attributable to actions occurring or conditions existing on or prior to the Closing Date.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"*Estimated Working Capital*" means the good faith estimate by Seller of the amount of the Actual Working Capital, which shall be calculated in a manner consistent with the calculation of Actual Working Capital, to be set forth on a Schedule to be delivered to Buyer not less than three (3) days prior to the Closing Date.

"*GAAP*" means United States generally accepted accounting principles as in effect as of the Closing Date or as of such date as otherwise specified herein.

"*Hazardous Substances*" means any pollutants, contaminants, chemicals or industrial, toxic or otherwise hazardous materials, substances or wastes that are regulated under Environmental Laws.

"*HSR Act*" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"*including*" means including but not limited to.

"*January 31, 2000 Balance Sheet*" means the balance sheet of the Business as of January 31, 2000 as previously provided to Buyer and prepared in accordance with GAAP,

2

"*Release*" means any release, spill, leak, discharge, disposal of, pumping, pouring, emitting, emptying, injecting, leaching, dumping or allowing to escape into or through the environment.

"*Remediation*" means an action of any kind to investigate and/or clean up a Release of Hazardous Substances into an environmental medium, including, but not limited to, the following activities: (a) monitoring, investigation, assessment, treatment, cleanup, containment, removal, mitigation, response or restoration work; (b) obtaining any permits, consents, approvals or authorizations of any governmental authority necessary to conduct any such activity; (c) preparing and implementing any plans or studies for any such activity; (d) obtaining a written notice from a governmental authority with jurisdiction over the site being investigated and/or cleaned up under Environmental Laws that no additional work is required by such governmental authority; and (e) the use, implementation, application, installation, operation or maintenance of removal actions, remedial technologies applied to the surface or subsurface soils, excavation and treatment or disposal of soils at an off-site location, in-situ treatment, systems for long-term treatment of surface water or groundwater, engineering controls or institutional controls, or any other activity constituting a response action under CERCLA.

"*Subsidiary*" of a Person means any corporation (a) of which such Person, directly or indirectly, owns or controls at the time outstanding shares of stock or other equity securities that have in ordinary circumstances (not dependent upon the happening of a contingency) voting power to elect a majority of the board of directors of such corporation, or (b) of which shares of stock or other equity securities of the character described in the foregoing clause (a) shall at the time be owned or controlled, directly or indirectly, by such Person and one or more of its Subsidiaries or by one or more of its Subsidiaries.

"*Working Capital Target*" means $54,200,000.

1.2   Location of Certain Other Defined Terms. The following terms used in this Agreement are defined in the Section indicated:

| Term | Section |
|---|---|
| Adjusted Purchase Price | 2.5(a) |
| Allocation Statement | 2.3 |
| Assets | 2.1(a) |
| Assignment | 2.1(c)(iv) |
| Assignment and Assumption Agreement | 2.1(c)(iii) |
| Assumed Contracts | 2.1(c)(iii) |
| Assumed Liabilities | 2.4 |
| Balance Sheet Date | 5.5 |
| Bill of Sale | 2.1(c)(ii) |
| Books and Records | 3.2(a)(xvi) |
| Business | Preamble |

4

(iv) assignments with respect to all patents, trademarks, trade or service names and marks, assumed names and copyrights and all applications therefor (other than Excluded Assets) owned by Seller and which are used primarily in the conduct of the Business as now conducted, in each case as specifically listed on Schedule 2.1(c)(iv), all in recordable form, in substantially the forms of Exhibits D1 to D3 hereto (each, an "*Assignment*", and collectively, the "*Assignments*");

(v) a lease assignment and assumption agreement in substantially the form attached hereto as Exhibit I (the "*Lease Assignment Agreement*"), whereby Seller shall assign to Buyer (i) all of its rights as tenant in and to Pipeline Lease and the Railyard Lease and (ii) all of its rights as Landlord in and to those real property leases listed on Section 5.8 of the Disclosure Schedules, in each case subject to the provisions of the Lease Assignment Agreement, and whereby Buyer shall assume and agree to perform, pay and discharge the liabilities and obligations of Seller relating to the Business and the Assets specified therein, provided, however, that such assumption shall not extend to and Buyer shall have no responsibility for any liabilities or obligations which relate solely to the period of time prior to the Closing Date;

(vi) an assignment and assumption agreement re: licenses, permits and warranties in substantially the form attached hereto as Exhibit J (the "*Licenses, Permits and Warranties Assignment Agreement*"), whereby Seller shall assign to Buyer all of its rights in and to any licenses, permits and warranties relating to the Real Property Assets, to the extent such licenses, permits and warranties are assignable, in each case subject to the provisions of the Licenses, Permits and Warranties Assignment Agreement, and whereby Buyer shall assume and agree to perform, pay and discharge the liabilities and obligations of Seller relating to the Business and the Assets specified therein, provided, however, that such assumption shall not extend to and Buyer shall have no responsibility for any liabilities or obligations which relate solely to the period of time prior to the Closing Date;

(vii) such other good and sufficient instruments of conveyance and transfer as shall be necessary to vest in Buyer good and valid title to the Assets (collectively, the "*Other Instruments*"), free and clear of all liabilities, obligations, claims and Liens (whether absolute, accrued, contingent or otherwise), except the Assumed Liabilities and Permitted Liens.

2.2   Purchase Price. The purchase price for the Assets shall be comprised of the consideration set forth in Section 2.2(a)(i), subject to adjustment pursuant to Section 2.5 of this Agreement, plus the assumption of the Assumed Liabilities, payable by delivery from Buyer to Seller of the following:

(i) $23,200,000 plus or minus the amount, if any, by which the Estimated Working Capital is more or less than the Working Capital Target, as the case may be, by wire transfer of immediately available funds to such account as Seller specifies to Buyer in writing not less than two Business Days before the Closing Date (the "*Cash Purchase Price*"); and

10

(ii) the Assignment and Assumption Agreement.

2.3 <u>Allocation of Purchase Price</u>. If completed prior to the date of execution hereof, attached hereto as <u>Schedule 2.3</u> is a statement setting forth the preliminary allocation of the Cash Purchase Price among the Assets, as agreed by the parties hereto, in accordance with applicable law including, without limitation, Section 1060 of the Internal Revenue Code of 1986, as amended (the "*Code*") (the "*Allocation Statement*"); *provided*, that if <u>Schedule 2.3</u> is not completed as of the date of execution hereof, Seller and Buyer shall negotiate in good faith to allocate the Cash Purchase Price among the Assets being purchased by Purchaser pursuant to this Agreement and in accordance with applicable law, including, without limitation, Section 1060 of the Code, within sixty (60) days after the Closing Date. The Allocation Statement shall be revised by the parties following the determination of the Adjusted Purchase Price, in accordance with Section 2.5 hereof, applying the same allocation methodology used in preparing the preliminary allocation set forth in <u>Schedule 2.3</u>. Each of Seller and Buyer will report the allocation of the Adjusted Purchase Price in a manner consistent with the Allocation Statement, as so revised, and will otherwise act in accordance with the Allocation Statement, as so revised, in the preparation and filing of all Tax returns, Tax audits, Tax reviews, and Tax litigation relating to the sale of the Assets or any of the other transactions contemplated hereby. Neither Seller nor Buyer will challenge any of the allocations set forth in the Allocation Statement, as so revised, or otherwise assert or represent that any such allocations are incorrect in any proceeding concerning either party's Tax basis in or Tax liability with respect to the Business, the Assets, or any of the transactions contemplated hereby.

2.4 <u>Assumption of Liabilities; Retained Liabilities</u>. Subject to the terms and conditions of this Agreement, at the Closing, Buyer shall assume and agree to perform, pay or discharge all of the liabilities and obligations of the Business (known or unknown, contingent or otherwise) other than the Retained Liabilities (the "*Assumed Liabilities*"). Except as set forth in this Section 2.4 and the Assignment and Assumption Agreement, Buyer shall not assume or be responsible for any liabilities or obligations of Seller, including, without limitation, the Retained Liabilities. The term "*Retained Liabilities*" shall mean any debt, liabilities or obligations (i) to the extent arising out of the Excluded Assets, (ii) to the extent arising from any Benefit Plan (other than accrued vacation liabilities to the extent provided in Section 4.1(c)) or the employment of any employees of the Business on or prior to the Closing, (iii) that are retained by Seller pursuant to the terms hereof, (iv) that are not related to the Business, (v) for Taxes attributable to the Business with respect to periods ending on or prior to the Closing Date and for Taxes attributable to any period beginning before the Closing Date and ending after the Closing Date, but only with respect to that portion of such period ending on the Closing Date, (vi) for any indebtedness and accounts payable of the Business to Seller and its Affiliates, (vii) with respect to all of the items listed on Section 5.7 of the Disclosure Schedules, or (viii) which arise upon the revocation, termination or expiration of any permit or agreement and which pertain to the removal and/or relocation of any structures or other improvements not in use by Seller on the Closing Date, and any associated restoration obligations with respect thereto.

2.5 <u>Working Capital Adjustments</u>.

11

(b) At or prior to the Closing, Seller shall pay 100% of all transfer, stamp, sales, use, excise or similar Taxes payable in connection with the sale of the Assets contemplated hereby.

(c) At or prior to the Closing, Seller shall deliver to the title company an executed title affidavit and indemnity in a form reasonably acceptable to Buyer and such title company.

3.3 <u>Deliveries by Buyer; Payment of Taxes</u>.

(a) At the Closing, Buyer shall deliver to Seller (unless delivered previously) the following:

(i) the Cash Purchase Price;

(ii) the Assignment and Assumption Agreement duly executed by Buyer;

(iii) the Pulp Supply Agreement referred to in Section 9.12 duly executed by Buyer;

(iv) the Transition Services Agreement referred to in Section 9.13 duly executed by Buyer;

(v) the Lease Assignment Agreement relating to the Leased Real Property, duly executed by Buyer;

(vi) the Lease Assignment Agreement relating to the real property leases set forth on Section 5.8 of the Disclosure Schedules, duly executed by Buyer;

(vii) the Licenses, Permits and Warranties Assignment Agreement, duly executed by Seller;

(viii) the officer's certificate referred to in Section 10.4;

(ix) the secretary's certificate referred to in Section 10.5; and

(x) all other previously undelivered documents, instruments and writings required to be delivered by Buyer to Seller at or prior to the Closing pursuant to this Agreement or otherwise required in connection herewith.

### ARTICLE IV. RELATED MATTERS

4.1 <u>Employee Matters</u>.

15

(a) <u>Employees</u>.  Immediately prior to the Closing, the employment of all of the employees of the Business shall be terminated by the Seller, and all such employees shall have the right to apply for employment with Buyer. Seller recognizes that Buyer intends to make offers of employment to a substantial number of employees of the Business, at terms and conditions of employment different from that provided by Seller, and that it is uncertain how many employees of the Seller will accept employment with Buyer. The number of offers of employment made by Buyer, and the terms and conditions of such offers, shall be determined by Buyer in its sole discretion and in accordance with applicable law; *provided*, that all such offers shall provide that all earned but unused vacation of such employees who accept offers of employment from the Buyer as of the Closing shall be honored by Buyer as set forth in Section 4.1(c). As set forth in Section 4.1(c), the Seller shall be responsible for any and all wages, bonuses, commissions, employee benefits and other compensation (including all obligations under any Benefit Plans, other than earned but unused vacation as set forth in Section 4.1(c)) due to the employees of the Business arising out of their employment with Seller prior to and as of the Closing, subject to the reimbursement requirements of Section 4.1(f). Buyer shall be responsible for any and all (i) wages, bonuses, commissions, employee benefits and other compensation that become due to the Hired Employees arising out of their employment with Buyer after the Closing, and (ii) any earned but unused vacation for Hired Employees as set forth in Section 4.1(c). Buyer shall not be responsible before, after, or as of the Closing for any of Seller's obligations to Seller's employees whom Buyer does not hire, except as set forth in Section 4.1(f). Buyer shall not be responsible before, after, or as of the Closing for any of Seller's obligations to Hired Employees, except as set forth in Section 4.1(c) and subject to the reimbursement requirements in Section 4.1(f) as applicable to Temporary Employees who are terminated by Buyer as a result of outsourcing or relocation of operations or layoffs at the Facility within 18 months following the Closing Date. Nothing contained in this Section 4.1 shall be construed to confer upon or give to any person other than the parties to this Agreement and their successors or permitted assigns any rights or remedies hereunder. Seller shall cooperate with Buyer and shall permit Buyer a reasonable period prior to the Closing Date (i) to meet with employees of Seller (including managers and supervisors) who are employed in the Business at such times as Buyer shall reasonably request, on the terms and subject to the conditions set forth on <u>Schedule 4.1</u> hereto, (ii) to review personnel files and other relevant employment information regarding employees of Seller and to speak with such employees' managers and supervisors (in each case with appropriate authorizations and releases from such employees) who are being considered for employment by Buyer, and (iii) to distribute to such employees of Seller such forms and other documents relating to potential employment by Buyer after the Closing as Buyer may reasonably request. Buyer shall be responsible for complying with all applicable laws in the interviewing and hiring process, and any liability incurred in the interviewing and hiring process based on conduct of Buyer shall be the responsibility of Buyer; *provided,* that in no event will Buyer be responsible for any severance payments to employees of Seller (subject to the reimbursement requirements of Section 4.1(f)) or any strike or strike-related conduct by employees or the Paperworkers Union as of or prior to the Closing. In addition, at such times selected by Buyer no earlier than two (2) business days after the date hereof and prior to the Closing Date, Buyer may consult with representatives of the Paperworkers Union on matters of mutual interest consistent with the National Labor Relations

16

Act, and Seller recognizes and agrees (i) that Buyer will not be assuming the collective bargaining agreement in effect between Seller and the Paperworkers Union or any of Seller's liabilities or obligations to the Paperworkers Union, other than any obligation to bargain with the Paperworkers Union that may be imposed by law, and (ii) that Buyer will not be responsible for any strike or strike-related conduct by employees or the Paperworkers Union against Seller arising out of or relating to such consultations. Further, in respect of notices and payments relating to events occurring on or prior to the Closing, Seller shall be responsible and assume all liability for any and all notices, payments, fines or assessments due to any government authority, pursuant to any applicable federal, state or local law, common law, statute, rule or regulation with respect to the employment, discharge or layoff of employees by the Seller as of or before the Closing, including but not limited to the Worker Adjustment and Retraining Notification Act and any rules or regulations as have been issued in connection with the foregoing (the "*WARN Act*"). Likewise, in respect of notices and payments relating to events occurring after the Closing, Buyer shall be responsible and assume all liability for any and all notices, payments, fines or assessments due to any government authority, pursuant to any applicable federal, state or local law, common law, statute, rule or regulation, including but not limited to the WARN Act, with respect to the employment, discharge or layoff of employees employed by the Buyer after the Closing.

(b) **Benefits**. With respect to all claims by current and former employees of Seller who are or were employed in the Business ("*Seller Employees*") arising prior to or as of the Closing under any Benefit Plans, whether insured or otherwise (including, but not limited to, life insurance, medical and disability programs), Seller shall, at its own expense, honor or cause its insurance carriers to honor such claims, whether made before or after the Closing, in accordance with the terms and conditions of such Benefit Plans without regard to the employment by Buyer of any such Seller Employees after the Closing.

(c) <u>Wages, Vacation Pay</u>.

(i) As soon as practicable after the Closing Date, Seller shall pay or cause to be paid to all Seller Employees the amount of (y) all wages, bonuses, commissions and other compensation, and (z) to the extent any Seller Employee is not hired by Buyer, the aggregate dollar value of any unused vacation time, if any, as such Seller Employee shall have earned under Seller's vacation plan in effect for such Seller Employee as of the Closing, in each case due in respect of periods ending prior to and as of the Closing.

(ii) To the extent Seller Employees become Hired Employees of the Buyer (including those employees hired as Temporary Employees), Buyer (x) shall be responsible for all earned but unused vacation for Hired Employees as each such Hired Employee shall have earned under Seller's vacation plan in effect for such Hired Employee as of the Closing (it being understood that a corresponding dollar-for-dollar accrual for such liability shall be made on the Closing Balance Sheet), (y) shall permit all such Hired Employees time off for such vacation days at reasonable times as approved by Buyer's managers, and (z) shall pay each such Hired Employee vacation pay for the time taken off at the rate that such Hired

17

Employee would have received as of the day prior to the Closing Date for accrued unused vacation earned prior to the Closing, but not after the Closing; *provided, however,* that the provisions of this Section 4.1(c) shall not affect Buyer's right to establish a new vacation policy for all Hired Employees for vacation time earned after the Closing.

(d) <u>Benefit Plans</u>. Except as otherwise expressly provided in this Section 4.1, Buyer shall not assume or be responsible for any liability or obligation whatsoever with respect to the Benefit Plans, and Buyer shall provide such benefits to those Seller Employees who become employees of Buyer as of or after the Closing as Buyer, in its sole discretion, shall determine. Seller shall indemnify, defend and hold harmless Buyer from and against any and all liabilities or obligations relating to Seller Employees under the Benefit Plans prior to the Closing, except for those liabilities and obligations assumed by Buyer pursuant to this Section 4.1.

(e) <u>Union Agreement and Union Obligations</u>. Buyer shall not assume the collective bargaining agreement in effect (the "*Union Agreement*") between Seller and the United Paperworkers International Union, Local 1967, or their successors (the "*Paperworkers Union*") and shall have no liability thereunder to Seller or to any Seller Employees for any obligation of Seller under the Union Agreement, including, without limitation, obligations with respect to the payment of wages, pensions or other benefits which may have accrued, vested or been earned prior to the Closing or any other term or condition of employment in effect as of or prior to the Closing relating to employees of Seller covered by the Union Agreement. Seller shall indemnify, defend and hold harmless Buyer from and against all liabilities or obligations (i) accrued by Seller Employees or the Paperworkers Union under the Union Agreement, and (ii) to the extent arising as a result of Seller's conduct or actions, under the National Labor Relations Act or the Labor-Management Relations Act, in each case as of or prior to the Closing.

(f) <u>Severance Benefits</u>.

(i) (A) In the event that Buyer fails to offer employment to more than two hundred and nineteen (219) (the "*Union Severance Target Number*") Seller Employees who are covered by the Union Agreement and are employed by Seller immediately prior to the Closing Date (the "*Union Employees*") (1) to whom Seller is obligated to pay severance pursuant to any severance plans or programs established by Seller in the course of "effects" bargaining with the Paperworkers Union with respect to the Union Employees (collectively, the "*Union Severance Plan*"), and (2) who have not failed a drug test administered by or on behalf of Buyer, Buyer shall reimburse Seller for an amount equal to:

> the product of (x) (a) the actual number of Union Employees not made offers of employment by Buyer to whom Seller is obligated to pay severance and who have not failed a drug-test minus the Union Severance Target Number, divided by (b) the total number of Union Employees to whom Seller is obligated to pay severance under the Union Severance Plan, and (y) the total dollar amount of the cash portion of the severance paid to Union Employees pursuant to the Union Severance Plan;

18

*provided, however,* that in the event Buyer makes offers to Union Employees listed by Buyer as temporary employees on Schedule 4.1(f)(i)(A) to be delivered by Buyer to Seller at Closing ("*Union Temporary Employees*"), and such Union Temporary Employees are terminated by Buyer as a result of outsourcing or relocation of operations or layoffs at the Facility within 18 months following the Closing Date, such Union Temporary Employees shall be treated as not having been offered employment for purposes of this Section 4.1(f)(i)(A) only. Notwithstanding the foregoing, other than Union Temporary Employees who are terminated by Buyer as a result of outsourcing or relocation of operations or layoffs at the Facility within 18 months following the Closing Date, it is understood that Union Temporary Employees shall be treated for purposes of this Section 4.1(f)(i)(A) as having been offered employment.

Notwithstanding the foregoing, in the event that Buyer fails to offer employment in accordance with Section 4.1(f)(i)(B) to Non-Union Employees in a number fewer than the Non-Union Severance Target Number but Buyer fails to offer employment to more Union Employees than the Union Severance Target Number, then the Union Severance Target Number shall be increased by the difference between (x) the Non-Union Severance Target Number and (y) the actual number of Non-Union Employees to whom the Buyer failed to make offers of employment (such difference is referred to herein as the "Excess Non-Union Severance Target Number").

(B)   In the event that Buyer fails to offer employment to more than thirty five (35) (the "*Non-Union Severance Target Number*") Seller Employees who are not covered by the Union Agreement and are employed by Seller immediately prior to the Closing Date (the "*Non-Union Employees*") (1) to whom Seller is obligated to pay severance pursuant to the Champion International Corporation Reorganization Plan #828 as in effect as of the Closing Date ( the "*Non-Union Severance Plan*"), and (2) who have not failed a drug test administered by or on behalf of Buyer, Buyer shall reimburse Seller for an amount equal to:

> the product of (x) (a) the actual number of Non-Union Employees not made offers of employment by Buyer to whom Seller is obligated to pay severance and who have not failed a drug-test minus the Non-Union Severance Target Number, divided by (b) the total number of Non-Union Employees to whom Seller is obligated to pay severance under the Non-Union Severance Plan, and (y) the total dollar amount of the cash portion of the severance paid to Non-Union Employees pursuant to the Non-Union Severance Plan, excluding any "Flex 6" enhanced severance and retirement benefits and any other enhanced pension and retirement benefits payable to such employees;

*provided, however,* that in the event Buyer makes offers to Non-Union Employees listed by Buyer as temporary employees on Schedule 4.1(f)(i)(B) to be delivered by Buyer to Seller at Closing ("*Non-Union Temporary Employees*"), and such Non-Union Temporary Employees are terminated by Buyer as a result of outsourcing or relocation of operations or layoffs at the Facility within 18 months following the Closing Date, such Non-Union Temporary Employees shall be treated as not having been offered employment for purposes of this Section 4.1(f)(i)(B) only. Notwithstanding the foregoing, other than Non-Union Temporary Employees who are

19

terminated by Buyer as a result of outsourcing or relocation of operations or layoffs at the Facility within 18 months following the Closing Date, it is understood that Non-Union Temporary Employees shall be treated for purposes of this Section 4.1(f)(i)(B) as having been offered employment.

In the event that Buyer does not fail to offer employment to more Union Employees than the Union Severance Target Number but Buyer fails to offer employment to more Non-Union Employees than the Non-Union Severance Target Number, then the amount reimbursable by Buyer pursuant to this Section 4.1(f)(i)(B) shall be reduced by an amount equal to:

> the product of (x) the difference between (a) the number of Union Employees not made offers of employment in accordance with Section 4.1(f)(i)(A) and (b) the Union Severance Target Number, and (y) the average cost of severance paid per Union Employee under the Union Severance Agreement.

For purposes of this Section 4.1(f)(i)(B), the average cost of severance paid per Union Employee shall be equal to the total amount of the cash portion of the severance paid to Union Employees pursuant to the Union Severance Plan divided by the total number of Union Employees to whom Seller is obligated to pay severance under the Union Severance Plan

(ii) (A) Seller hereby agrees, subject to the provisions of Section 4.2(f)(i), to pay severance in accordance with the terms of the Union Severance Plan to Union Temporary Employees, if and when the employment of any such Union Temporary Employees is terminated by Buyer to the extent that such terminations occur within 18 months following the Closing as a result of outsourcing or relocation of operations or layoffs at the Facility. The severance benefits to which such Union Temporary Employees would be entitled if terminated within 18 months following the Closing will be equal to the severance benefits such employees would have received in accordance with the Union Severance Plan had they not been offered employment by the Buyer.

(B) Seller further agrees, subject to the provisions of Section 4.2(f)(i), to pay severance in accordance with the terms of the Non-Union Severance Plan to Non-Union Temporary Employees, if and when the employment of any such Non-Union Temporary Employee is terminated by Buyer to the extent that such terminations occur within 18 months following the Closing as a result of outsourcing or relocation of operations or layoffs at the Facility. The severance benefits to which such Non-Union Temporary Employees would be entitled if terminated within 18 months following the Closing will be equal to the severance benefits such employees would have received in accordance with the Non-Union Severance Plan had they not been offered employment by the Buyer.

(iii) Buyer shall reimburse Seller in accordance with this Section 4.1(f) within fifteen (15) days after Seller delivers to Buyer a statement setting forth, in reasonable detail, the reimbursements paid or due and payable, the calculation of such reimbursements in accordance with this Section 4.1(f), the Union Severance Plan and the Non-Union Severance

20

Plan, and other documents, if any, used by Seller in determining the amount of such reimbursements or as reasonably requested by Buyer.

(iv) As soon as practicable after the Closing, but in no event later than 15 days after the Closing, Buyer will provide Seller with (1) the names of all Union and Non-Union Employees to whom Buyer has made offers of employment, (2) the names of all Union and Non-Union Employees who were not made offers of employment, (3) the total number of all Union and Non-Union Employees who failed a drug test and were not made offers of employment, and (4) the names of all Union Employees and Non-Union Employees to whom Buyer made offers of employment and who became Hired Employees. For any Union or Non-Union Temporary Employee whose employment is terminated within 18 months of the Closing as a result of outsourcing or relocation of operations or layoffs at the Facility, Buyer will provide Seller on a confidential basis with the name of each such Temporary Employee within 45 days after such employee's termination of employment with Buyer and whether such Temporary Employee was terminated as a result of outsourcing or relocation of operations or layoffs at the Facility. Buyer will cooperate with Seller to implement the provisions of this Section 4.1(f) by providing Seller with any of Buyer's employment records or other documents requested and needed by Seller to implement the provisions of this Section 4.1(f), provided that Seller obtains from the applicable employee an appropriate authorization and release authorizing Buyer to disclose the requested information to Seller and releasing Buyer from any and all liability associated with such disclosure.

(v) Buyer agrees that:

(A) for a period of six (6) months from and after the Closing Date, Buyer shall not hire any Non-Union Employee not offered employment by Buyer as of the Closing to whom Seller has or is required to pay severance benefits under the Non-Union Severance Plan, including, without limitation, such employees who have received or are eligible to receive "Flex 6" enhanced severance and retirement benefits, unless Buyer reimburses Seller for the amounts paid or payable to such employee under the Non-Union Severance Plan, including the actuarial value of the "Flex 6" enhanced severance and retirement benefits paid or payable to such employee by Seller; and

(B) for a period of six (6) months from and after the date on which a Non-Union Temporary Employee is terminated by Buyer, but in no event later than eighteen (18) months after the Closing Date, Buyer shall not re-hire any such Non-Union Temporary Employee to whom Seller has or is required to pay severance benefits under the Non-Union Severance Plan, including, without limitation, such employees who have received or are eligible to receive "Flex 6" enhanced severance and retirement benefits, unless Buyer reimburses Seller for the amounts paid or payable to such employee under the Non-Union Severance Plan, including the actuarial value of the "Flex 6" enhanced severance and retirement benefits paid or payable to such employee by Seller;

21

provided, however, that both subsections (A) and (B) of this Section 4.1(f)(v) shall apply only in the event that Buyer fails to offer employment in accordance with Section 4.1(f)(i)(B) to Non-Union Employees in a number fewer than the Non-Union Severance Target Number, after taking into account the portion of the Excess Non-Union Severance Target Number actually counted towards the Union Severance Target Number pursuant to Section 4.1(f)(i)(A).

Notwithstanding the above, (x) if Buyer reimburses Seller for an employee in accordance with this Section 4.1(f)(v), the employee for which reimbursement was made shall be treated as having been offered employment for purposes of Section 4.1(f)(i)(B); (y) the provisions of this Section 4.1(f)(v) shall not apply if Buyer hires such Non-Union Employees or rehires such Non-Union Temporary Employees in the event of a strike by the Paperworkers Union; and (z) there shall be no limitation upon Buyer's ability to hire or re-hire any Union Employee to whom Seller has or is required to pay severance benefits.

4.2 Apportionments.

(a) Real Estate Taxes and Assessments.

(i) Real estate Taxes, charges and assessments (on the basis of the actual fiscal years for which such Taxes are assessed) affecting the Facility, personal property Taxes on the other Assets, water and sewer rentals, prepaid license fees and other charges for licenses and permits for the Facility which will remain in effect for Buyer's benefit after Closing which, in each case, are listed on Schedule 4.2 attached hereto, and municipal rubbish removal charges shall be apportioned pro rata between Seller and Buyer on a per diem basis as of the Closing Date, disregarding any penalty assessed prior to the Closing Date or any penalty imposed with respect to Taxes assessed for periods occurring prior to the Closing Date. Seller shall pay all such Taxes, rentals, fees and charges for all years prior to the Closing on or before the Closing Date.

(ii) If the Mill Facility or the Treatment Facility is not separately assessed for real estate Tax purposes as of the Closing Date, the real estate Tax assessment attributable to the Mill Facility or the Treatment Facility, as applicable, shall be deemed to be that portion of the total assessment of the buildings on the larger parcel with which the Mill Facility or the Treatment Facility, as applicable, is assessed which bears the same ratio to such total assessment of buildings as the ground floor area of buildings on the Mill Facility or the Treatment Facility, as applicable, bears to the total ground floor area of buildings on the larger parcel; and that portion of the total assessment of the land constituting the larger parcel with which the Mill Facility or the Treatment Facility, as applicable, is assessed which bears the same ratio to such total assessment of land as the area in the Mill Facility or the Treatment Facility, as applicable, bears to the total land area in the larger parcel.

(iii) If bills for real estate Taxes on the Mill Facility or the Treatment Facility, as applicable, have not been issued as of the Closing Date, and if the amount of real estate Taxes of the then current Tax fiscal year is not then known, the apportionment of real estate Taxes shall be made at Closing on the basis of the prior year's real estate Taxes. After

22