**EXHIBIT 10**

DETERMINATION OF ADMINISTRATOR

Sale of Hamilton B Street Mill

Robert Florio, acting as Administrator of Champion International Corporation Reorganization Severance Policy #828, makes the following determination. This determination is made under the authority of the Administrator to "determine all questions of eligibility" and "to interpret the provisions of the Policy" as provided in Section 10 of Champion International Corporation Reorganization Severance Policy #828 ("Policy 828").

Background

International Paper Corporation ("IP") has entered into a contract for the sale of the Hamilton B Street mill (the "Mill"). The Mill was a facility of Champion International Corporation ("Champion") which has been merged into IP.

The contract for sale of the Mill provides that the buyer, Smart Papers, LLC (the "Buyer") will make offers of employment to certain of the current employees at the Mill. Other employees at the Mill will not be offered employment by the Buyer.

IP has requested that the Administrator determine the application of Policy 828 to employees of the Mill in connection with the sale. This request was made to allow communication with employees as to their benefits under Policy 828.

The Administrator understands that IP has communicated with employees about the potential application of Policy 828. These statements were made prior to the appointment of the Administrator. Therefore, the Administrator is making this determination without regard to the prior statements made to employees of the Mill, although the Administrator believes that the determination is consistent with the prior communications.

Considerations

The Administrator has evaluated the terms of Policy 828 and the underlying rationale for Policy 828. The Administrator has also consulted with counsel about the interpretation of Policy 828 as applied to the sale of the Mill.

The stated purpose of Policy 828 is to provide severance and other benefits to employees whose "employment is Terminated as a result of Reorganization". Policy 828, Section 2. Under Policy 828, "Reorganization" has a specific definition as follows.

> "Reorganization consists of employment action(s) resulting in an Eligible Employee's Termination during the Policy Period". Policy 828, SPD Section 1.12.

IPD300271

For a "Reorganization" to occur that triggers the application of Policy 828, there are two elements. First, the employee must suffer an "employment action". Second, there must be a Termination.

The phrase, "employment action", is not defined in Policy 828. Therefore, the term must be interpreted in light of the purposes of Policy 828 and ordinary usage. In ordinary usage, "employment action" carries the connotation of an action by an employer that has an adverse effect on an employee. If the employee is able to continue in the same position under the same working conditions, there is no adverse effect on the employee. This interpretation of the term is consistent with the purpose of Policy 828 to protect employees who are adversely affected by a change in their employment.

The second element is a "Termination" must occur. It is clear that Policy 828 was not intended to cover every situation in which an employee ceases to work for the Company after the Merger. The definition of "Termination" requires a "termination by the Company of the employment of an Employee". Policy 828, SPD Section 1.14(a). The definition also includes an example of how Policy 828 is to be interpreted. The SPD notes that a transfer to another subsidiary of International Paper Company is not a Termination (unless it involves a relocation of the principal place of employment). Policy 828, SPD Section 1.14(a).

The Administrator notes that the definitions of Reorganization and Termination are only in a summary plan description. A summary plan description may not contain all of the terms of a plan. As with any summary plan description, there may be a need to interpret the plan on matters that are not specifically dealt with in the plan or summary plan description. The sale of the Mill with an offer of continued employment from the buyer is a matter that is not specifically dealt with in Policy 828 or the SPD. Therefore it is an appropriate subject of interpretation by the Administrator.

Determination

Based on this analysis, the Administrator makes the following determinations with respect to Policy 828 as it applies to the sale of the Mill:

1. The sale of the Mill is an event that may trigger the application of Policy 828 to employees at the Mill.

2. If an employee at the Mill does not receive an offer of continued employment from the Buyer, the employee will be entitled to benefits under Policy 828.

3. If an employee at the Mill receives an offer of continued employment from the Buyer at the same or higher salary as previously paid by Champion and accepts the offer, there is not an "employment action" with respect to the employee. Therefore, the employee will not be eligible for benefits under Policy 828.

2

IPD300272

4.  If an employee receives an offer of employment as described in paragraph 3 and the employee chooses not to accept the offer of employment from the Buyer, the termination of employment would be a voluntary termination by the employee for purposes of Policy 828. The employee is not entitled to severance after a voluntary termination (except in limited circumstances not applicable to this situation). Therefore, the employee will not be eligible for benefits under Policy 828.

5.  If an employee at the Mill receives an offer of continued employment from the Buyer at a lower salary than previously paid by Champion or which requires relocation (based on a thirty-five mile standard), the employee will be eligible for benefits under Policy 828 if the employee does not accept the job with the Buyer.

Dated: March 12, 2001

*[signature]*
Robert Florio
Administrator of the Champion
International Corporation
Reorganization Severance Policy #828

\\TAX\81897.2

IPD300273

3



# INTERNATIONAL PAPER

May 15, 2001

Mr. Scott D. Dalesandro
3465 Lakebrook Court
Hamilton, OH 45011

Re: Claim under Champion International Corporation Reorganization Severance Policy #828

Dear Mr. Dalesandro:

I have received and reviewed your claim for benefits under Champion International Corporation's Reorganization Severance Policy #828 (the "Policy" or the "Plan").

Section 10 of the Policy gives the Plan's Administrator authority, responsibility, and discretion to interpret the Policy and to determine all questions of eligibility and status. I have reviewed the details of the sale of the Hamilton B Street Mill to Smart Papers, LLC. I have also been advised that you were offered and accepted a position to continue employment at the Hamilton Mill at the same or higher salary. Based on these and other facts, I have made the following determination on the application of the Policy to your claim.

The stated purpose of the Policy is to provide severance and other benefits to employees whose "employment is Terminated as a result of Reorganization." (Policy 828, Section 2). "Reorganization" and "Termination" are defined terms under the Plan. A Reorganization consists of "employment action(s) resulting in an Eligible Employee's Termination during the Policy Period." While the phrase "employment action" is not expressly defined in the Policy, read in context the term connotes an action by an employer having the specific adverse effect of terminating the employee's employment. Employees who are able to continue their employment at substantially the same salary suffer no such adverse action and, accordingly, neither the plain language nor the purpose of Policy 828 provides for payment of severance benefits to such employees.

The Plan's definition of "Termination" also demonstrates an intent to exclude employees who retain their employment following a merger or asset sale. Subpart (a), which applies to terminations by the Company, provides that "it shall not be deemed a termination of employment if after the Merger the Employee is transferred to the employment of International Paper Company or a subsidiary thereof..." (SPD Section 1.14 (a)). While the Plan does not address subsequent corporate transactions during the policy period, by expressly excluding employees who obtained employment with International Paper as a result of the merger that gave rise to the creation of the Plan, the summary plan description shows that the Plan's purpose is to compensate employees for an expected period of unemployment or other adverse employment consequence, not to provide benefits to employees suffering only a change in the identity of their employer but no loss of continued employment.

IPD300106

Other Plan provisions lead to this conclusion as well. As part of the sale of the business as a "going concern," a substantial majority of non-union employees were offered (and almost all accepted) employment with Smart Papers. Yet the Plan provides Outplacement Assistance benefits to covered employees. Employees accepting continued employment in full-time positions at the Hamilton Mill, however, have no need for such services. (SPD, Section 7.5). The Plan also provides for continued Employee and Family Assistance Program coverage for covered employees, presumably to help such employees cope with the stress of unemployment. Of course, employees who suffer no loss in continued employment are unlikely to require such assistance.

Additionally, the Plan provides for a lump-sum payment for banked, earned, and accrued vacation. (SPD, Section 7.1). When Smart Papers purchased the Hamilton Mill as a "going concern," however, the purchase agreement required Smart Papers to honor earned and accrued vacation for employees it retained following the sale. Providing benefits under Policy 828 to such employees would thus result in a windfall payment inconsistent with the Plan's purpose to provide benefits only to the extent of loss of continued employment at the Mill. Finally, the Plan provides for financial and retirement planning assistance, which International Paper and Champion have generally only provided to employees suffering loss of continued employment.

For all the reasons discussed above, because you received and accepted an employment offer from Smart Papers to continue working at the same or higher salary, you are not entitled to receive benefits under Policy 828. This conclusion is consistent with the past practices of both Champion International and International Paper in not providing severance benefits under the circumstances presented by your claim.

The Policy provides you with the right to request a review of this denied claim, to review pertinent documents and to submit any comments in writing. Any request must be submitted within 60 days of your receipt of this letter to:

> Paul Karre
> Vice President, Human Resources
> International Paper
> 6400 Poplar Ave.
> Memphis, TN 38197

Sincerely,

*Robert Florio*

Robert Florio
Director, Employee Benefits



# INTERNATIONAL PAPER

May 18, 2001

Ms. Diane J Noonan
260 South Washinton Blvd
Hamilton, OH 45013

Re: Claim under Champion International Corporation Reorganization Severance Policy #828

Dear Ms. Noonan:

I have received and reviewed your claim for benefits under Champion International Corporation's Reorganization Severance Policy #828 (the "Policy" or the "Plan").

Section 10 of the Policy gives the Plan's Administrator authority, responsibility, and discretion to interpret the Policy and to determine all questions of eligibility and status. I have reviewed the details of the sale of the Hamilton B Street Mill to Smart Papers, LLC. I have also been advised that you were offered and accepted a position to continue employment at the Hamilton Mill at the same or higher salary. Based on these and other facts, I have made the following determination on the application of the Policy to your claim.

The stated purpose of the Policy is to provide severance and other benefits to employees whose "employment is Terminated as a result of Reorganization." (Policy 828, Section 2). "Reorganization" and "Termination" are defined terms under the Plan. A Reorganization consists of "employment action(s) resulting in an Eligible Employee's Termination during the Policy Period." While the phrase "employment action" is not expressly defined in the Policy, read in context the term connotes an action by an employer having the specific adverse effect of terminating the employee's employment. Employees who are able to continue their employment at substantially the same salary suffer no such adverse action and, accordingly, neither the plain language nor the purpose of Policy 828 provides for payment of severance benefits to such employees.

The Plan's definition of "Termination" also demonstrates an intent to exclude employees who retain their employment following a merger or asset sale. Subpart (a), which applies to terminations by the Company, provides that "it shall not be deemed a termination of employment if after the Merger the Employee is transferred to the employment of International Paper Company or a subsidiary thereof..." (SPD Section 1.14 (a)). While the Plan does not address subsequent corporate transactions during the policy period, by expressly excluding employees who obtained employment with International Paper as a result of the merger that gave rise to the creation of the Plan, the summary plan description shows that the Plan's purpose is to compensate employees for an expected period of unemployment or other adverse employment consequence, not to provide benefits to employees suffering only a change in the identity of their employer but no loss of continued employment.

IPD301395

Other Plan provisions lead to this conclusion as well. As part of the sale of the business as a "going concern," a substantial majority of non-union employees were offered (and almost all accepted) employment with Smart Papers. Yet the Plan provides Outplacement Assistance benefits to covered employees. Employees accepting continued employment in full-time positions at the Hamilton Mill, however, have no need for such services. (SPD, Section 7.5). The Plan also provides for continued Employee and Family Assistance Program coverage for covered employees, presumably to help such employees cope with the stress of unemployment. Of course, employees who suffer no loss in continued employment are unlikely to require such assistance.

Additionally, the Plan provides for a lump-sum payment for banked, earned, and accrued vacation. (SPD, Section 7.1). When Smart Papers purchased the Hamilton Mill as a "going concern," however, the purchase agreement required Smart Papers to honor earned and accrued vacation for employees it retained following the sale. Providing benefits under Policy 828 to such employees would thus result in a windfall payment inconsistent with the Plan's purpose to provide benefits only to the extent of loss of continued employment at the Mill. Finally, the Plan provides for financial and retirement planning assistance, which International Paper and Champion have generally only provided to employees suffering loss of continued employment.

For all the reasons discussed above, because you received and accepted an employment offer from Smart Papers to continue working at the same or higher salary, you are not entitled to receive benefits under Policy 828. This conclusion is consistent with the past practices of both Champion International and International Paper in not providing severance benefits under the circumstances presented by your claim.

The Policy provides you with the right to request a review of this denied claim, to review pertinent documents and to submit any comments in writing. Any request must be submitted within 60 days of your receipt of this letter to:

> Paul Karre
> Vice President, Human Resources
> International Paper
> 6400 Poplar Ave.
> Memphis, TN 38197

Sincerely,


Robert Florio
Director, Employee Benefits

IPD301396

 **INTERNATIONAL PAPER**

PAUL J. KARRE
VICE PRESIDENT
HUMAN RESOURCES

6400 POPLAR AVENUE
MEMPHIS, TN 38197
PHONE 901 763 7667
FAX 901 763 6356

December 7, 2001

<u>Via Facsimile to:</u>
Theresa L. Groh, Esq.
Murdock Goldenberg Schneider & Groh
700 Walnut Street, Suite 400
Cincinnati, Ohio 45202-2011
Fax: (513) 345-8294

Re: Claims under Champion International Corporation Reorganization Severance Policy # 828

Dear Ms. Groh:

I have received and reviewed the appeal for benefits you have filed under Champion International Corporation's Reorganization Severance Policy #828 ("the Policy" or "the Plan") on behalf of Stuart Cooper, Jr., Scott Dalesandro, Janet Dempsey, Jennifer Hobbs, Joseph Keating, Diane Noonan, Julie Smith, and Donna Theobald. For the reasons discussed below, I have concluded that Plan Administrator Robert Florio correctly denied your clients' claims for benefits.

Your letter begins by asserting that Mr. Florio violated your clients' right to due process by denying certain information requests. I have reviewed both your requests and the information Mr. Florio provided to you. It appears that many of your requests are based on recent changes to the law that are not applicable to your clients' claims. Additionally, your letter mischaracterizes the position Mr. Florio has taken in response to several of your information requests. Rather than recount that position here, I will simply refer you back to Mr. Warner's July 30, 2001 and September 18, 2001 correspondence to you. Based on my review of that correspondence, I believe you have been provided with all the documents to which your clients are presently entitled.

You next assert that "there is substantial evidence that the Administrator's determinations and denial of benefits was tainted by self-interest and that he operated under a conflict of interest." In support of this assertion, you speculate that, because of Mr. Florio's position with the company, he had a "financial incentive to deny benefits and promote the interests of the Company at the expense of the interests of its employees." I am not aware of any such financial incentive provided by the Company either to Mr. Florio or myself, nor am I aware of any actual evidence of bias on his part. Moreover, although you attempt to bootstrap your claim that your clients' information requests were improperly denied into evidence of alleged bias, because Mr. Florio produced all documentation that he was required to produce, I do not believe his response to your information requests supports your claim of bias in any way.

On this point, your letter not only mischaracterizes Mr. Florio's responses to your information requests, but it also demonstrates strained logic at points. To take but one example of the first point, you assert that "[t]he Administrator refused to provide any information or response to Claimants' June 5, 2001 Requests relating to the appointment of the Plan Administrator." Yet Mr. Warner's July 30th correspondence enclosed the Appointment of Administrator for Champion International Corporation Reorganization Severance Policy No. 828, which to my knowledge was the only document evidencing that appointment.

IPD301097

Theresa Gron
Page 2

Additionally, as to the second point, you reason that because you requested information relating to calculations of the cost of paying the benefits at issue and no such documents were provided to you, the Administrator must have intentionally kept those documents from you because they would evidence a conflict of interest. Yet this argument assumes both that such calculations were made and that Mr. Florio ever sought to review such calculations. Both assumptions are erroneous. My review of Mr. Florio's determinations shows that he based his determinations on the language and intent of the Plan as well as his understanding – based on conversations he had with Champion representatives – of the company's past practice when confronting similar circumstances under other severance plans. I have not found any evidence that Mr. Florio based his decision on – or even considered – the costs to International Paper of paying benefits to your clients or other claimants.

Your appeal next takes issue with the Administrator's exercise of his discretion in interpreting the Plan. Although you assert that the Plan's unambiguous terms leave no questions concerning your clients' eligibility for benefits, I respectfully disagree. While your appeal correctly points out that Smart Papers is not a subsidiary of International Papers, this misses the point. The Plan nowhere expressly states what result should obtain if employees receive continued employment at the Mill following a merger or asset sale after the initial merger between Champion and International Paper that gave rise to the Plan's creation. Consequently, the Administrator had to interpret—based on the Plan's definition of "Termination" in Section 1.14 and other Plan provisions—whether employees offered continued employment as a result of such mergers or sales were intended to be covered by the Plan. Because the Plan expressly excluded employees who were offered continued employment as a result of the Champion-International Paper merger that gave rise to the Plan's creation (see Section 1.14(a), which provides that "it shall not be deemed a termination of employment if after the Merger the Employee is transferred to the employment of International Paper Co. or a subsidiary thereof . . . ."), the Administrator fairly determined that employees who were offered continued employment in later transactions similarly involving continued employment were not intended beneficiaries of the Policy.

Notwithstanding your assertions to the contrary, this interpretation is not only consistent with the Plan's definition of "termination" in Sections 1.14(a) and 1.14(b), but it is also consistent with the Plan's stated purpose and other Plan provisions. The Policy's stated purpose is to provide severance and other benefits to employees whose "employment is terminated as a result of Reorganization," which is defined to mean "employment action(s) resulting in an Eligible Employee's Termination during the Policy Period." Because your clients were offered continued employment, they have not suffered any such employment action. Based on my knowledge of Champion's and International Paper's practices as well as my (and the Plan Administrator's) conversations with representatives of each company, this determination is consistent with the companies' past practices under similar circumstances.

Your letter disputes the Administrator's interpretation of the Plan's purpose by claiming that the purpose of Policy 828 was not to compensate employees who lose their employment at the Mill within one year as a result of the Champion-International Paper merger, but rather to "reward" them "for their many years of service" and "entice them to stay with a reorganized company" through International Paper's sale of the Mill to Smart Papers. But if your interpretation were correct and Policy 828 was intended simply as a reward for years of service to Champion, it would make little sense for the drafters to include a provision allowing the Plan to be terminated or amended after one year without restriction. Moreover, you have presented no evidence – nor am I aware of any evidence – that International Paper was even contemplating a subsequent sale of the Mill when Policy 828 was put in place. Accordingly, it makes little sense to ascribe to the drafters a purpose of "entic[ing] [employees] to stay with a reorganized company . . . through International Paper's sale of the Mill to Smart Papers."

Moreover, as noted in the Administrator's determination, the Policy provides for outplacement benefits, EAP benefits to help severed employees cope with the stress of unemployment, financial and retirement assistance which is generally offered in circumstances such as these only to employees suffering loss of continued employment, and a lump-sum payment for banked, earned, and accrued vacation.

IPD301098

Page 3

These benefits clearly show the Plan was designed to help employees with issues associated with unemployment, not to provide a windfall for employees who suffer no loss of continued employment. On this latter point, it is again worth noting that Smart Papers and International Paper agreed that employees' earned accrued vacation would be honored by Smart Papers. Accordingly, employees who received both a lump-sum payment for such vacation and the ability to take such vacation at Smart Papers would, in fact, receive a windfall benefit. Based on this and the other language in the Plan discussed above, I do not believe the Administrator erred in finding that the Plan's purpose was to compensate employees who lose their employment at the Mill within one year as a result of the Champion-International Paper merger. Because your clients did not lose their continued employment at the Mill, the Administrator properly denied their claim for benefits.

Your appeal also takes issue with the Administrator's reliance on "extraneous information" such as the terms of the asset sale between International Paper and Smart Papers and the past practices of Champion and International Paper in administering severance plans under similar circumstances. Once again, though, the main reason you cite as to why such reliance was improper is that you were allegedly denied access to information you requested concerning these issues. My review of the documents produced to you by the Administrator, however, shows that you were provided all relevant documents concerning the terms of the sale between International Paper and Smart Papers that were relied upon by the Administrator. And, as to the past practices of Champion and International Paper in administering severance plans, both the Administrator's understanding of these past practices and my own understanding are based on our personal knowledge of the companies' experiences and on conversations we have had with company officials. Because the Administrator did not deem it necessary to gather documentation of these practices in making his determinations, no such documentation was provided in response to your requests.

The fifth major argument raised in your appeal expresses your belief that the Administrator improperly amended the Plan in contravention of Section 9, which provides that the Plan may not be terminated or amended in a way that adversely affects an Eligible Employee's rights, expectancies or benefits for one year immediately following the Champion-International Paper merger. Here, though, the Plan Administrator in no way terminated the Plan, nor did he amend the Plan. Rather, as discussed above, the Administrator exercised his power to interpret the Plan—a power that is clearly granted to him by Section 10—to determine that your clients are not Eligible Employees as that term is used in the Policy. Because the Administrator's exercise of his power to interpret the Plan was entirely consistent with his obligation not to terminate or adversely amend the Plan under Section 9, his decision should be affirmed.

Your appeal goes on to recite a host of alleged representations and purported facts that you believe further entitle your clients to severance benefits under Policy 828. However, your appeal does not present, nor am I aware of, any representations made by anyone acting on behalf of the Plan or in their capacity as Plan Administrator that would have the effect of modifying the Plan's terms or requiring an interpretation of the Plan that is different from the one adopted by Mr. Florio. Additionally, many of the facts you recite focus on the reduction in benefits your clients suffered as a result of continuing their employment with Smart Papers. As at-will employees of International Paper prior to the sale, however, your clients' benefits were subject to change regardless of any sale of the Hamilton Mill, and nothing in the Plan's definition of "termination" makes a reduction in benefits a qualifying event under the Plan.

Your appeal also complains generally that the Administrator arbitrarily applied Policy 828. In support of this assertion, you claim that there are salaried employees who were not hired by Smart Papers and received full severance benefits. This, however, is entirely consistent both with the Plan's language and with the Administrator's interpretation of the Policy as applied to your clients' claims, as these employees would have suffered loss of continued employment at the Mill during the Policy's one-year policy period. You next point out that some employees were given the opportunity to inform Smart Papers that they did not want a job offer so they could elect to receive severance benefits under Policy 828.

IPD301099

Page 4

Once again, though, I am not aware of any such representations being made by someone with authority to interpret, administer, or act on behalf of the Plan, nor do such representations, if made, require a different interpretation or application of the Plan. Next, you allege that some employees were hired by Smart Papers and still received full severance benefits. I am not aware of any employee, however, who received continued employment with Smart Papers through the policy period and who also received severance benefits under Policy 828. However, if an employee initially received continued employment by Smart Papers but was later involuntarily terminated within the one-year policy period, the employee likely did qualify for benefits. Again, however, this is consistent with both the Plan's language and the Administrator's interpretation of the Policy as applied to your clients' claims, as your clients suffered no loss of continued employment during the one-year policy period.

Your letter also claims that some employees who were hired by Smart Paper quit their employment and still received full severance benefits. I am not aware of any employee, however, who received benefits as a result of voluntarily resigning his or her employment with Smart Papers.

I understand and sympathize with the stress and concern your clients may have experienced in connection with the sale of the Hamilton Mill. For all the reasons discussed above, though, your clients are not entitled to receive benefits under Policy 828. Accordingly, their appeal of Mr. Florio's determinations must be denied.

Sincerely,

Paul J. Karre
Vice President, Human Resources

IPD301100